## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

### Baltimore Division

Heaven White, individually and on
behalf of her three minor children,
D.C. and K.C. and H.C.
1164 Frederick Douglas Street
Annapolis, Maryland 21403
Anne Arundel County,

**Civil Action No. 1:19-cv-01442-CCB**

Nashell Smith, individually and on
behalf of her three minor children,
D.E.P. and D.X.P. and M.P.
813 Betsy Court
Apartment B
Annapolis, Maryland 21401
Anne Arundel County,

**JURY TRIAL DEMANDED**

Nicole Clark, individually and on
behalf of her two minor children,
T.L. and N.C.
813 Betsy Court
Apartment A
Annapolis, Maryland 21401
Anne Arundel County,

Tyneice Holliday, individually and on
behalf of her three minor children,
D.R. and A.H. and E.D.
808 Brooke Court
Apartment B
Annapolis, Maryland 21401
Anne Arundel County,

LaDawn Camp, individually and on
behalf of her one minor child,
A.R.
801 Brooke Court

Apartment C
Annapolis, Maryland 21401
Anne Arundel County,

Tiamani Johns, individually and on
behalf of her one minor child,
N.J.
1125 Madison Street
Apartment B3
Annapolis, Maryland 21403
Anne Arundel County,

Jonathan and Breonna Dixon,
individually and on behalf of their two
minor children,
B.J.D. and A.A.D.
1324 Maryland Avenue
Johnstown, Pennsylvania 15906,

D'Andre Covert
1164 Frederick Douglas Street
Annapolis, Maryland 21403
Anne Arundel County,

Glenn Rogers
701 Glenwood Street
Apartment 616
Annapolis, Maryland 21401
Anne Arundel County,

Lakisha Fuller, individually and on
behalf of her two minor children,
M.D. and O.D.
1432 Tyler Avenue
Annapolis, Maryland 21403
Anne Arundel County,

    Plaintiffs,

v.

The City of Annapolis by and through
the City Council
A municipal corporation
160 Duke of Gloucester Street
Annapolis, Maryland 21401
Anne Arundel County,

Gavin Buckley as Mayor of the City of
Annapolis
160 Duke of Gloucester Street
Annapolis, Maryland 21401
Anne Arundel County,

Housing Authority of the
City of Annapolis,
A public body corporate and politic
1217 Madison Street
Annapolis, Maryland 21403,

Beverly Wilbourn as Executive
Director of the
Housing Authority of the
City of Annapolis
1217 Madison Street
Annapolis, Maryland 21403,

Defendants.

## AMENDED COMPLAINT

COMES NOW, before this Honorable Court, your Plaintiffs by and through

counsel, P. Joseph Donahue and Wise & Donahue, PLC, and Kathleen M. Hughes,

Lisa Marie Sarro, and the Office of Maryland Legal Aid attorneys, hereby sue the

Defendants, and as grounds therefore state as follows:

## NATURE OF ACTION

Plaintiffs are primarily African American[1] residents of housing developments owned and operated by the Housing Authority of the City of Annapolis ("HACA" or the "Housing Authority").  This action challenges the ongoing discriminatory policies of the City of Annapolis and the officials of the City to forego their statutory obligation to inspect and license the leased properties owned by the Housing Authority.  It further challenges the long-standing pattern and practice of preventing African American and other Black persons from residing in predominantly White communities of Annapolis, and furthering policies of racial segregation, thereby perpetuating not only the exclusion of minorities from the overwhelmingly White City of Annapolis, but also the pattern of racial housing segregation in Annapolis generally, which has, for decades, officially and unofficially acknowledged the significant presence of racial segregation.  By these and other illegal and discriminatory acts, the Defendants have continued the City's tradition of perpetuating violations of Plaintiffs' rights under the Fair Housing Act as amended, 42 U.S.C. § 3601, *et seq.;* the Civil Rights Act of 1866, 42 U.S.C. §§ 1982, 1983,

---

[1] With reference to the racial makeup of the individuals concerned in this action, the term "African American" is primarily used throughout instead of the term "Black." The determination of how to refer to an African American or Black individual should be left to the individual.  However, it is a foundational allegation in this Complaint that the City of Annapolis has consistently mistreated its population of African American residents since the end of African slavery.  It is the decision of Plaintiffs to be referred to as such for this matter.

1985, and 1986; the Equal Protection clause of the Fourteenth Amendment to the United States Constitution; the "affirmatively furthering" obligations of the Fair Housing Act, 42 U.S.C. § 3608; and the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq*, in addition to violations of the Maryland Consumer Protection Act, as well as other State causes of action.

## JURISDICTION AND VENUE

1.      This civil action arises under the laws of the United States of America. This Court has original jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory relief), and 42 U.S.C. § 3613 (Fair Housing Act, private right of action for damages and injunctive relief).

2.      Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the claims brought under Maryland law because they are related to Plaintiffs' federal claims and arise out of a common nucleus of related facts.

3.      Venue herein is proper under 28 U.S.C. §§ 1391 (b)(1) and (2). Plaintiffs all reside or resided in the City of Annapolis, Anne Arundel County, Maryland. Defendants City of Annapolis, Mayor Gavin Buckley, Aldermen and Alderwomen of the City of Annapolis, Beverly Wilbourn, Director, Housing Authority of the City of Annapolis, and the Housing Authority of the City of Annapolis all maintain their principal place of business in the City of Annapolis,

Anne Arundel County, Maryland; the events or omissions giving rise to the claim occurred in this district and division.

## PARTIES

### Plaintiffs

**Newtowne Twenty Residents**

4.     Plaintiff Nashell Smith ("Ms. Smith") is an African American woman. She and her three minor children live at 813 Betsy Court, Apartment B, an apartment in Newtowne Twenty.

5.     Plaintiff Nicole Clark ("Ms. Clark") is an African American woman. She and her two minor children live at 813 Betsy Court, Apartment A, an apartment in Newtowne Twenty.

6.     Plaintiff Tyneice Holliday ("Ms. Holliday") is an African American woman.  She and her three minor children live at 808 Brooke Court, Apartment B, an apartment in Newtowne Twenty.

7.     Plaintiff LaDawn Camp ("Ms. Camp") is an African American woman. She and her minor child live at 801 Brooke Court, Apartment C, an apartment in Newtowne Twenty.

**Harbour House Residents**

8.     Plaintiff Tiamani Johns ("Ms. Johns") is an African American woman. She and her minor child live at 1125 Madison Street, Apartment B3, an apartment in Harbour House.

9.     Plaintiffs Jonathan and Breonna Dixon ("the Dixons") lived at 960 President Street, Apartment B3, in HACA's Harbour House Property.  Ms. Dixon and her two minor children are African American.

**Eastport Terrace**

10.    Plaintiff Heaven White ("Ms. White") is an African American woman. She and her three minor children live at 1164 Frederick Douglas Street, a townhouse in Eastport Terrace.

11.    Plaintiff D'Andre Covert ("Mr. Covert") is an African American man, and the adult child of Plaintiff Heaven White.  He lives at 1164 Frederick Douglas Street, a townhouse in Eastport Terrace.

**Morris H. Blum Senior Apartments**

12.    Plaintiff Glenn Rogers ("Mr. Rogers") is an African American man.  He has lived at 701 Glenwood Street in Apartment 502 and now lives in Apartment 616 located at the Morris H. Blum Senior apartments.

**Robinwood**

13.    Plaintiff Lakisha Fuller ("Ms. Fuller") is an African American woman. She lives at 1432 Tyler Avenue with her two minor children.

**Defendants**

14.    Defendants City of Annapolis by and through the Aldermen and Alderwomen of the Annapolis, duly elected members of the City Council in their official capacities.

15.    Defendant Gavin Buckley, duly elected Mayor and City Official of the City of Annapolis.

16.    Defendant Beverly Wilbourn, Executive Director of the Housing Authority of the City of Annapolis.

17.    The Housing Authority of the City of Annapolis ("HACA"), a "public body corporate and politic that: (1) exercises public and essential governmental functions; and (2) has all the powers necessary or convenient to carry out the purposes of this Division II."[2]

18.    The Housing Authority of the City of Annapolis Board of Commissioners ("Board of Commissioners").   HACA and the Board of Commissioners are referred to herein collectively as "HACA."

---

[2] Md. Code Ann., Hous. & Comty Dev. §13-103.

## FACTUAL AND HISTORICAL BACKGROUND

### Historical Treatment of African Americans by the City of Annapolis

19.     Throughout its nearly 370-year history, Annapolis has been home to many people of African descent.  However, the roots of that bond forever endure as a stain on the fabric of the City, the State of Maryland, and that of the United States as a whole.

20.     The historical record is clear: Annapolis was integral in the perpetuation of the African slave trade, which resulted in the subjugation of newly imported Africans to white slaveholders.  Those slaves populated plantations throughout Maryland and its surrounding states and provided free labor to an adolescent country.   As policy, Annapolis facilitated the slave trade for over a century, its harbor an auction block, which served as a stepping stone to lifetimes of bondage for hundreds of thousands of human beings.

21.     Slavery was practiced in Maryland for nearly 200 years before its abolition by the Maryland Legislature in April 1864.  Following Emancipation, and during the early part of Reconstruction, the population of former slaves and other African descendants in Maryland's Capital remained segregated.  However, despite obtaining citizenship through passage of the 14th Amendment in 1868, these former African slaves remained subject to the indignities and disparate treatment of Jim Crow racism for much of the next century.

22.    To protect and bolster their community, much of the African American population in Annapolis settled into an area that had been redistricted by the City in 1914 and was known then as the 4th Ward (the "Old 4th Ward").  The Old 4th Ward was located on the western side of the City of Annapolis, only a short walk from the State House and the Governor's Mansion.  It is highlighted in Figure 1 *infra*.  By the mid-1940s the Old 4th Ward had become a self-contained community of primarily African American residents, and was home to bars, lunchrooms, supper clubs, churches, a theater, and the Dixie Hotel, which was home to live music and entertainment.  The rich culture of the Old 4th Ward, located in the shadow of the State House, was created by its African American population through resilience, hard work, patience, and a determination to overcome the obstacles of racial animosity still much a part of daily life in the early 20th century.  The Old 4th Ward was regularly represented on the City Council by duly elected African American community leaders.

23.    The culture, establishments, and nightlife of the Old 4th Ward were shared and enjoyed by more than just the African American residents of the City. The vibrant community attracted the majority White citizenry of Annapolis, the all-White Naval Academy midshipmen, the all-White naval officers stationed in the City, as well as legislators from all over the State who traveled to and often resided full-time in the State's Capital.

## Federal Programs Bring Change to the City

24.    Housing authorities in the United States were initially brought about through New Deal legislation in the 1930s.  The legislation sought to eliminate slum-like conditions throughout the country, while in turn creating thousands of construction jobs for unemployed Americans of all racial backgrounds.  At that time, only a few generations removed from the horrors of slavery, African American families benefited greatly from those various Acts, and in addition to receiving jobs, many African Americans were provided clean homes for the first time since bondage.  The Housing Authority of the City of Annapolis was founded in 1937 and sought to take advantage of the newly available federal development funds.

25.    From the beginning, HACA sought to provide affordable housing to any Annapolis citizens in need.  However, segregation persisted.  The first properties under the management of HACA were Bloomsbury Square with its Caucasian occupants, and College Creek Terrace, occupied by African Americans.   Both properties were in the Old 4th Ward.  HACA would not desegregate these housing developments until the mid-1960s.

26.    The 1950's brought continued growth to Annapolis, and with expansion in utility services, the City's boundaries had begun to grow.  The City passed legislation, which caused the boundaries of the Old 4th Ward to be subsumed by Ward 2 as it exists today.  The African American community persisted against the

encroaching tide.  However, the 1960's policies of urban renewal devastated the neighborhood, destroying nearly all of its 33 businesses.  Eminent domain policies led to the demolition of numerous homes in the almost entirely African American Old 4th Ward areas, which displaced 237 families.  Bulldozers leveled the community almost entirely.  The result was a housing crisis for the African American community in Annapolis.

27.  Contemporaneously with the reorganization of the Old 4th Ward, which historically had been represented on the City Council predominantly by African Americans from the community, was a shift in its representation at the City Council level.  Today, Ward 2 is represented by predominantly White Alderpersons, while Ward 4 and Ward 6 – the Wards which are home to the majority of HACA units in the areas that received an influx of the displaced citizens as a result of urban renewal – are represented by African Americans.[3]

28.  As the Civil Rights movement was taking hold across the nation, the City of Annapolis, in cooperation with HACA, moved its African American residents away from the City center.  These residents were provided public housing units, and many, then stripped of their livelihood, were congregated into dense

---

[3] Exhibit A is a current map of the City of Annapolis Wards.  Lest there be any confusion about whether or not Ward 6 was drawn specifically to marginalize African Americans, the Robinwood neighborhood was carved out of Ward 5, and is circled in red.

developments scattered miles from employment opportunities and without a viable public transportation system.  Given no alternative, the once vibrant community was decimated, and its population crammed into public housing against their will.  The African American residents of Annapolis have never recovered from the 1960's urban renewal policies of the City of Annapolis.[4]

### The HACA Properties Today

29.    HACA now manages approximately 790 apartments spread over six (6) developments, which are home to approximately 1,600 residents.  As illustrated in Figure 1 *infra*, and highlighted in yellow, there are six remaining developments:

    a.  Bloomsbury Square – Rebuilt in 2003, this is HACA's newest property, and it consists of 51 units;

    b.  Harbour House – Constructed in 1964, is comprised of 273 units;

    c.  Eastport Terrace – Constructed in 1953, is HACA's oldest property and is comprised of 84 units.  Eastport Terrace and Harbor House share a property line, and the residents share the same recreational facilities;

---

[4]  Sources of information relating to the urban renewal policies of the City of Annapolis are difficult to access without significant effort.  One article from The Washington Post dated June 3, 1979 relays in fine detail the devastation of those policies and the aftershocks still felt approximately a decade after the decimation of the Old 4th Ward.  *The Annapolis Land Grab*, Wash. Post, June 3, 1979, *available at* https://www.washingtonpost.com/archive/lifestyle/magazine/1979/06/03/the-annapolis-land-grab/435030bc-7355-475c-a3ab-77b80e0bfeb5/?utm_term=.ba1de6aa58c9.

d.  Morris H. Blum Senior Apartments – Constructed in 1976, are HACA's only dedicated units for the elderly and disabled, and require tenants be 55-years-old (or 50-years-old if disabled) to apply;

e.  Robinwood – Constructed in 1970 is comprised of 150 units; and

f.  Newtowne Twenty (or "Newtowne 20") – Constructed in 1971 is comprised of 78 units.



**Figure 1 – Map of the HACA Properties**

As compared to the footprint of the Old 4th Ward, which is highlighted in blue, these six (6) remaining HACA properties (the "HACA Properties") are randomly located around the City.

## The Myth of Free Housing

30.   It is a common misperception that Public Housing is "free" for low-income families.  Nothing could be further from the truth.  Congress designed the Public Housing Program in order to afford low-income families with a dignified opportunity to pay their fair share for safe, decent, habitable housing.  Under the Public Housing program, families pay rent to Public Housing Authorities ("PHA") that manage the properties.  Federal rules govern the calculation of tenant rents, which, for the vast majority of public housing residents, the family share of the rent is based on household income.

31.   The United States Housing Act of 1937 established the conventional public housing program.  Public Housing admission is limited to low-income families and individuals earning below 80% of the Area Median Income ("AMI"), although in many areas, applicants may need to earn incomes below 50%, or even 30% of the AMI.  The average income of an average-sized public housing family of 2.1 persons was $14,412 in 2015, which is below the poverty level.

32.   The policy of defining maximum Public Housing rents as a percentage of family income began in 1969 when Congress passed the "Brooke Amendment,"

the current version of which is codified at 42 U.S.C.A. § 1437. Congress has subsequently amended the Brooke Amendment many times. The rent-income ratio has increased to its current level of 30 percent of adjusted household income. Additional changes in federal policy allow Public Housing tenants the option to pay "flat rents" based on the reasonable market value of their units. In addition, HACA has established its own minimum rent of $50 per month, even if a tenant's income is zero. Rents in the HACA Properties range as high as $1,500 per month or more.

### Rental Unit License – A Requirement of the Annapolis City Code

33.    Chapter 17.44.010 of the City Code states: "No person shall let for occupancy or use any vacant single rental dwelling unit, multiple dwelling, bed and breakfast home, roominghouse, or bargehouse without a current operating license issued by the Department of Planning and Zoning, after the application for the license has been approved by the Director of Planning and Zoning, with the concurrence of the Fire Chief, and the County Health Officer, for the specific named unit, multiple dwelling, bed and breakfast home, roominghouse, or bargehouse."

34.    Chapter 17.44.020 of the City Code states: "No operating license shall be issued or renewed unless the applicant owner first has made application on an application form provided by the Director of the Department of Planning and Zoning. The Director shall develop the forms and make them available to the public."

35.   Pursuant to this and other portions of the City Code, all rental units require a license issued by the City if they are to be legally authorized to operate.

36.   In order to obtain a license, rental units must be inspected and found to be in compliance with the City's Residential Property and Maintenance Code. Annapolis City Code, Chapter 17.44.010.

37.   HACA Properties managed solely by HACA are **neither licensed nor inspected** by the City.  These properties are the **only** rental properties within the City that are **neither licensed nor inspected**.  They are not licensed because the City Code is simply not enforced on the HACA Properties.

38.   Pursuant to policies of the City's Office of Licenses & Permits Division, when conditions that present a danger to health or safety are found in an apartment that is currently occupied by tenants, a landlord will be required to relocate that tenant, remediate the danger, request a reinspection, and provide other proof at the landlord's expense to the City Inspector demonstrating the danger is no longer present.

39.   Chapter 17.44.130 of the City Code states: "Upon suspension, revocation, denial, or expiration of a license, the director shall have the authority to cause notices to be posted on the property which shall state as follows: "OCCUPANCY OF ANY DWELLING UNIT IN THIS BUILDING NOW VACANT OR BECOMING VACANT IS UNLAWFUL UNTIL A LICENSE TO

OPERATE HAS BEEN OBTAINED AND IS DISPLAYED ON THE PREMISES."

No such postings are made by the City on the HACA Properties.

### The City's Notice of its Failure to Evenly Enforce its Code

40.    Rental licenses have been a requirement of prospective landlords by the City since approximately 1985.  Despite the inspection requirement, the public housing units managed by HACA were rarely, if ever, subjected to any City inspections, but have never been fully, finally, or properly inspected and licensed in accordance with the City Code.

41.    Former Annapolis City Mayor Michael J. Pantelides was elected to that office in November 2013 and sworn in on December 2 of that year. To assist incoming Mayors with their transition into office, teams of relevant professionals are commissioned by the City to conduct in-depth reviews of specified areas subject to the purview of the Mayor and City Council.

42.    On October 27, 2014, a Public Housing Transition Team report (the "Transition Report") was presented to and adopted by incoming Mayor Pantelides. A copy of that Transition Report is attached hereto as Exhibit B.

43.    On slide eight (8) of that report, the Transition Team stated: "The condition of HACA properties is in serious decline.  The latest available [U.S. Department of Housing and Urban Development] score for their physical condition

is 25 out of 40.  Residents say the condition and maintenance of their units are their biggest problems."

44.    The Transition Team recommended two specific courses of action. Recommendation 1 provided: "Per State code unless an exception is made, the City should begin inspecting HACA units under the City's rental licensing program that applies to all other rental housing in the City."  Exhibit B, p. 8.  Recommendation 2 provided: "The City has an obligation to protect health and safety of public housing residents, as they do other City renters, and should work with HACA to phase in City inspection of HACA properties."  *Id*.  For each of these recommendations, the Transition Team identified the recommended timeline for the inspections as "Immediate."

45.    The Transition Team report was more than a recommendation, however, as it provided the Mayor and City Council with **notice** that their policy not to inspect HACA properties was also a violation of the Maryland State Code.

46.    Maryland Housing and Community Development Code § 12-403 states: "Except as provided in § 12-506(b)(9) of this title, all housing projects of an authority are subject to the planning, zoning, sanitary, health, fire, housing, subdivision, and building laws, ordinances, codes, rules, and regulations that apply where the housing project is located."

47.   Maryland Housing and Community Development Code § 12-506(b)(9) states: "To aid and cooperate in the planning, undertaking, construction, or operation of housing projects located wholly or partly in the area in which it may act, a State public body, with or without consideration and on terms that it determines, may … plan, replan, zone, or rezone any part of the State public body, make exceptions to its sanitary, building, housing, fire, health, subdivision, or other similar laws, rules, regulations, and ordinances or make any changes to its map or master plan…."

48.   On December 18, 2014, during a public hearing of the Annapolis City Council the testimony of the Transition Team resulted in the following recommendations/observations:

Recommendation/Observation 1:

> "The City should inspect HACA properties, so they conform to City Code.  State Code Section 12.403 requires that HACA Properties conform to City's health, fire, and housing codes, or be explicitly exempt from doing so; however, the City does not currently inspect HACA properties, and therefore treats HACA properties differently from every other rental property in the City with regard to inspections.  So, the City should be aware of potential liability because they have chosen to basically ignore this issue over the years.  And I believe we have had a conversation with the finance officer in regard to this and he too indicated that there was potential issue with liability for the City."

Recommendation/Observation 2:

> "We should note that HACA right now inspects their own properties by basically having a contractor come in and do a random inspection every year just before HUD comes in.  So,

HUD, which does not inspect all of the properties, it also does a random inspection, it's [only] about 20% of the properties actually get looked at, so that is how these scores are addressed. They are not looking at the property in totality, and it does include all of those properties that have already been revitalized."

Recommendation/Observation 3:

"Why would the worst housing in town occupied by the lowest income people not be of concern to the City of Annapolis where we are concerned about wealthy high rent apartments?"

49.   One member of the Transition Team was queried regarding the difference in standards between the HUD inspections and those of the City of Annapolis.  In addition to providing the fact that HUD only inspects a sample of the units and not 100% of the units as required by City Code, the following response was proffered:

[HUD requirements are] different from the City Code in at least one material way that we found, and that is with regard to fire safety.  HUD requirements as far as inspections, for example with respect to smoke alarms, say that smoke alarms can be battery operated, and one smoke alarm per level.  The City Code with respect to fire safety says that the smoke alarms have to be wired, and there has to be a smoke alarm outside of each bedroom.  So just with respect to fire safety, there is a disconnect between HUD inspection requirements and City Code.

In response to this explanation, Mayor Pantelides replied: "That is a great example. Very big public safety concern.  Residents of Annapolis should be up to the same standard as well."

50.    During that same meeting on December 18, 2014, Mayor Pantelides made the following observation regarding the City's prior failures with respect to inspections of the HACA properties:

> Your transition report probably more than any other one that came forward sparked a lot of debate, especially within the newspaper, which I think was a healthy dialogue to have.  I'm sure everyone didn't agree on everything that was said but the fact that we're talking about it, and such an important part of our population gets overlooked, had gone on for too long.

51.    Following the findings and recommendations of the Transition Team, Mayor Pantelides set in motion a plan for the City to carry out the first inspections of the HACA properties, which would not ultimately begin until April 2016.

### Mayor Pantelides' Notice to HACA and HUD

52.    In November 2015, Mayor Pantelides put HACA and HUD on notice that he intended to enforce inspections on the HACA Properties pursuant to his legal duties as Mayor.  The Mayor acknowledged that it was not until approximately the Fall of 2014 that he realized that the City had the authority and legal responsibility to inspect the HACA properties.

53.    In a November 20, 2015 article published in The Capital Gazette, the Mayor acknowledged that: "The City has taken a passive role, but that's not going to be the case anymore."

54.    In a November 23, 2015 article published in The Capital Gazette, the Mayor was reported to have sent a letter to HACA officials outlining his intent to

inspect.   The letter stated: "Unless there are substantial improvements in the condition of the housing stock between now and then, I suspect that a number of residents will need to be relocated until repairs and/or major reconstruction is completed.   I hope you take this matter as seriously as I do."

55.   In November 2015, a similar letter was sent to HUD officials.   The HUD spokesperson at the time declined to comment to The Capital Gazette reporters, but reportedly responded to the Mayor in writing.

56.   In January 2016, in response to a reporter's questions about HUD's ongoing investigation of HACA's use of grant funding, Pantelides stated: "It is a good thing that HUD is coming in and investigating HACA.   This is an agency with a troubling past and present."

57.   On November 26, 2015, Trudy McFall, a previous chairman of the HACA Board and member of the Mayor's Housing Transition Team wrote a Letter to the Editor in The Capital Gazette wherein she praised the Mayor for his decision to finally enforce City inspections on the HACA Properties.   She stated as follows:

> For many years, previous mayors and other elected officials have been told this by me and others, but none made any move to comply with the state law and better protect the residents of public housing.
> …
> I congratulate the mayor for his leadership in deciding to do this, when others before him have ignored the issue. **Unquestionably, it will not be easy for the city and will raise complex issues.   However, it is well past time for the elected officials for the city to ensure that public housing residents**

**have the same protections as other city renters.**   All city
residents will benefit by improved public housing."

(Emphasis added).

### Rental License Application Process in the City of Annapolis

58.   Chapter 17.44.060 (A) of the City Code states: "The operator of a multi-
family dwelling consisting of fifty or more units who employs a full-time
maintenance staff of three or more employees on-site shall have its license initially
issued or renewed for a two-year period. **All other licenses shall be issued or
renewed on an annual basis**."  (Emphasis added).

59.   Pursuant to the City Code, given the characteristics of the HACA
Properties, all of its 790 units are required to be inspected and re-licensed by the City
of Annapolis annually.[5]

60.   The Rental Operating License Application mandated by the City of
Annapolis states:

> A property owner must obtain a license prior to operating a rental
> facility within the City of Annapolis.  License application and
> rental operating license are non-transferable. Application must
> include fee of $100.00 per unit. ***Property must be inspected for
> compliance of the City's Code and International Property
> Maintenance Code before the license will be issued***.

*See* Exhibit C (emphasis in original).

---

[5] HACA does not maintain a large enough maintenance staff across all six (6) of its
properties to qualify for the "two-year" license.

61.   The City requires smoke alarms in rental units to be supplied with installed AC powered smoke alarms pursuant to City Code Section 17.40.440.  The Rental Operating License Application states in italicized language the following: "****Must have smoke alarms installed on each ceiling or wall outside of each separate sleeping area in the immediate vicinity of bedrooms, in each sleeping room, and each story of the dwelling unit (International Property Maintenance Code 704.2).*" Exhibit C (emphasis in original).

62.   The Rental Operating License Application requires that the landlord certify that "they will comply with the ICC Code and the Charter and Code of the City of Annapolis, which are applicable hereto; [] they agree to inspections by the Department of Planning and Zoning and the Fire Department to determine if the property is in compliance with the provisions of the ICC Code and the Charter and Code of the City of Annapolis."  *Id.*

### Logistical Issues Raised Prior to Inspections

63.   After the December 2014 meeting, it took nearly a year for the inspection process to begin to take shape.  That intervening year of 2015 was fraught with political infighting around the issue of the HACA inspections.

64.   Pursuant to the City Code, HACA was required to pay $79,000 in order to apply for rental licenses for each of its 790 units.  Despite HACA's status as a landlord in the City, Alderwoman Sheila Finlayson proposed legislation to the City

Council which would waive the inspection fees.  On December 7, 2015, Resolution

31-15 (the "Waiver Legislation") was proposed by Alderwoman Finlayson.

65.    Included within R-31-15 was the following language:

> **FOR** the purpose of waiving fees associated with the licensure
> and inspection of HACA residential rental units.
>
>  …
>
> **WHEREAS** City Code Chapter 17.44 requires the City to
> license and inspect all rental housing units in the City; and
>
> **WHEREAS** the cost of such licensure, inspection and associated
> fees could encumber HACA with tens of thousands of dollars of
> expenses.

*See* Exhibit D.    In the  proposed  legislation  itself,  the  City  acknowledged  its

responsibility to license and inspect the HACA Properties.

66.    The Fiscal Impact Note related to R-31-15 issued by the City made the

following observation:

> **Analysis of Fiscal Impact:** This legislation waives the fees
> associated with the licensure and inspection of HACA residential
> rental units as required by City Code Chapter 17.44. The current
> fee structure, section 17.44.040 of the City Code, includes a
> $100.00 fee per annum for an operating license for rental unit
> and rooming house. According to HACA, there are currently
> seven hundred and ninety (790) HACA residential rental units
> within the City of Annapolis. Based on the number of units, the
> net fiscal impact would be $79,000.

*See* Exhibit E.

67.   The Waiver Legislation created some contention among the City's leadership, but the debate centered less on whether the fee should be waived, and more on the effect of a City inspection of the HACA Properties.   One exchange among former Aldermen highlighted the "concern":

Alderman Littman:

> If this legislation was approved, and if the City did these inspections, presumably we all suspect there will be a number of violations.   I would like to know the "So what" question.   So what do we do then?   Is there going to be any… Assuming that we have a list of, let's just say arbitrary 30 units, that need some repair, 10 of them should not be habitable, So what?   Are we going to put those people somewhere else and do the work?   Are we going to ask HACA nicely to do the work?   Are we forcing HACA to do the work?   Is HUD going to force HACA to do the work?   If those people are going to be moved out are they going to be moved out in any sense of maintaining community?   Are they going to be guaranteed their units back when the work is done?   So I would like to know what the impact of this work is before we just go ahead and do a lot of paperwork that might not have any impact at all to actually accomplishing the very important goal that I do support of improving the housing for our HACA residents.

Alderman Kirby:

> I guess I have some of those same issues myself.   Right now, we don't inspect.   It's always been left up to the HUD officials and they did their own inspections, and I do not believe they went through every unit.   So we've never been responsible for the Housing Authority inspections.   So this is different and it is going to raise some further questions about condemning units and what happens to tenants when we condemn the unit.

Alderman Budge:

What's the plan?  We know that the Mayor has stated it is his intention to proceed with the inspections whether or not we pass R-31, and that is going to invoke the whole list of questions that Alderman Littman has been asking regardless so I think we should proceed with that line of questioning…. We as a council need an understanding of what the plan is to bring HACA housing up to standard.  It is my understanding that the Mayor intends to make it a HUD problem.  HUD doesn't want to pick up the problem.  HACA doesn't have a plan.  We don't have a plan.  **There is train wreck in front of us**.

(Emphasis added).

68.    At some point a question was raised as to the Constitutionality of the Waiver Legislation itself.  Counsel from the City Attorney's office testified before the City's Finance Committee with regard to the potential Constitutional conflict as follows:

Very simply… the difficulty we face structurally is that there is no specific right Constitutionally under the 14th Amendment to have fees waived and so under the legal tests, there has to be a rational basis, or if a suspect class is involved there has to be what is called strict scrutiny, and in either case, and in this particular case, because we are dealing with a quasi-public entity that is bound to a federal agency, it does not preclude their responsibilities under the host jurisdiction of laws to meet the letter of the law.  **Now, historically there has been a presumption, as I understand it, that HACA and HUD were doing their own investigations and their own inspections on an annual basis.  We have discovered that the inspections that are done, are not of all units, but rather are, from a statistical sampling, and our law is rather clear that it requires each and every unit to be inspected in terms of multi-units like this, on a bi-annual basis.**  And our law is also clear that there is a fee associated with that, and to grant this particular quasi-public agency a waiver without some specific legal justification simply because they may not have the money,

does potentially create some constitutional legal issues for us. So, if it is the desire of the council going forward, to find a way to work with them economically, I am sure that we can do that, but the blanket waiver is probably unconstitutional.

…

HUD does have a responsibility, both under the legislation that controls their relationship with HACA, and under our laws to make certain that these units are habitable, and **our inspection process is how we determine that**.

(Emphasis added).

69.     As a result of this opinion of the City Attorney's Office, Alderwoman Finlayson withdrew R-31-15.  In doing so, she provided her thought process about the City's decision to inspect, and the concern she had for holding HACA accountable as the City should any other landlord:

> **I sponsored this legislation when the City decided, <u>wisely so</u>, to inspect all of our rental units including those in public housing.**  What concerned me was the fact that we were then going to turn around and charge the very agency who is **struggling to maintain some semblance of quality residences** in the City.  That bothered me considerably.  So this legislation was poised to waive the fees that we would charge the housing authority for those inspections.  **I've since been assured by the City Manager that there is no intention for the city to charge the housing authority for these inspections**.  And I have also been informed by the previous city attorney that it is probably unconstitutional to waive the fees because being poor is not a protected class.  But again, **I've been assured by the City manager… that there will not be any fees or any charges to the housing authority**.  So for that reason I am going to withdraw this legislation.

(Emphasis added).

**Revelations from the City's Initial Inspections of the HACA Properties**

70.     Pursuant to City Policy provided in the City's "Rental Operating License Application," the inspections are held to the standards set out in the International Property Maintenance Code.

71.     When the City finds violations of its Code in an initial inspection, it **does not** issue a rental license until those violations are fixed by the prospective landlord.

72.     Despite expressed concern that it would be unconstitutional to waive the fee through legislation, the City did not enforce the City Code provision requiring HACA pay the 2016 inspection fee of $100 per unit ($79,000 total), and seemingly waived it without legislation, or otherwise credited HACA for the fee.

73.     On May 1, 2016, the City began inspections of the HACA Properties. This initial round of inspections was not completed until July or August 2016. The results of the inspections were abysmal. Of the 790 units inspected there were **2,498** City Code violations uncovered by inspectors. The initial inspection results for each of the 790 units are attached hereto as Exhibit F.

74.     Each of the six HACA Properties inspected lacked the "Electric Hardwired Smoke Detectors" required by City Code of **all** rental units. Many of the battery powered smoke detectors required of HUD's lower inspection standard were not functioning.

75.    Many of the City Code violations presented dangers to health and safety.  Consistent with the City Code, the City **should have required HACA** to relocate tenants pending the correction of the dangerous conditions or to reimburse tenants for their costs related to securing adequate substitute housing.  Even after it conducted the initial inspections, the City did not enforce its own Code requirements of revocation of the licenses or vacation of the HACA Properties.

76.    After the initial inspection results were provided to HACA officials in the summer of 2016, the Housing Authority was provided with follow-up inspection dates for when the City would be back out for a second round of inspections.  Some follow-up inspections were conducted, but **none of the six HACA Properties were ever fully and properly licensed.**

77.    On September 12, 2016, the approximate time when the follow-up inspections were set to begin, Members of the HACA Board testified before the City Council.  HACA Interim Director Richard Walton testified as follows:

> Mr. Mayor I just wanted to comment a little bit about the City inspections.  It went very well actually, and I want to say thank you and your staff.  They worked very well with our staff.  All of the inspections were completed by the end of our fiscal year, which was June 30th, to all properties but one, and that was Newtowne 20.  That inspection was completed in August.

HACA, the Mayor, and the City Council maintained the appearance to the citizenry of Annapolis that the City inspections of the HACA properties had been completed, even going so far as to issue licenses to many of the units despite their continued

failed status and the pending follow-up inspections.  The 2016 City inspections of the HACA Properties were **never fully completed**.

78.    On February 13, 2017, members of the HACA Board testified before the City Council.  Then HACA Board Member John Dillon testified as follows regarding the results of the inspections:

> The buildings and structures, and I think we are all well aware of, are, for the most part … past their useful life.  For at least a decade or so we really stopped doing any plan of any major renovation or construction.

He went on to further clarify that "**as you well know**," Eastport Terrace and Harbour House "**are shot**."  (Emphasis added).

79.    On April 18, 2017, Beverly Wilbourn was introduced as HACA's new Executive Director.

## HACA's Presentation to the New Mayor and City Council on February 26, 2018

80.    City elections were held in November 2017.  Mayor Pantelides, who had emphasized during his reelection campaign that he was the "First Mayor to Inspect Public Housing," was unseated by Gavin Buckley.

81.    Mayor Buckley was sworn into office on December 7, 2017. At that time, the follow-up inspections for HACA properties were still in slow progress.

82.    Mayor Buckley did not have a transition report dedicated to public housing.  Despite the drastic change that had occurred three (3) years previously

with regard to City inspection policy as related to the HACA Properties, no mention was made in Mayor Buckley's transition reports to the status of inspections or the state of the public housing.

83.   On February 26, 2018, HACA presented its Quarterly Report to the City Council.  Mayor Buckley opened the meeting as follows:

> We had a visit… for the first time in a long time the Mayor, the HACA Executive Director, the HACA Board Chair, and several representatives of the United States Department of Housing and Urban Development were around a table talking about the future of HACA.  I want to thank Beverly for her leadership of HACA and her help to bring us all together to discuss the issues important to this community.  I would also like to thank Sandra Chapman and the HACA board chair and for her leadership as well.   There were several high-ranking leaders there including our region's administrator Joseph DeFelice, our division director Russell DeSouza, and Carol Payne, the director of HUD's Baltimore office.  **And I can tell you it was a lovefest.  We had a great great meeting.  And at the end of the meeting, it was decided that they believe that HACA is in better shape than it has ever been.**  There are currently no HUD restrictions on HACA, they have no major issues with HACA.  The reports are right on target, and they are ready to support HACA with its initiatives.  It was very clear to me that HUD credits Beverly Wilbourn with turning the agency around, and I am grateful for her leadership and hard work, we are lucky to have you Beverly, thank you so much.

(Emphasis added).   The Mayor concluded his opening remarks by saying: "We cannot be a great community until we make a great community for everybody. Beverly [Wilbourn] believes in the mission of public housing, and it's going to be amazing when we are finished."

84.    Director Wilbourn began her remarks by clarifying: "We can't really

have a strong housing authority without the full support of the City of Annapolis."

85.    Director Wilbourn then spoke about the various issues faced by HACA

when it came to maintenance:

> **Let me be clear, I can't do maintenance. I can't get maintenance to get me away clear on properties that are 40, 50, in the case of Eastport Terrace 65 years old, and in need of major rehab**.  That is where redevelopment comes into play. And that is what we have RAD, that is what we have selected as the redevelopment tool… But the reality is, there is only so far we can get with maintenance.  At a point real estate needs some capital infusion, some major system rehabs, changing out, renewal, even the layouts need to be changed some. Obsolescence comes into play.  **And that's where we are with probably about five of our developments.**   And we are committed to taking that through so that we have in each of our communities, communities that all of us can be proud of.

(Emphasis added).

86.    Mayor Buckley acknowledged at the meeting that the prior and current

HACA Properties **in higher visibility areas have received funding**, but that the

City has not invested in the other developments:

> I just want to say that there are only 750 units [sic] that HACA are in charge of….  So if we look at the city and we see where problems are, its areas where we haven't invested.  So you see the areas where we have invested in … Annapolis Gardens or Bloomsbury Square, **they don't have the same issues in the areas that have been forgotten**.  They haven't been invested in in 50 or 60 years.  We have to find the money and the apparatus to get them invested in so that we can move forward.

(Emphasis added).

87.     Alderwoman Shaneka Henson explained some of the historical aspects of public housing in Annapolis to the HACA members and the City Council. Alderwoman Henson specifically acknowledged that the HACA Properties were home to the African American population that had been displaced through urban renewal:

> Annapolis is a City where we had a concentration in our African American population concentrated in our Old 4th Ward area. After urban renewal came, then everyone was dispersed and then pushed out into these public housing neighborhoods.  So for better or worse it is the unfortunate legacy that [all] some people have is just the public housing.  People were not paid fair prices for their homes.  People were not really given a fair deal when urban renewal came.  So public housing was what they had left over.  We live in a country that hasn't paid reparations. We haven't righted all the wrongs, but one of the apples in the basket was public housing, and this program forever changes that, and it will not be a true public housing anymore.

Alderwoman Henson sought here to highlight that the public/private partnership model would replace the public housing model **provided that** HACA's application for the various programs were accepted by HUD.

### The Cooperation Agreement and The City's Violation of its Contractual Obligations to HACA's Residents

88.     Alderwoman Finlayson's proposed legislation which would have relieved HACA's obligation as a landlord to pay for annual inspections of its rental properties was not the first effort to alleviate a perceived financial burden on HACA

without the Housing Authority having even made an affirmative public request for relief.

89.    Maryland State Code allows for agreements between a state public body such as the City of Annapolis and housing authorities such as HACA.  Referred to as "Cooperation Agreements," these agreements make it possible for HACA to receive federal funds.

90.    Under Maryland's constitution and statutes, the low-rent housing developed by HACA with funding assistance from what is now known as HUD, is exempt from real and personal property taxes and special assessments. *See* Md. Code. Ann. Tax-Prop. §7-215.  The Cooperation Agreement allowed the City to receive money from the Federal Government, but importantly, it also obligated HACA to make Payment in Lieu of Tax ("PILOT") payments to the City on a regular basis.

91.    Cooperation agreements and tax-exempt status are intended to go hand-in-hand as a protection for publicly owned low-income housing.  The cooperation agreement is a contract between the local government and the housing authority that is intended to ensure that local governmental services will be provided to the housing in exchange for the PILOT payments.

92.    The City of Annapolis entered a Cooperation Agreement with HACA on March 10, 1950.  Subsequent amendments were made to that Cooperation

Agreement, with the most recent amendment having been approved by the City Council on February 6, 2009.  The Cooperation Agreement details the special relationship between the City and HACA and outlines various obligations of the City for the benefit of HACA's residents.

93.   Under the PILOT scheme devised, HACA is required to return to the City of Annapolis 10% of the rents it collects from its tenants annually or "the amount permitted to be paid by applicable state law in effect on the date such payment is made, whichever amount is the lower."  In either event, the payments would never exceed the amount of real property taxes which would have been paid if the property were not exempt.  Of the amount remitted to the City by HACA, 50% is to be distributed to Anne Arundel County.

94.   Under the Agreement, the City was required to:

> Furnish or cause to be furnished to [HACA] and the tenants of such Project **public services and facilities of the same character and to the same extent as are furnished from time to time without cost or charge to other dwellings and inhabitants in the Local Government**.

(Emphasis added).  In other words, HACA was required to make the PILOT payments, and the City in return was to provide all the services for the residents of the HACA properties that it provided to all other members of the City in exchange for the property taxes paid by those residents.

95.   In August 2018, Mayor Buckley introduced legislation (R-41-18) to supersede and void the Cooperation Agreement as amended, in its entirety.  Under the proposed legislation, all HACA "obligations and liabilities under the Cooperation Agreements" were declared to "have been fully satisfied and discharged" even though the City acknowledged that it "**ha[d] not collected any payments under these agreements for years.**" [6] (Emphasis added).

96.   In addition to alleviating HACA of its prior debt which HACA owed to the City (50% of which was by extension owed to the County), the proposed legislation aimed to reduce HACA's PILOT to $1.00 annually.  However, it was not just HACA that the City sought to benefit with this proposed legislation.  As a bonus, the legislation would also apply to real property owned by HACA, but that was subject to contracts with third parties who were providing low-income housing to City residents.  In other words, this legislation sought to alleviate the tax obligations of private companies that partnered with HACA to provide low-income housing. This allowed out-of-state vendors to come into the City, engage in qualifying operation, construction, or management of qualified low-income housing developments, and then not have to pay any local taxes or any payments for the services of its tenants.

---

[6] See Exhibit G, Staff Report and Fiscal Impact Note, Resolution: R-41-18, Housing Authority of the City of Annapolis (HACA) – Payment in Lieu of Property Taxes (PILOT) Agreement, August 30, 2018.

97.   The proposed legislation also failed to set out any obligations on the part of the City of Annapolis toward the residents of HACA properties that are addressed under the Cooperation Agreement, apparently alleviating the City of its responsibilities to HACA's tenants.

98.   By excusing HACA from making the required PILOT payments to the City and County, by excusing HACA from paying the fees associated with licensure, and by excusing HACA from adhering to the same building code standards as other landlords in the City of Annapolis, the City has been, and continues to be, complicit in furthering the sub-standard conditions in which the residents of HACA properties find themselves and for which they have no avenue for recourse.

99.   The proposed legislation of R-41-18 is illustrative of the reality that City officials, perceive HACA as an extension of the City itself.  HACA and the City hold themselves out as independent entities, but their singular operation further highlights the disparate treatment of the tenants of the HACA Properties as compared to the tenants of all other rental properties in the City.

100.  The Cooperation Agreement is a Contract between the City and HACA, made for the express benefit of the tenants of HACA Properties and the taxpayers. The failure of the City to enforce that Contract has for years caused significant harm to all concerned parties.

**The Mayor, The City Council, and HACA Officials Agreed to Halt Inspections and to Suspend Indefinitely the Enforcement of the City Code on HACA's Properties**

101.  Upon information and belief, Director Wilbourn and others at HACA approached the City and requested that the City of Annapolis no longer enforce the City Code on the HACA Properties.

102.  Upon information and belief, Director Wilbourn and others at HACA advised the City that HACA could not pay for the annual inspection fees required of landlords by the City Code.

103.  Upon information and belief, Director Wilbourn and others at HACA requested that Mayor Buckley prevent the City Inspectors from responding to complaints received by tenants residing in the HACA Properties.

104.  Upon information and belief, Director Wilbourn and others at HACA requested that Mayor Buckley direct the City Inspector's Office to forward any complaints received by tenants residing in the HACA Properties to the HACA property managers themselves instead of responding in the City's own capacity through the City Inspector's Office.

105. Upon information and belief, at some point during 2018, Mayor Buckley, the Aldermen and Alderwomen of the City Council, Director Wilbourn, and/or other officials at HACA conspired to suspend City inspections of the HACA Properties.

**Changes to the HACA Properties and Management Under Director Wilbourn**

106.  In July of 2018, HACA reported to the City that its fiscal year ending June 30, 2018 reflected a net income surplus that increased from $92,059 in 2017 to $537,900.  This surplus was tremendous as compared to HACA's budget numbers in the preceding five years. HACA officials attributed this to **increased rent enforcement on its public housing tenants and decreased spending on maintenance**.

107.  Mayor Buckley and the City Council praised Director Wilbourn and her staff profusely for the financial shift.  Alderwoman Finlayson stated: "You are to be congratulated on this report."  Alderwoman Tierney described the jump in revenues as "remarkable."

108.  However, Alderman Savage pointed out that HACA's financials reflected that despite the previous leadership having budgeted $1 million for "resident services," under Director Wilbourn's leadership, she and her HACA staff had cut down the "resident services" for the 2017-2018 fiscal year to only $400,000.  HACA **spent $600,000 less than budgeted** for residential services.

109.  When asked about residential services, Director Wilbourn explained that given the cuts from the federal government, they were no longer funded for "residential services," but only for "bricks and mortar."  This was Director Wilbourn's interpretation of the funding, and **not a specific direction from HUD**.

110.  Based on HACA's reported financials presented in July 2018, as well as Director Wilbourn's conduct that year, the Mayor and City Council were on notice that Director Wilbourn and the HACA staff had increased efforts to increase its income flow by aggressively seeking, often without affording tenants with proper due process, payments from residents under threat of eviction, demanded that the City not inspect the properties, and decreased services it had previously budgeted and provided for its residents.

111.  Director Wilbourn acknowledged in the July 2018 testimony before the City Council that, indeed, it was the fact that Mayor Buckley and the City Council were so willing to work with HACA that made the extra funds available:

> It has been a sea-change, it really has, **in working very closely with the City** and the administration and council members to say, **hey, this is all I've got**. This is where mine is going. **I can bridge, but I need some wrap around services from other folks** getting some money, because my funding really is housing.

(Emphasis added).

112.  By foregoing their legal obligation to inspect and license HACA's properties as required by the City Code and State Law, Mayor Buckley and the City Council knowingly enabled Director Wilbourn to decrease the quality standard of housing and services to HACA residents.

113.  Once the City officials stopped carrying out their legal obligation to evenly enforce City Code on HACA, they stepped up their praise of Director

Wilbourn.  To close the July 2018 meeting, Mayor Buckley expressed: "Thank you so much for making our City better, we really appreciate all of this."

### The HACA Properties Continue their Downward Spiral

114.  Newtowne Twenty has been in a "near-demolition" status for half a decade.  In 2015, then HACA Executive Director Vincent Leggett was asked why there was such a deficit with regard to Newtowne 20.  He responded as follows:

> Why continue to put tens and twenties and hundreds of thousands of dollars into Newtowne 20 when it might end up in the county landfill? And so we are **trying to keep it operational enough.** And HUD has a process called demolition and disposition that once we move the pre-development work along a little further, HUD will not hold a lack of occupancy against our scoring or our funding. So that's what we are really trying to do. So that's what it is, it's just not throwing off the rent. They have gas lines, water lines, high maintenance, so that's really part of it, it's not fully occupied.

(Emphasis added).

In other words, once the application was accepted, Newtowne 20 could be demolished.  Director Leggett closed by explaining that, regarding Newtowne 20, "the physical plant is collapsing on us."  That application is still pending five (5) years later.

115.  In August 2018 the Newtowne 20 residents were without power or with only partial power for days when the aging electrical infrastructure suffered an outage that required Baltimore Gas and Electric to spend time locating an antiquated replacement part.  The Salvation Army responded to provide meals, and the City

opened the Pip Moyer Recreation Center as a "cooling zone" due to the significant summer heat.

116.  The HACA Properties as a whole, and specifically Newtowne 20, have continued their decline.  In a January 2019 city council meeting, Director Wilbourn explained to the Mayor and City Council that Newtowne Twenty is so old that it has gotten to the point where they simply can't patch it anymore, and they must redevelop the property.

> The impetus for RAD was the continually deferred maintenance and deteriorating condition of public housing nationally, and Newtowne is in that place.  Newtowne was built in 1971.  I don't know the history, but I haven't seen any indications of major capital placed into it.  That is why we have a fragile electrical system.  It's those kinds of things that you can't patch anymore, that you have to move out to redevelop.  So we are providing the safe and sanitary housing in Newtowne in operable condition.  And we are trying to move as quickly as possible to empty out the units, and we think that will happen in August of this year.

Despite these representations, no additional federal funds have been allocated, and these properties continue to degrade.

117.  One month prior to those comments, on December 6, 2018, The Capital Gazette reported then Speaker Mike Busch had conducted a walk-through of the Newtowne 20 development. He was quoted as follows: "I don't really know how people live in that housing," Busch said. "It is by far in my estimation **the greatest challenge in the county**."  (Emphasis added).

45

118.  Despite this grounded assessment by Speaker Busch, just weeks later, at the same January 2019 meeting, well after she, the Mayor, and other members of the City Council had agreed to refuse further enforcement of the City Code on HACA, Alderwoman Henson expressed her view of Director Wilbourn and her actions as they related to Newtowne 20:

> Can I just commend your leadership and the board's support for you on that. It would have been really easy to feel like something new is coming just around the corner and to not do all the efforts that you all did to make sure that the residents who are there now have a safe place to live. To go into the vacant units, to listen to people's concerns like that is … and to put the resources there when you knew it was something that you were going to demolish. It really shows your commitment to the quality of life of the residents. So for whatever it's worth I just want to commend you for that.

Alderwoman Henson's comments belie reality.  Her praise reflects the City's recklessly deliberate indifference to the actual status of the properties and the danger it poses to the tenant residents of the City.  Her description patently misrepresents the dire conditions of the HACA Properties, and only represents what she, the Mayor, and City Council want the public to believe about the public housing in Annapolis, thus maintaining the status quo.

**The Mayor and City Council are Aware of Continuing Violations of City Code and Have Not Only Ignored the Violations But Have Taken Affirmative Steps to Avoid Enforcement of the City Code on HACA**

119.   On February 27, 2019 and March 4, 2019, the Senior Inspector of the City of Annapolis was provided notice of alleged violations of the City Code on HACA Properties by representatives of Plaintiffs Ms. Smith and Ms. Clark.

120.  Consistent with the City's new policy pertaining to HACA properties, the Senior Inspector **did not respond** to the properties to inspect the alleged violations.

121.  The central complaint by Ms. Smith and Ms. Clark to HACA was related to mold and moisture, as well as filth in the ventilation systems of their apartments that were affecting the air quality due to years of failed maintenance by HACA.  Specifically, Ms. Smith and Ms. Clark complained, and **as was confirmed by a certified industrial hygienist**, that the Housing Authority had fraudulently and negligently covered up mold that was present in their shared attic, by simply **sealing the attic shut**.  Furthermore, it was alleged that the mold was caused by an ongoing roof leak, and that not only did the leak need to be stopped at its source, but to make the apartment suitable for occupancy, the attic also needed to be professionally remediated.

122.  The ventilation ducts which were on separate loops within the apartments, and therefore independent of one another, nevertheless had nearly identical characteristics.  Neither appears to have been cleaned at any time since the buildings were erected in 1971:



**Figure 2 - Apartment 813 A Ventilation Duct**



**Figure 3 - Apartment 813 B Ventilation Duct**

123.   In response, HACA personnel blamed Ms. Smith and Ms. Clark for failing to clean their home and failing to properly use their ventilation systems in the home, specifically in the bathroom where humidity and moisture collects on the walls as a result of normal use.

124.   Ms. Smith presented a letter from her doctor explaining her condition: "She has had testing that shows she has an allergy to mold and dust.  She has severe symptoms related to this allergy and it [was] worsening a severe medical condition."

125.   Based on these reports, the Senior City Inspector advised HACA of the appropriate way to remediate the mold, but given the restrictions placed on her by Mayor Buckley, the City Council, and/or their agents, she could only recommend to HACA the appropriate course of action based on how the City enforces its Code on all of the other landlords in the City.

126.   On February 27, 2019 regarding the apartment of Ms. Smith, the Senior Inspector provided the following notice to Director Wilbourn and other senior HACA personnel:

> I have received the attached reports of mold in the above referenced unit which is located in Newtowne Twenty (HACA) properties. [7]

---

[7] It is worth noting that the Senior Inspector for the City specifically refers to Newtowne Twenty as "(HACA) properties."  The indication of a specific landlord otherwise licensed in the City would not require such identification except when, as here, that landlord is going to be treated differently by the City.

Based on the report, **I would recommend having resident relocated**, hire a licensed accredited mold remediation company to perform the work and then have the unit re-tested to clear of any further mold spores before having resident move back in to the unit.

If you have any further questions, please don't hesitate to contact our office.

(Emphasis added).  As reflected in this email, it is the policy of the City to require landlords to relocate tenants when hazardous conditions exist within the rented apartment.

127.  On March 4, 2019, regarding the shared attic of Ms. Smith and Ms. Clark, the Senior Inspector provided the following notice to Director Wilbourn and other senior HACA personnel:

I have received the air quality samples for this attic area (same sampling since a shared space above both units) for both 813-A & B Betsy Ct.  I would suggest that the mold remediation be conducted in the attic area as well since this is the highest levels.

If you have any questions, please don't hesitate to contact me.

This requirement to remediate the mold in the attic was **never** followed by HACA.

128.  On February 18, 2019, March 1, 2019, March 6, 2019, March 14, 2019, March 15, 2019, and again on March 20, 2019, Mayor Buckley, his staff, and the City Council were again placed on notice of the ongoing violations of the City Code and the failure of the City Inspector to take action, and were aware at that time that residents of the HACA Properties had requested the City respond to the Properties.

129.  The City's website reflects that on March 5, 2018, just days after Ms. Clark and Ms. Smith sought the assistance of the City regarding their apartments, and **after** Mayor Buckley had been placed on notice of the alleged violations of the City Code, the City created a "file" on their website titled "Discussion on MOLD in Housing Authority Properties."  This "file" reflected the scheduling of a meeting of the Mayor and City Council on March 21, 2019.

130.  On March 21, 2019, at the request of the Mayor and the City Council, Dr. Clifford Mitchell, the Director of the Environmental Health Bureau at the Maryland Department of Health was summoned to City Hall to speak before the Council.  Seemingly unaware of why he was there, he explained that "he was asked basically to come and talk about mold."

131.  He spoke to the City Council for approximately one hour about the various types of mold, air quality in indoor spaces, and the dangers to persons who are sensitized to mold exposure.  At the conclusion, the Mayor and Council Members asked questions and made comments.

132.  Dr. Mitchell explained the dangers of failing to hire professional mold remediators to abate mold conditions and stressed that once mold is discovered it needs to be remediated professionally.  HACA has repeatedly failed to properly remediate mold and other hazardous conditions present on their properties.

133.  The Mayor and City Council were aware of the allegations Ms. Smith and Ms. Clark had made regarding mold and air quality issues in their apartments. HACA management, to include Director Wilbourn, responded directly to representatives of Ms. Smith and Ms. Clark, and the Mayor and City Council were aware of those HACA responses.

134.  Instead of following their procedure to inspect the property, the Mayor and City Council called the March 21, 2019 meeting to talk about the alleged violations that neither they nor their Senior Inspector had ever actually observed or inspected.

135.  It is the **policy and practice** of Mayor Buckley and the City Council **to refuse** to enforce on the Housing Authority the same standard that is enforced on every other landlord in the City of Annapolis by administering the City Code evenly regardless of the race of the tenants.

136.  The certified industrial hygienist hired by Ms. Smith to inspect her apartment confirmed that the mold in the bathroom ceiling was directly related to the mold that had formed in the attic above, and was the result of a leak in the roof. At the time of the March 21, 2019 meeting, Mayor Buckley and the City Council had received copies of the correspondence from Ms. Smith's representatives which included the photos in **Figure 4, 5, and 6 below**.



**Figure 4 – Mold on the Bathroom Ceiling of the Smith Apartment**



**Figure 5 – Mold on the Bathroom Ceiling of the Smith Apartment**



**Figure 6 – Black Mold in the Attic immediately above the Bathroom Ceiling that was not remediated, but instead sealed into the Attic in the Smith Apartment days after this photo was taken.**

137.   In March 2019, Mayor Buckley, as well as the rest of the City Council, were on notice of the mold, air quality, and ventilation issues found in the Smith and Clark apartments.  The Mayor and City Council were aware that HACA:

    a.   Had refused to remediate the toxic levels of mold found in the attic with professional remediators;

    b.   Had simply sealed the mold into the attic, an action that failed to address the ongoing significant danger to health and safety of the Smith and Clark families;

c. Had threatened the Smith and Clark families with criminal trespass if they entered their attic spaces which were in fact a part of the Smith and Clark apartments according to their leases as well as HUD regulations;

d. Had refused to correct the source of the moisture which caused the mold in the first place; and

e. Had refused to clean the ventilation ducts which were contributing to the hazardous air quality.

138. These actions were in direct contravention of what Dr. Mitchell had recommended, yet Mayor Buckley and the City Council took no further action to enforce the City Code or to mitigate the health and safety dangers created through HACA's actions.

139. Mayor Buckley concluded the March 21, 2019 meeting by further confirming that HACA had dictated to the City how it would handle the mold issues, instead of holding HACA to the same standard that the City holds the rest of its landlords:

> So, **our housing authority is telling us** as soon as they find an incident, or as soon as it is reported, they go to its source, mitigate the moisture, let it dry, and that's how they treat it, they treat it sectionally.  So, and then they say, it reoccurs in the bathroom.
>
> So, how many people in this group, put your hand up if you have mold in your bathroom.  [Mayor and one other raise hands. Laughing.]  Just us two?  Us three?  Geez.  Alright.  So, thank you Mr. Mitchell, when is your next convention? I want to come party with you guys.

(Emphasis added).

140. Neither the Mayor, the City Council, nor the City Inspector ever responded to the Smith and Clark properties to enforce the standards of the Annapolis City Code on the Housing Authority.

### Annapolis Receives Community Development Block Grants ("CDBG") – CDBG Anti-Discrimination Certification and Regulatory Obligations

141. For decades, Annapolis has been a recipient of millions of dollars in federal CDBG funds for low and moderate-income benefit, including housing in the City, among other purposes. CDBG is one of many federal community planning and development grant programs in which Annapolis participates.

142. One of the stated goals of planning and development programs, including CDBG, is "to develop viable urban communities by providing decent housing and a suitable living environment and expanding economic opportunities principally for low- and moderate-income persons." 24 C.F.R. § 91.1 (a)(1). "Decent housing includes … increasing the availability of permanent **housing in standard condition** and affordable cost to low-income and moderate-income families, particularly to members of disadvantaged minorities, without discrimination on the basis of race, color, religion, sex, national origin, familial status, or disability." 24 C.F.R. § 91.1 (a)(1)(i) (emphasis added).. The U.S. Congress explained further that "[a] suitable living environment includes … reducing the isolation of income groups within a community or geographical area

through the spatial deconcentration of housing opportunities for persons of lower income and the revitalization of deteriorating or deteriorated neighborhoods…." 24 C.F.R. § 91.1 (a)(1)(ii).

143. Despite U.S. Congressional goals of using federal CDBG funds to develop and increase "the availability of permanent housing in standard condition," to citizens of Annapolis who are "members of disadvantaged minorities, without discrimination on the basis of race, color, religion, sex, national origin, familial status, or disability," the City of Annapolis has adopted policies that are in direct contradiction to those federally-stated goals.  By refusing to inspect the HACA Properties, Mayor Buckley and the City Council have adopted a policy of racial discrimination against a protected class of Annapolis citizens.

144.   Since the actions were undertaken by the City to destroy the Old 4th Ward Community, there has been a near constant policy – spoken and unspoken – to perpetuate the racial segregation of the citizens of Annapolis.   Mayor Buckley and the City Council have reinforced the City's dedication to further undermining the goals of the U.S. Congress by, among other actions and inactions, refusing to take affirmative steps to redevelop the aging public housing infrastructure that is currently in place, and instead allowing the besieged Housing Authority to flounder, and its residents to suffer the consequences.

145. As a condition of payment and receipt of CDBG funds, Annapolis provides HUD annual written certifications including Annapolis' "Specific CDBG Certifications," which include a certification that the City's policies and actions will be in "Compliance with anti-discrimination laws."  That certification of the City of Annapolis includes the following language:

> Compliance With Anti-discrimination laws – The grant will be conducted and administered in conformity with title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d), the Fair Housing Act (42 U.S.C. 3601-3619), and implementing regulations.

146. Congress has provided HUD with authority to administer the FHA, including authority to issue regulations interpreting the Act.  42 U.S.C. §§ 3608(a).

147.   HUD's regulations provide that, "[a] practice has a discriminatory effect where it actually or **predictably results in a disparate impact** on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500 (emphasis added).

148. HUD's *disparate impact* rule applies to individuals, businesses, and government entities, and applies here to both the City of Annapolis and HACA.

## The City's Affirmative Duty to Further Fair Housing

149. As a yearly recipient of CDBG funding and by its execution of "Local Grantee Certification" to HUD, Annapolis consents annually to a mandatory duty to "affirmatively further fair housing" in the City (hereinafter "AFFH duty").

150.  As a recipient of CDBG funds, the AFFH duty of the City of Annapolis requires the City to:

      a. conduct an analysis of impediments to fair housing choice;

      b. take appropriate actions to overcome the effects of impediments identified through that analysis; and

      c. maintain records reflecting the analysis and actions.

24 C.F.R. Part 91, Exhibit H, 1-2, HUD's Fair Housing Planning Guide ("FHPG").[8]

### HUD's "Basically CDBG" Course Training Manual for Annapolis

151.  For the past twelve (12) years, HUD has annually provided Annapolis with a "Basically CDBG" Course Training Manual (hereinafter, "CDBG Manual") to assist the City in administering the CDBG program.  The latest version of the CDBG Manual was published in July 2012.

152.  HUD's CDBG Manual, Section 19.2.1 states, "To be in compliance, the grantee must adhere to all the basic tenets of fair housing and equal opportunity regulations.  To demonstrate support for ensuring these tenets, grantees must endorse in attitude and deed all regulations for fairness in the provision of CDBG funded programs and projects."  Exhibit I, p. 19-1.

---

[8] The full FHPG can be found at the following web address: https://www.hud.gov/sites/documents/FHPG.PDF

153.  HUD's CDBG Manual Section 19.1.1 states:

> Grantees should be aware that fair housing provisions apply to the locality as a whole and not just those activities that are CDBG funded; and that implementing fair housing activities is an essential part of the CDBG responsibilities. **No person shall be subjected to discrimination because of: race, color, religion, sex, disability, age, familial status, or national origin**.

> Fair housing actions should increase housing opportunities and affirmatively promote fair housing throughout the entire housing market at all income levels. **These activities may include independent actions by the grantee** or cooperative ventures with housing related industries, such as mortgage lenders, home builders, and local non-profits working in housing. **The grantee is expected to take progressive actions to further fair housing with each CDBG project**.

Exhibit I, p. 19-6 (emphasis added).

154.  HACA is a recipient of CDBG funding through the City's grant. The City's failure to enforce its Code on HACA has subjected the HACA property tenants to racial discrimination in violation of HUD requirements for entities that received CDBG funds.

155.  In order to receive CDBG funds, the City is required to affirmatively act, which in the present case requires "independent actions" by the City with housing related industries to redevelop the neglected HACA properties.

**HUD's Fair Housing Planning Guide Provided to Annapolis**

156.  Since 1996, Annapolis has had knowledge of and access to HUD's FHPG which provides information to federal Entitlement Jurisdictions like Annapolis on how the City may take steps to affirmatively further fair housing.

157.  The FHPG provides that an "analysis of impediments to fair housing choice" ("AI") involves "[a]n assessment of conditions, both public and private, affecting fair housing choice for all protected classes."  Initially in 2006, and then again in 2015, the City submitted an Analysis of Impediments Report ("AI Report") to HUD officials.

158.  The 2006 AI Report identified Impediment No. 6 as follows:

> There is overlap between census tracts containing high percentages of low-income households and large numbers of members of the protected classes indicating that the **lack of affordable housing has a disproportionate impact** to members of the protected classes making their affordability problem a fair housing problem.

(Emphasis added).  Since this was acknowledged by the City in 2006, little has changed.

159.  Nearly a decade later, Mayor Pantelides and the City Council submitted their 2015 AI Report, which included critical census data that identified significant segregation within the City and confirmed that little had been done to address these very significant issues.  The 2015 AI Report provided: "In response to the

dissimilarity, isolation, and exposure data, the City will continue to incorporate strategies to address segregation and encourage diversity across the region."

**To Receive HUD CDBG Annual Funding the City of Annapolis <u>Falsely</u> Represented to HUD that the City Code is Enforced on the HACA Properties**

160.  As mandated by HUD, in order to receive federal CDBG funding, the City is required to file annually a Consolidated Annual Performance and Evaluation Report ("CAPER").

161.  The purpose of the CAPER is to report the City's success in meeting the housing and community development goals and objectives contained in its Five-Year Consolidated Housing and Community Development Plan (the "Five-Year Plan"), and to report on the prior fiscal year's successes in meeting those goals.

162.  The last Five-Year Plan was submitted on May 15, 2015.  In that plan, submitted by Mayor Pantelides one year prior to the commencement of HACA Property inspections, the Mayor certified the following:

> Because the City licenses and inspects **all rental units (except HACA properties) annually,** most of the rental units are considered in good repair. Specifically, all Section 8 properties are inspected twice; since both the City and HACA inspect the Section 8, existing and project-based units. Thus, the City's affordable housing stock is generally considered not to be substandard in nature.

(Emphasis added).

163.  As discussed *supra*, Mayor Pantelides was the first Mayor to enforce City Code on the HACA Properties.  As a result, when the City submitted its CAPER

in 2016 and 2017, the language reflected that change, and the "(except HACA properties)" language was removed.

164.  As discussed *supra*, Mayor Buckley, with the agreement of Director Wibourn and the City Council, reversed Mayor Pantelides policy.  However, when the Mayor and City Council submitted their 2018 CAPER on September 28, 2018, they falsely reported as follows:

> Because **the City licenses and inspects all rental units annually**, most of the rental units are considered in standard condition. All Section 8 properties are inspected twice; since both the City and the Housing Authority inspect the Section 8, existing and project-based units and **all public housing units are inspected both by the City and HACA**. Thus, the City's affordable housing stock is generally considered not to be substandard in nature.

(Emphasis added).  This statement is misleading for at least two reasons.  First, as discussed extensively *supra*, the City does not license or inspect any of the HACA Properties, and in fact, **all of the HACA Properties are unlicensed at this time**. Second, regarding the public housing apartments in the HACA Properties, **neither the City nor HACA** inspects all of these apartments annually.  During the spring of 2018, HACA defunded or otherwise removed its full-time inspector on staff.  The HACA properties are only visited by HACA staff when maintenance complaints are received from tenants, if ever.

165.  HUD's inspection of the HACA Properties affect a maximum of 20% of the HACA apartments in total, and HACA has up to four (4) months of advanced

notice to ensure those apartments are prepared for the inspection.  Additionally, and as discussed *supra* and acknowledged by the City, the HUD inspections are held to a significantly lower standard than those conducted by the City Inspector.

## Demographic Context and Disparate Impact

166.  The Housing Authority of the City of Annapolis has six low-income housing properties: Bloomsbury Square; Harbour House; Newtowne Twenty; Eastport Terrace; Robinwood; and Morris H. Blum Senior Apartments.  As its name indicates, Morris H. Blum Senior Apartments is restricted primarily to older persons.

167.  Racial composition of these low-income housing developments is not directly available from public sources, but the racial composition of the Census block (the immediate neighborhood) where each property is located can be determined from the 2010 Census.  The Census blocks for each of the six low-income housing properties are identified using the street addresses listed by the Housing Authority of the City of Annapolis.  The Census Bureau's American FactFinder street address function identifies Census blocks based on street addresses.

168.  Five of the Housing Authority properties are located in majority Black Census blocks.  Three of the Housing Authority properties (Bloomsbury Square, Newtowne Twenty, and Robinwood) are in blocks where **more than 90% of residents are Black**.  Whites comprise 58.9% of the residents in the block where

the Morris H. Blum Senior Apartments is located, 16.3% of the residents are Black and 21.3% of the residents are Latino.[9] This is the only Housing Authority property designated for seniors, and the only Housing Authority property located in a majority White Census block.

169. The six Housing Authority properties are in blocks where Blacks comprise 67.5% of the residents, Whites comprise 22.6% of the residents, and Latinos comprise 5.7% of the residents. In contrast, in the City of Annapolis as a whole, Whites accounted for 53.5% of residents, Blacks accounted for 25.7% of residents, and Latinos accounted for 16.8% of residents. Residents of the six Housing Authority properties are disproportionately Black. The proportion of Black residents in these properties is 2.6 times greater than the proportion of Black residents in the City of Annapolis.

170. The five Housing Authority properties **not** designated as senior housing are in blocks where Blacks comprise 71.5% of the residents, Whites comprise 19.7% of the residents, and Latinos comprise 4.4% of the residents. As noted above, Whites accounted for 53.5% of residents in the City of Annapolis, Blacks accounted for 25.7% of residents, and Latinos accounted for 16.8% of residents. Residents of the five Housing Authority properties not designated as senior housing are disproportionately Black. The proportion of Black residents in the neighborhoods

---

[9] White refers to Non-Hispanic Whites.

where these properties are located is 2.8 times greater than the proportion of Black residents in the City of Annapolis.

171. *The City of Annapolis Five Year Consolidated Housing and Community Development Plan Federal Fiscal Year 2015-2019* identifies the racial distribution of residents in the public housing properties. Of the 831 public housing units,[10] 759 (91.3%) were identified as occupied by Blacks and 58 (7.0%) were occupied by Whites.[11] A separate table reports 20 Hispanic residents.[12] The race of the Hispanic residents is not reported. This report was submitted in May 2015, so these numbers presumably represent the public housing population in 2015. In 2010, Whites accounted for 53.5% of residents in the City of Annapolis, Blacks accounted for 25.7% of residents, and Latinos accounted for 16.8% of residents. Based on the City's report and the 2010 Census data, the proportion of Black residents in these properties is 3.6 times greater than the proportion of Black residents in the City of Annapolis.

---

[10] This figure of 831 public housing units references the additional HACA units which are located outside of the HACA managed properties in other public/private developments, and incipiently, are inspected by the City.

[11] Table 24, *The City of Annapolis Five Year Consolidated Housing and Community Development Plan Federal Fiscal Year 2015-2019.*

[12] Table 25, *The City of Annapolis Five Year Consolidated Housing and Community Development Plan Federal Fiscal Year 2015-2019.*

## Harm to Plaintiffs

## General Harm to All Plaintiffs

172.  All the Plaintiffs have suffered harm in this case.  Each of the Plaintiffs to a varying degree has suffered the loss of personal property that was ruined by water or sewage intrusion due to structural failures, mold, or other actions or inactions of HACA or City personnel.

173. The history of segregation in Annapolis, the lack of wealth accumulation that segregation created, and the failure of the City of Annapolis and HACA to do anything about it over several decades have resulted in lasting health and economic effects for the City's' public housing residents, thwarting residents' ability to access opportunity and relegating once healthy people to a lifetime of disability and hardship. **The conditions that public housing residents are currently living with have led to a public health crisis for this community**.

174. The actions and omissions of the Housing Authority of the City of Annapolis and the City of Annapolis combined have allowed HACA properties to deteriorate to a deplorable state in violation of the basic human right to adequate housing and a standard of living adequate for the health and well-being of the Plaintiffs.

175.  The Universal Declaration of Human Rights (UDHR), adopted by the UN General Assembly on December 10, 1948 sets forth these basic rights in Article 25:

> Everyone has the right to a standard of living adequate for the health and well-being of himself and of his family, including food, clothing, housing and medical care and necessary social services and the right to security in the event of unemployment, sickness, disability, widowhood, old age or other lack of livelihood in circumstances beyond his control.

Moreover, the United States has ratified a number of international treaties in which these basic tenets are set forth solidifying the notion that human rights are not just aspirational, but must be protected and are at the very core of our social structure.

176.  The International Convention on the Elimination of all Forms of Racial Discrimination (CERD), ratified by the U.S. on November 20, 1994, states in relevant part:

> In compliance with the fundamental obligations laid down in article 2 of this Convention, State Parties undertake to prohibit and eliminate racial discrimination in all its forms and to guarantee the right of everyone, without distinction as to race, colour, or national or ethnic origin to equality before the law, notably, in the enjoyment of the following rights … in particular … **the right to housing**."

CERD, Article 5 (emphasis added).   Similar language can be found in the International Covenant on Civil and Political Rights at Article 2 and Article 26, ratified by the U.S. Congress on September 8, 1992, and the Charter of the

Organization of American States at Article 34(k), ratified by the U.S. Congress on December 13, 1951.

177.  When dealing with HACA, at no point has any Plaintiff been offered the opportunity to be relocated into an apartment that was deemed safe for habitation by the City of Annapolis or that is currently licensed by the City.

**The Smith Family**

178.  Prior to living at her present address of 813 Betsy Court, Apt. B, in Newtowne 20, Ms. Smith and her three minor children lived at 1125 Madison Street, Apt. B3, in Harbour House.  During the winter 2015 and spring 2016, Ms. Smith discovered water seeping into the corner of her bedroom from a leak in the foundation and wall outside of the apartment.  She also discovered raw sewage leaking into her bathroom from the apartment above.

179.  The moisture from the leaks led to significant mold growth behind the walls and ceilings of the bedroom and bathroom of the apartment.  Despite numerous complaints to HACA about the presence of the water and mold, HACA refused to hire a professional mold remediation company to remediate the mold, but instead simply wiped the mold away with bleach, and directed Ms. Smith to do the same if the mold returned.

180.  Between May 16 and May 19, 2016, the City inspectors completed their initial inspections of the Harbor House development.  During that inspection, the

City found multiple violations of the City Code.  The apartment did not have any of the AC powered smoke detectors required by the City Code.

181.  The City inspectors failed HACA on the May 2016 inspection but did not require the relocation of Ms. Smith and her family at that time and issued the rental license to HACA despite the failures.

182.  One month later, in June 2016, an attorney for Ms. Smith contacted HACA and advised them of the presence of toxic mold in the air at Ms. Smith's apartment.  HACA **refused to act** to remediate the mold.

183.  In August 2016, the attorney for Ms. Smith contacted the City's Senior Property Maintenance Inspector Mary E. Emrick.  As a result of the correspondence, a follow-up inspection was conducted of Ms. Smith's apartment.   During that inspection on August 3, 2016, HACA was cited for numerous additional violations of the City code, including the presence of mold and sewage leaking through **the ceiling** of the Smith bathroom, which was located on the basement floor.  As a result of this August 2016 inspection, the City issued a Notice of Inspection that provided HACA 30 days to fix the violations.   In accordance with City policy, the City Inspector directed HACA to relocate Ms. Smith and her family for the duration of the remediation.  *See* Exhibit J.

184.  Instead of relocating the Smith family temporarily, shortly after the receipt of the notice, the Smith family was moved to an entirely different

development, where they continue to reside currently at 813 Betsy Court in Newtowne 20.

185.  Later in 2016, and as discussed *infra*, Plaintiff Tiamani Johns and her infant son were moved into the Smith's old apartment at Harbour House.

186. Shortly after moving into the Newtwone 20 apartment, Ms. Smith complained to HACA maintenance staff regarding mold in the new apartment as well.  The mold growth was constantly reappearing in the upstairs bathroom. Maintenance would arrive after calls, and simply state that the mold growth was Ms. Smith's fault because she did not use the ventilation system in the apartment to control the moisture.

187.  Ms. Smith retained a certified industrial hygienist to conduct air quality tests of the apartment and the attic directly above the bathroom.  The testing revealed high concentrations of toxic mold present in the air in both the living space of the apartment, as well as the attic.  Some of the highest and most dangerous types of mold discovered in the apartment were in the attic.

188. Ms. Smith's children have each on several occasions suffered nose bleeds and headaches as a result of exposure to the conditions of the apartment.  Ms. Smith herself had significant health issues since moving into the apartment to include breathing difficulties related to her asthma.  She advised HACA of these

medical problems, but they refused to move her to an apartment that is inspected by the City.

189.  In February 2019, Ms. Smith put HACA on notice of the mold present in the apartment. She also made the City Inspector's office aware of the mold as well, but as discussed *supra*, unlike its response in 2016 which subjected HACA to further inspections and forced HACA to act for the benefit of the tenants, the City's new policy prevented the City Inspector from enforcing the City Code on the Housing Authority.   As a landlord, HACA was then permitted to respond as it desired, instead of being held to the standard of all other landlords in the City.

190.  HACA chose to ignore the City's guidelines regarding remediation of mold.   After confirming the mold presence in the attic, HACA's maintenance personnel used caulk to seal the wood hatch to the attic shut.  In doing so, HACA personnel threatened Ms. Smith that if she accessed her attic – the space directly above her bathroom – she would be guilty of trespass.

191.  Pursuant to HUD regulations as well as Ms. Smith's lease, she had the right to access the attic crawl space.

192.  During the time period while HACA's personnel and contractors were making these alterations to her apartment, HACA relocated the family to a hotel. The family lived in the hotel for nearly a month during the school year, with no access to the children's school transportation.  The children missed some days of

school during this time period.  Additionally, Ms. Smith, who had recently begun a new job, was forced to quit or be fired as a result of the difficulties related to the sudden relocation and the transportation difficulties faced by her children.

193.  Ms. Smith and her children's mental and physical health have been greatly affected by the failures of both HACA and the City, and those failures have caused them significant damage.

194.  Ms. Smith and her family live in an unlicensed rental apartment, and no effort has ever been made by the City to advise her that the apartment is not licensed. Despite HACA having failed the 2016 inspection, she and her family were never relocated from the home in accordance with the requirement of the City Policy at the time.

**The Clark Family**

195.  Ms. Clark and her two minor children live at 813 Betsy Court, Apartment A, in the apartment immediately adjoining the Smith family home.

196.  In 2017, Ms. Clark's oldest son suffered an accident.  As a result of the accident, he was forced to spend significant time in recovery at home.  However, the mold and moisture presence in the home was so great, that he could not stay at the Newtowne 20 residence, the Clark family was forced to live elsewhere for approximately six months while he recovered.

197.  HACA was on notice of the terrible condition of the apartment during this time when the family was forced to live elsewhere.

198.  During their time living at the Newtowne 20 apartment, the family has been plagued by plumbing and sewage leaks behind the walls.  On three (3) separate occasions, the ceiling on the first floor below the bathroom collapsed due to leakage from the bathroom.

199.  During the last City inspection of the property in June 2016, it was also discovered that the property did not have adequate smoke detectors as required by City Code.  In fact, two of the bedrooms had no working smoke detectors at all, and the apartment did not have any of the AC powered detectors required by the City Code.  It was discovered that the electrical outlets in the kitchen were not properly grounded which presented a serious safety risk.  However, the City did not enforce the City Code on HACA as it does other landlords, and instead of requiring HACA to relocate the Clark family, they were left in the home with the violations unfixed. To date, the apartment still does not have the smoke detectors required by City Code.

200.  The Smith and Clark apartments share the same attic.  In March 2019, Ms. Clark put HACA and the City on notice that she too had hired a certified industrial hygienist to test her apartment.  Ms. Clark, along with Ms. Smith, also provided the City and HACA with photographs of the ventilation system in their homes, which are reflected in Figures 2 and 3 *supra*.

201.  As with Ms. Smith's apartment, and as a direct result of the City policy not to inspect HACA properties, the City refused to respond to inspect Ms. Clark's apartment and enforce the City Code on HACA as a landlord.

202.  Ms. Clark and her children's mental and physical health have been greatly affected by the failures of both HACA and the City, and those failures have caused them significant damage.

203.  Ms. Clark and her family live in an unlicensed rental apartment, and no effort has ever been made by the City to advise her that the apartment is not licensed. Despite HACA having failed the 2016 inspection, she and her family were never relocated from the home in accordance with the requirement of the City Policy at the time.

**The Johns Family**

204.  Ms. Johns and her son live at 1125 Madison Street, Apartment B3 in Harbour House, and as indicated *supra*, Ms. Johns was moved into this apartment just months after the Smith family was relocated.

205.  Ms. Johns has made numerous complaints to HACA regarding the continued presence of mold in her apartment.

206.  Ms. Johns has also contacted the City regarding the mold in her home however, the City refused to respond to inspect Ms. Johns' apartment and enforce

the City Code on HACA as a landlord and only forwarded Ms. Johns' complaint on to HACA.

207.  Ms. Johns and her child's mental and physical health have been greatly affected by the failures of both HACA and the City, and those failures have caused them significant damage.

208.  Ms. Johns and her family live in an unlicensed rental apartment, and no effort has ever been made by the City to advise her that the apartment is not licensed.

**The Holliday Family**

209.  Ms. Holliday and her three (3) minor children live at 808 Brooke Court, Apartment B, at Newtowne 20, where she has resided since 2017.

210.  Brooke Court is located approximately 200 yards from Betsy Court which is also located in Newtowne 20.  Prior to 2017, Ms. Holliday lived at 804 Betsy Court, Apartment C.  This was a basement level apartment.

211. In the June 2016 inspection of 804 Betsy Court, where Ms. Holliday was living at the time, the City Inspector discovered a number of violations in the apartment.  The City inspector discovered that none of the bedrooms had working smoke detectors, and that none of the smoke detectors were AC powered as required by the City Code.  Flaking paint was discovered in the apartment, and Ms. Holliday's children were very young at the time.  It was discovered that mold was present inside the bathroom, and the City required HACA to repair the bathroom, prepare the area,

and paint.  However, the City did not enforce the City Code on HACA as it does other landlords, and instead of requiring HACA to relocate the Holliday family, they were left in the home with the violations unfixed.

212.  In 2017, while living at that apartment, there was an infestation of bats, and as a result of that infestation, HACA moved the Holliday family out of the apartment and into their present residence on the other side of the development.  At the time they were moved out of that apartment, none of the violations of the City Code had been fixed by HACA.

213.  Ms. Holliday's children suffer from asthma, with which they were diagnosed during the time they lived in the HACA properties.  One of her sons requires breathing treatments administered with a nebulizer numerous times a day as a result of his breathing difficulties.  HACA has been on notice of these issues and has refused to accommodate the family.

214.  On several occasions, the sewage pipes have backed up into the Holliday home.  On at least one occasion, a sewage pipe located in a closet of the apartment ruptured, and leaked sewage all over the floor of the apartment.  The leaks in the plumbing have caused ongoing moisture issues in the walls and attic of the home.

215.  From the time she moved in, Ms. Holliday has complained to HACA about persistent mold, moisture, and sewage in the home.  In addition to these issues,

the ventilation systems have never adequately been maintained.  **Figures 7 and 8** are photographs of the ventilation ducting system in the Holliday apartment.  This building is on the opposite side of the development from that of Ms. Smith and Ms. Clark, yet their ventilation systems, as illustrated *supra*, are equally vile.



**Figure 7 - Apartment 808 B Ventilation Duct**



**Figure 8 - Apartment 808 B Ventilation Duct**

216.  Ms. Holliday and her children's mental and physical health have been greatly affected by the failures of both HACA and the City, and those failures have caused them significant damage.

217.  Ms. Holliday and her family live in an unlicensed rental apartment, and no effort has ever been made by the City to advise her that the apartment is not licensed.  Despite HACA having failed the 2016 inspection, she and her family were not relocated from the home at the time in accordance with the requirement of the City policy.

**The White Family**

218.  Ms. White and her three minor children live at 1164 Frederick Douglas Street, which is located in HACA's Eastport Terrace Property.  Mr. D'Andre Covert is Ms. White's 18-year-old son who also lives with his mother and siblings at the residence.

219.  On May 12, 2016, the City inspected 1164 Frederick Douglas Street.  It was discovered that mold was present inside the bedroom ceiling, and the City required HACA to repair the bedroom, prepare the area, and paint.  However, the City did not enforce the City Code on HACA as it does other landlords, and instead of requiring HACA to relocate the White family, they were left in the home with the violations unfixed.  To date the mold is still present in the ceiling.

220. On numerous occasions since they have lived in the home, HACA has been notified of the continued presence of mold growth on walls throughout the home.  Ms. White continuously cleans and paints over the mold, but due to the condition of the structure and the moisture in the walls, she is unable to stop the growth.

221. Ms. White's 19-year-old son Mr. Covert has significant breathing issues related to asthma.  He takes medicine for his asthma through a nebulizer which assists him to breathe.  In the summer, when the mold content in the apartment air is the highest, he has on numerous occasions been forced to sleep a few houses down at a friend's house where the mold in the apartment air is not as bad.

222. Ms. White and her children's mental and physical health have been greatly affected by the failures of both HACA and the City, and those failures have caused them significant damage.

223. Ms. White and her family live in an unlicensed rental apartment, and no effort has ever been made by the City to advise her that the apartment is not licensed.  Despite HACA having failed the 2016 inspection, she and her family were never relocated from the home in accordance with the requirement of the City Policy at the time.

**The Dixon Family**

224.  Jonathan and Breonna Dixon lived at 960 President Street, Apartment B3, in HACA's Harbour House Property.

225.  In May 2016, the City inspected the Dixon Apartment.  The City cited HACA for the presence of mold in the apartment, as well as peeling paint.  However, when they moved into the apartment in September 2016, HACA representatives affirmatively misrepresented to the Dixons that there was **never** any mold found in their apartment prior to September 2016.

226.  Two years later, in May 2018, the Dixons advised HACA that there appeared to be a leak in the foundation which was allowing rainwater direct access to their bedroom.  As a result of the moisture, mold immediately began to grow again in the apartment.

227.  Mr. Dixon had been diagnosed with multiple sclerosis ("MS") in June 2016.  At the time the Dixons moved into the apartment in September 2016, they advised HACA representatives that Mr. Dixon had MS.  In addition to his MS, he had severe allergies to airborne mold and in the summer of 2018, he provided a detailed doctor's note and report regarding his mold sensitivity to his property manager at HACA.

228.  The Dixons advised HACA of the mold and moisture but were told by HACA there was no mold present.

229.  The Dixon family left town for a week at the end of May, but when they returned, the mold had only gotten worse.  The Dixons demanded that testing be done, and as a result of HACA testing, significant levels of mold were found in the apartment.

230.  HACA provided the Dixon family a hotel room for approximately one week while they were forced out of the apartment in May 2018.

231.  HACA responded to the apartment and removed portions of drywall. HACA **did not**, however, hire a professional remediator, which is the policy requirement of the City.  As a result, the remediation was not completed in accordance with the relevant professional guidelines.  Once the Dixon family was allowed back into the home, mold was still present in the air, and Mr. Dixon advised HACA immediately that he was not able to live in the apartment due to his sensitivity as a result of his allergy and his MS.  Mr. Dixon could not be in the apartment for more than a few minutes without intense physical reaction to the air quality.

232.  When the Dixons complained again to HACA, they were told by the property manager that HACA would not be spending any more money on the apartment, and that the family could either move back in or "get a lawyer."  A HACA representative also explained that they would not accommodate tenants who were allergic to mold or other contaminants in the HACA Properties because allergies were not a disability.

233.  The Dixon family stayed out of the apartment for the remainder of June, July, and August, and lived with family.

234.  In July, Mr. Dixon visited an allergist about his breathing.  As a result of the testing, the allergist advised that Mr. Dixon had a heightened sensitivity to elevated levels of mold in the air.  HACA was again notified of Mr. Dixon's MS diagnosis and his sensitivity to the mold, but the Housing Authority refused to help he and the family.

235.  HACA was also put on notice of medical conditions related to the Dixons' youngest son.  Due to a genetic disorder, he too was sensitive to the conditions of the apartment, and HACA was provided information explaining that condition which had been presented to them by the child's doctor.  HACA refused to act based on that information.

236.  During the summer of 2018, the Dixons contacted the Mayor's office, and made the City aware of the ongoing mold problem in their apartment.  The City **did not send** inspectors to the home.  The City did not enforce its policies on HACA as it would have any other landlord in the City.

237.  In September 2018, Mrs. Dixon contacted the Mayor's office and spoke with a Ms. Janice.  Mrs. Dixon was advised that: "Director Wilbourn will be coming in for a meeting at the Mayor's office that Monday [September 17, 2018], and that she would bring the issue up with the Mayor at the meeting."  For the remainder of

September 2018, HACA did nothing to remediate the mold still present in the apartment.

238. On October 3, 2018, the Dixons returned to the apartment to conduct a visual inspection. When they entered the apartment, they were overcome by a strong smell of sewage. They contacted HACA maintenance personnel who arrived at the apartment. The maintenance person explained that the apartment on the third floor had a sewage leak that leaked down into the second floor apartment above, and that HACA had cleaned up the sewage from those apartments, but had not realized that the leak had made it all the way to the Dixon apartment on the basement floor.

239. After maintenance cleaned the feces out of the ceiling of the Dixon apartment, they dried the ceiling out, but claimed that there was no moisture and so there was no reason to replace the drywall.

240. Ms. Dixon was advised that one of HACA's policies is that if a tenant is not living in the home for a period of time, HACA has the right to evict them and move their belongings outside of their home and place them next to the dumpster. During the time when the Dixons were not living in the apartment due to the mold, HACA continued to threaten them with eviction due to their failure to be present in the home despite the ongoing issues with the air quality.

241. On approximately October 5, 2018, Mrs. Dixon contacted Senior City Inspector Mary Emerick. Ms. Emerick explained that HACA had told the City that

the work was completed and the whole apartment had been tested.  In fact, only one bedroom had been tested by HACA.  Mrs. Dixon asked Ms. Emerick if the City could come out and test the apartment and she replied that "HACA did not want any government officials including the health department on their property without HACA knowing."

242. Shortly after the October 5, 2018 conversation with Ms. Emerick, HACA maintenance personnel Francisco Castellanos reached out to Mrs. Dixon. Mr. Castellanos explained that he had spoken to the City's inspector, and that as a result, he had ordered additional testing to be performed at the apartment.

243.  On approximately October 19, 2018, Mr. Castellanos requested to meet with the Dixons in person at their apartment to speak about the results of the air testing.  Mr. Castellanos advised the Dixons that due to health reasons, they could not move back into their apartment.  HACA explained that they would find a different apartment for the family.

244.  The Dixons had moved to public housing while Mr. Dixon, who could no longer work due to his MS diagnosis, was waiting for his disability to be approved.  Public housing was a steppingstone at a difficult time in their lives.  As a result of HACA's failure to take their complaints seriously, the family was forced to live out of their car and with family for approximately six (6) months prior to permanently leaving town.

245. During that difficult time, the City never responded to the Dixons' complaints as required by the City Code and policy, State Law, and consistent with the City's enforcement of the City Code on other landlords in the City.

246. Mr. and Mrs. Dixon and their children's mental and physical health have been greatly affected by the failures of both HACA and the City, and those failures have caused them significant damage.

247. The Dixons lived in an unlicensed rental apartment, and no effort was ever made by the City to advise their family that the apartment was not licensed.

**Glenn Rogers**

248. Mr. Rogers lives alone in his apartment at the Morris H. Blum Senior Apartments. He previously resided in Apartment 502. While at that apartment, he endured numerous problems due to the lack of regular maintenance by HACA and the failure of the City to enforce inspections on HACA. In 2014, the Capital Gazette interviewed him regarding the water leaking through his ceiling and the resulting smell related to HACA's failure to properly fix the damage.

249. Beginning in 2018, Mr. Rogers began complaining to HACA about discoloration in his ceiling that resulted from water damage and odors coming out of his ventilation that were causing intense burning to his eyes and skin. HACA was made aware of the issues immediately but did nothing to fix the source of the

problem in the building.  Mr. Rogers was forced to seek treatment at the emergency room and at his primary care physician on multiple occasions.

250.  In approximately April 2018 one HACA maintenance worker painted over discoloration related to the water damaged drywall to conceal the leak from HUD inspectors.

251.  In September and October of 2018, Mr. Rogers continued to reach out to the Maryland Department of Health as well as the City of Annapolis Permitting Office to seek assistance.  Neither the Maryland Department of Health nor the City responded in person or sent representatives to his apartment.  The person he spoke with at the City put him in contact with a member of the HACA maintenance staff instead of sending a City inspector out to the property.

252.  During the fall and winter of 2018/2019, Mr. Rogers often left his room at night to escape the strong fumes in his apartment and would stand outside in the fresh air.

253.  Mr. Rogers had applied for a transfer in 2014 but had not received the offer of a different apartment where the air was clean or that had been properly licensed by the City.

254. During the time in his apartment, he was plagued by a cockroach infestation.  The insects would access his kitchen through holes in the ceiling that HACA refused to patch, and no amount of cleaning could deter their presence.

255.  In October 2018, maintenance personnel from HACA inspected the apartment and discovered that the vents likely needed to be cleaned.  Shortly thereafter, Mr. Rogers purchased a home mold testing kit, and performed a test of the growth he observed on the walls and other areas of the apartment.  The results confirmed the presence of toxic mold in the apartment.  Mr. Rogers presented the results of the test to HACA personnel, but nothing was done.

256.  In December and January 2018/2019, HACA still refused to take action to address the air quality issues within Mr. Rogers' apartment.  In February 2019, Mr. Rogers provided HACA with a letter he had received from his Doctor which stated that Mr. Rogers was:

> having numerous severe symptoms that have been suspected to be a reaction to some toxin or irritant (in his apartment) to which he is sensitive.  He has been undergoing evaluation by specialists, and has been referred to the Environmental/Occupational Health clinic at University of Maryland.  Because these symptoms abate when he is not in the Morris Blum building, he is being advised to move out of the building.

Despite this notice, HACA did not move Mr. Rogers out of the building or even out of the apartment.

257.  In March 2019, Mr. Rogers again reached out to the City and explained his problems with the apartment.  This time, the Senior City Inspector Mary Emerick responded by going to the apartment with a member of HACA's staff, and days later, Mr. Rogers was transferred to a new apartment in the building.  No City inspection

was completed, and no rental license was issued by the City despite the visit to the apartment by the City's Senior Inspector.

258.  Mr. Rogers' mental and physical health have been greatly affected by the failures of both HACA and the City, and those failures have caused him significant damage.

259.  Mr. Rogers lives in an unlicensed rental apartment, and no effort has ever been made by the City to advise him that the apartment is not licensed.  Despite HACA having failed the 2016 inspection, he was never relocated from the home in accordance with the requirement of the City Policy at the time.

**The Camp Family**

260.  Ms. LaDawn Camp lives with her 14-year-old son at 801 Brooke Court, Apartment C, in the Newtowne 20 Development.  She has a chronic illness which affects her immune system and makes her particularly sensitive to poor environmental conditions.  Since Ms. Camp has lived in her current unit, she has been hospitalized on at least 3 occasions and has been on and off a peripherally inserted central catheter line for approximately 3 years.  HACA has been on notice of this disability for the entire relevant period.

261. Ms. Camp's unit is situated at the end of a row of garden style apartments with a unit directly above her. The entrance to her home is at the bottom

of a steep grade with poor drainage.  As a result, water pools outside of her front entrance when it rains.

262.  During her tenure at her current address, Ms. Camp has experienced numerous maintenance issues.  In 2013, the hot water heater in the unit above Ms. Camp broke flooding the unit above and causing her living room ceiling to collapse. Both Ms. Camp and her neighbor were relocated to a hotel for approximately two weeks. The flooding greatly exacerbated the presence of mold in the apartment which was previously present.

263.  In 2014, Ms. Camp presented a letter to the management office from her physician requesting the she be moved due to her weakened immune system.  At the time, Ms. Camp's Social Security benefits had been reduced, her rent was not adjusted accordingly, and she fell behind in her payments.  As a result, HACA refused her transfer request because she was "not in good standing." The rent issue was ultimately resolved, however, HACA never processed the transfer.

264.  In July 2016, as part of the City inspections the City inspected her apartment, and it failed the inspection as a result of safety violations.

265.  Ms. Camp has made numerous requests for maintenance which have largely been ignored.  Most recently, Ms. Camp's unit has had mold, flaking, peeling and bubbling paint, and gaps between her window and bedroom wall allowing airflow and rainwater from outside to enter.

266.  In addition to Ms. Camp's requests, on February 14, 2019, HACA was sent written notice of the conditions in Ms. Camp's unit, along with photographs, and a request to relocate her to a healthier living environment "as quickly as possible."  To date, there has been no response to that request.

267.  On Friday, March 8, 2019, a report was made to the City Inspector's office. They responded by sending an inspector to the unit on March 21, 2019 and then contacting HACA to request they make a site visit to check for possible mold and fungus present in the apartment and to make some other repairs.

268.  On or about April 3, 2019, HACA recaulked the tub and shower surround, repaired the area around the bedroom window so that it no longer leaks, and advised Ms. Camp that there was no mold in the unit.  **At no time** did any inspector test for mold.  Ms. Camp's unit has never been inspected by HUD to her knowledge.

269.  Ms. Camp and her child's mental and physical health have been greatly affected by the failures of both HACA and the City, and those failures have caused them significant damage.

270.  Ms. Camp lives in an unlicensed rental apartment, and no effort has ever been made by the City to advise her that the apartment is not licensed.  Despite HACA having failed the 2016 inspection, she was never relocated from the home in accordance with the requirement of the City Policy at the time.

**The Fuller Family**

271.   Ms. Lakisha Fuller lives with her two minor children at 1432 Tyler Avenue in the Robinwood community.   Ms. Fuller is expecting a third child in October.   The townhouse the Fullers live in is at the end of the complex, adjacent to the woods.   Ms. Fuller put in a transfer request about two years ago because her house needed various repairs that HACA refused to fix.   Shortly before her HUD inspection was set to take place in 2018, a HACA maintenance person advised that certain repairs were needed.   She showed the maintenance person documentation that she had already put in work orders for repairs, and that HACA had done nothing. Once the HUD inspection was scheduled, HACA sent someone out to do the repairs. Ms. Fuller asked about the transfer again in April 2019, and she was told they are not doing any transfers.

272.   In addition to needed repairs, there is mold growing in the unit.   The HACA maintenance person has come out repeatedly to try to get rid of the mold but the source of the problem has not been remediated, so the problem persists.

273.   Ms. Fuller's son has been diagnosed with asthma and is required to use a nebulizer when he has trouble breathing.   The air in the apartment is a constant source of concern.   The ventilation has not been cleaned in years, and the family is constantly suffering from sinus-related issues while they are in the apartment.   The same issues ease when they are not in the apartment.

274.    There are also paint chips coming off the walls throughout the home. Ms. Fuller is concerned about this because she is expecting a baby in October.

275.  When the City inspected their apartment in May 2016, it was discovered that none of the bedrooms had smoke detectors at all, let alone the AC powered detectors required by the City Code.  It was discovered that mold was present inside the bathroom ceiling, and the City required HACA to repair the bathroom, prepare the area, and paint.  However, the City did not enforce the City Code on HACA as it does other landlords, and instead of requiring HACA to relocate the Fuller family, they were left in the home with the violations unfixed.  To date the mold is still present in the apartment.

276.  Ms. Fuller and her children's mental and physical health have been greatly affected by the failures of both HACA and the City, and those failures have caused them significant damage.

277.   Ms. Fuller and her family live in an unlicensed rental apartment, and no effort has ever been made by the City to advise her that the apartment is not licensed.  Despite HACA having failed the 2016 inspection, Ms. Fuller and her family were never relocated from the home in accordance with the requirement of the City Policy at the time.

## FIRST CAUSE OF ACTION
### (Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1982)
### *Against all Defendants*

278.  Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

279.  Defendants' discriminatory practices, made in reckless or callous indifference or disregard for the rights of Plaintiffs, deprive Plaintiffs of their right to purchase, lease, or otherwise hold or convey property on the basis of race, color, and national origin and thus deprive them of the same such rights as are enjoyed by White persons in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1982.

280.  The Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

## SECOND CAUSE OF ACTION
### (Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States)
### *Against all Defendants*

281.  Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

282.  Defendants' discriminatory customs, patterns, practices, and usages in contravention of Plaintiffs' constitutional and federal statutory rights made in reckless or callous indifference or disregard for the rights of Plaintiffs, did deprive Plaintiffs of their right of equal access to housing under color of law in violation of

the Federal Civil Rights act of 1871, 42 U.S.C. § 1983, and their rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution with regard to housing.

283.  The Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

### THIRD CAUSE OF ACTION
**(Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1985 and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States)**
***Against all Defendants***

284.  Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

285.  Defendants conspired with discriminatory purpose to deprive either directly or indirectly the rights of Plaintiffs, members of a protected class, to equal protection of the laws or equal privileges and immunities under the laws, and one or more of the Defendant conspirators did or caused to be done acts in furtherance of the object of the conspiracy, and Plaintiffs were injured in person or property or deprived of having and exercising their rights as citizens of the United States.

286.  The Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

### FOURTH CAUSE OF ACTION
**(Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1986 and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States)**

*Against all Defendants*

287.  Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

288.  Defendants were in a position of power and knowledge of the conspiracy to deprive Plaintiffs of their rights in violation of 42 U.S.C. § 1985.

289.  Defendants were on notice through City Council meetings, both open and closed to the public, as well as communications between the Mayor, City Council, the Executive Director, and Housing Authority officials, that the City had an obligation to inspect the HACA Properties.  Despite this obligation, the City adopted the policy not to inspect the HACA properties.  In continued refusal of enforcement of City Code, and despite notice of that obligation, Defendants failed to uphold their duty to ensure the health and safety of Plaintiffs.  Plaintiffs' civil rights were violated as a result.

290.  The breach of Defendants' duty was the proximate cause of the violations of the Plaintiffs' civil rights.

### FIFTH CAUSE OF ACTION
**(Violation of the "Affirmatively Furthering" Obligations Under the Fair Housing Act, 42 U.S.C. § 3608)**
*Against all Defendants*

291.  Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

292. Defendants, in connection with their use of federal funds related to housing, including funds from the federal CDBG program, have used the funds received in a discriminatory manner which promotes segregation and otherwise failed to meet the "Affirmatively Furthering Fair Housing" obligations of the Fair Housing Act.

293. The Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

## SIXTH CAUSE OF ACTION
### (Violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*)
### *Against all Defendants*

294. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

295. Defendants' discriminatory practices regarding the administration of federal programs are carried out with reckless or callous indifference or disregard for the rights of Plaintiffs, and violate the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.

296. The Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

## SEVENTH CAUSE OF ACTION
### (Violation of Fair Housing Act, 42 U.S.C. § 3601 *et seq.*)
### *Against all Defendants*

297. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

298. Defendants' policy of non-enforcement of the City Code on the HACA Properties constitutes a violation of the Fair Housing Act, 42 U.S.C. §3604(b), which makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

299. Defendants Mayor Buckley, the City of Annapolis, the Aldermen, and Alderwomen of the City of Annapolis' facially neutral housing acts, policies, and actions challenged herein inflict disproportionate harm on African American residents of the HACA Properties. The disproportional harm experienced by the African American residents of the HACA Properties is the direct and immediate consequence of the Defendants' policy of non-enforcement of the City Code on the HACA Properties.

300. As a result of Defendants' Mayor Buckley, Aldermen, and Alderwomen of the City of Annapolis' acts, the Plaintiffs have been denied the opportunity to live in safe rental housing inspected by the City of Annapolis on an annual basis, a right they would enjoy if they lived in any other rental property in the City that was not managed by the Housing Authority.

301. Defendants' acts, policies, and practices constitute discrimination in violation of the Fair Housing Act, as amended, 42 U.S.C. §3604, and its implementing regulations, in that:

    a. Defendants' acts, policies, and practices have made and continue to make housing unavailable because of race in violation of 42 U.S.C. §3604(a); and

    b. Defendants' acts, policies, and practices provide different terms, conditions, and privileges of rental housing on the basis of race, in violation of 42 U.S.C. § 3604(b)

302. Plaintiffs are aggrieved persons as defined in 42 U.S.C. § 3602 (d) and (i). They have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

## EIGHTH CAUSE OF ACTION
### (Violation of Title II of the Americans with Disabilities Act
### 42 U.S.C. § 12131 *et seq*.)
### *Against the Housing Authority of the City of Annapolis*
### *and the City of Annapolis*

303. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

304. The Housing Authority of the City of Annapolis and the City of Annapolis are public entities as defined by 42 U.S.C. § 12131(1).

305. Each Plaintiff family has one or more members who is a "qualified individual with a disability" as defined by 42 U.S.C. § 12131(2).

306. Defendant HACA has failed to reasonably modify their policies, practices, and procedures to provide reasonable accommodations to the Plaintiffs when requested, and has failed to engage in a meaningful dialogue with plaintiffs regarding requests for reasonable accommodation in violation of 42 U.S.C. § 12132.

307. Defendant HACA has failed to properly remediate mold and/or other air quality contaminants and/or make necessary repairs or modifications to apartments and/or failed to provide Plaintiffs with transfers out of apartments which exacerbate illnesses and disabilities in violation of the Americans with Disabilities Act.  Defendant HACA has kept Plaintiffs in unsafe and unhealthy conditions which has a discriminatory effect and has otherwise limited the Plaintiffs enjoyment of the rights, privileges, advantages, and opportunities provided to others in violation of the Americans with Disabilities Act.

308. Defendant City of Annapolis has failed to inspect and require repairs, modifications and remediation to HACA properties, as it does for all other rental properties in the City of Annapolis, resulting in discriminatory effect against the Plaintiffs and has limited Plaintiffs in the enjoyment of rights privileges, advantages, and opportunities provided to others, and otherwise discriminated against Plaintiffs

on the basis of disability in violation of the Americans with Disabilities Act and its implementing regulations.

**NINTH CAUSE OF ACTION**
**(Violation of Section 504 of the Rehabilitation Act 29 U.S.C. 794 et seq.)**
**Against The Housing Authority of the City of Annapolis**
**and the City of Annapolis**

309. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

310. Each Plaintiff household has one or more members who is a qualified individual with a disability for purposes of Section 504 of the Rehabilitation Act, 29 U.S.C. 794, *et seq*.

311. The Housing Authority of the City of Annapolis receives federal financial assistance from HUD; the City of Annapolis receives federal financial assistance from HUD and/or other federal sources.

312. By failing to properly remediate mold and/or other air quality contaminants and/or make necessary repairs or modifications to Plaintiffs' apartments and/or failing to provide Plaintiffs with transfers out of their unhealthy apartments into apartments free from unhealthy conditions, Defendant HACA has failed to afford Plaintiffs an opportunity to participate in and benefit from housing which is equal to that afforded others, failed to provide housing which does not exacerbate illnesses and disabilities, kept Plaintiffs in unsafe and unhealthy conditions which has a discriminatory effect and has otherwise limited the Plaintiffs'

enjoyment of the rights, privileges, advantages, and opportunities provided to others in violation of Section 504 0f the Rehabilitation Act and its implementing regulations.

313.  By failing to inspect and require repairs, modifications and remediation to HACA properties in order to ensure that HACA's rental properties are safe and sanitary, as it does for all other rental properties in the City of Annapolis, Defendant City of Annapolis has acted in a discriminatory manner against the Plaintiffs and has limited Plaintiffs in the enjoyment of rights privileges, advantages and opportunities provided to others, and otherwise discriminated against Plaintiffs on the basis of disability in violation of Section 504 0f the Rehabilitation Act and its implementing regulations.

## TENTH CAUSE OF ACTION
### (Writ of Mandamus)
***Against Defendant City of Annapolis, Defendant Mayor Gavin Buckley, and Defendants City Council of the City of Annapolis***

314.  Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

315.  Plaintiffs, pursuant to Md. Rule 15-701, seek a writ of mandamus to compel Defendants Mayor and the Aldermen and Alderwomen of Annapolis to perform their statutory duties.

316.  Mayor and Aldermen and Alderwomen of Annapolis comprise a body corporate and politic and a chartered municipal corporation under Maryland Code

and are responsible for issuing rental licenses through its Department of Planning and Zoning pursuant to its ordinance codified at 17.44.010.

317.  Mayor and Aldermen and Alderwomen adopted a policy not to inspect any properties of the Housing Authority, all of which are leased to low-income public housing tenants, who are predominately African American.

318.  Mayor and Aldermen and Alderwomen have a clear duty to enforce the rental licensing requirements of the City Code on all persons letting for occupancy a multiple dwelling unit such as those which are let by the Housing Authority.

319.  Plaintiffs who live in low-income public housing have a plain and clear right to have their dwelling units inspected.

320.  Plaintiffs have no other adequate remedy by which to obtain this right of City inspection of their rented dwellings.

## ELEVENTH CAUSE OF ACTION
## (MARYLAND CONSUMER PROTECTION ACT)
### *Against all Defendants*

321.  Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

322.  At the inception of the leases with each of the Plaintiffs, which is required by HACA policy to occur annually, Defendants had both actual and constructive knowledge that the HACA Properties were not properly licensed pursuant to City Code.

323.  On some occasions, HACA represented to Plaintiffs that it was properly licensed pursuant to the rental laws of the Annapolis City Code when it was not.

324.  In some instances, HACA or its agents falsely represented to Plaintiffs, HACA tenants, and judicial tribunals of the State of Maryland that HACA was not licensed, but that it was by law not required to be licensed.

325.  Prior to entering the leases, Defendant HACA affirmatively showed the units to Plaintiffs and represented them to be free of any material defects, including unhealthy indoor molds and water intrusion defects.

326.  The units in fact had design defects, serious safety shortfalls including the lack of appropriate fire safety systems, construction and/or maintenance defects which caused severe water intrusion and extensive mold growth and dangerous air quality issues, all existing at the time the lease was entered into and these defects were omitted in the representations made by Defendants.

327.  Defendant HACA made the affirmative representation to all Plaintiffs at the time of lease inception that "HACA is obligated to…comply with the requirements of all applicable building and housing codes materially affecting health and safety…."  At the time of that representation, Defendant HACA was on notice from the City of Annapolis, since at least July 2016, that the HACA Properties were not in compliance with the City's Fire Safety Code as it pertained to "multiple dwelling rental unit" as defined by the City Code.

328.  This misrepresentation that the HACA Properties were of a particular standard was made to every tenant of the HACA Properties at lease inception and their renewal amounted to unfair and deceptive trade practices.

329.  The City of Annapolis failed to enforce their own policy and City Code to advise the consumer tenants of the HACA Properties that the units were not licensed for occupancy.  The City of Annapolis failed to enforce their own policy and City Code to enforce fines and penalties on HACA.   The fact that these units were not licensed amounted to a material fact, and its omission deceived the consumer tenants of the HACA Properties.

330.  As a proximate and direct result of Defendants unfair and deceptive trade practices in violation of the MCPA, Plaintiffs have suffered economic harm and loss, including but not limited to, medical bills, rent paid to Defendant HACA, loss of personal property/contents of unit due to damage, costs of testing and reporting of moldy conditions, mental and emotional anguish, costs of relocation, damages due to loss of employment related to relocation, and costs of intermittent remediation of properties.

**TWELFTH CAUSE OF ACTION**
**(BREACH OF CONTRACT – DAMAGES)**
***Defendant Beverly Wilbourn and Defendant Housing Authority of the City of Annapolis***

331.  Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

332. Plaintiffs entered into valid written contracts for the lease of real property with Defendant HACA.

333. Under those contracts, Defendant HACA obligated itself to:

a. Maintain the unit and the development in decent, safe, and sanitary condition;

b. Comply with the requirements of all applicable building and housing codes materially affecting health and safety and all applicable U.S. Department of Housing and Urban Development regulations;

c. Make necessary repairs to the units within a reasonable time;

d. Keep the development's buildings, facilities and common areas, not otherwise assigned to tenants for maintenance and upkeep, in clean and safe condition;

e. Maintain in good and safe working order and condition, electrical, plumbing, sanitary, heating, and ventilation and other facilities and appliances, including elevators, supplied or required to be supplied by HACA; and

f. Provide reasonable accommodations for a disabled Tenant or any other household member.

334. Defendant HACA has breached the contracts by:

   a.  Failing to provide decent, safe, and sanitary conditions;

   b.  Failing to allow City inspectors to complete inspections of the HACA properties as required by the relevant housing code, specifically Chapter 17.44.010 of the City Code;

   c.  Failing to correct the City Code violations discovered by the initial City Inspections in 2016;

   d.  Failing to properly remediate unsanitary conditions in the attics and ventilation systems of the dwellings; and

   e.  Failing to properly remediate mold conditions in the apartments.

335.  Further, Defendants refuse to act in a manner consistent with the terms of the contracts which they entered into by:

   a.  Maintaining a clean and healthy living environment;

   b.  Actively inspecting the HACA units and common areas for unhealthy indoor molds;

   c.  Remediating the units and common areas for mold that has been or reasonably should be discovered;

   d.  Conducting regular maintenance of the ventilation systems in the HACA properties; and

   e.  Otherwise refusing to act consistent with the terms of the contracts.

336.  As stated, instead of complying with the terms of the lease agreements with tenants, Defendant HACA has sought to hide the conditions and hire unqualified third-party inspectors instead of inspectors employed by the City of Annapolis to falsely represent that the apartments are safe and habitable.

337. As a result of Defendant HACA's breach, Plaintiffs have suffered economic losses including, but not limited to, money paid for rent, and money paid to inspect unhealthy indoor molds and water intrusion.

## THIRTEENTH CAUSE OF ACTION
## (BREACH OF CONTRACT – SPECIFIC PERFORMANCE)
### *Defendant Beverly Wilbourn and Defendant Housing Authority of the City of Annapolis*

338.  Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

339.  Plaintiffs seek specific performance of the lease agreements to include the provision of a safe and habitable residence that is licensed and inspected by the City.

## FOURTEENTH CAUSE OF ACTION
## (BREACH OF WARRANTY OF HABITABILITY)
### *Defendant Beverly Wilbourn and Defendant Housing Authority of the City of Annapolis*

340.  Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

341. A reasonable inspection by HACA would have revealed defective conditions related to water intrusion, mold, contaminated ventilation, and other defects in the HACA Properties.

342. At least as early as July 2016, Defendants knew that the HACA Properties were in violation of the Fire Safety requirements of the City of Annapolis, after which time they requested that City Inspectors no longer inspect HACA properties for violations.

343. Defendant HACA thereby breached the warranty of habitability in that it knew or should have known of dangerous conditions upon the units which Plaintiffs leased.

344. Defendant HACA continued to collect monthly rent from Plaintiffs despite their lack of a City-issued rental licenses though the defective and dangerous conditions of the units rendered them unfit for habitation in violation of state and local housing codes which require among other things, healthy conditions free of water intrusion and properly installed fire detection systems.

345. Plaintiffs paid rent, and continue to pay rent, and have been subjected to physical eviction demands despite Defendant HACA's knowledge of this breach of the implied warranty.

## FIFTEENTH CAUSE OF ACTION
### (NEGLIGENCE)
#### *Against all Defendants*

346. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

347. Defendants had a duty recognized by the law which required conformance to a certain standard of conduct for the protection of others against unreasonable risks.

348. Defendants failed to conform to that standard through a breach of that duty.

349. Defendants' breach was the proximate cause of actual damage to Plaintiffs that resulted in damages to include monetary loss as well as physical injury and emotional pain and suffering.

## SIXTEENTH CAUSE OF ACTION
### (GROSS NEGLIGENCE)
### *Against all Defendants*

350. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

351. Defendants through their actions expressed a reckless disregard for the consequences to the life or property of Plaintiffs and made no effort to avoid those consequences when there was a clear duty to act.

352. Defendants' breach was the proximate cause of actual damage to Plaintiffs that resulted in damages to include monetary loss as well as physical injury and emotional pain and suffering.

## SEVENTEENTH CAUSE OF ACTION
### (Tort – Civil Conspiracy)
### *Against all Defendants*

353. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

354. Two or more of the Defendants or their agents agreed to and did wrongfully direct the City Inspector's Office of the City of Annapolis, in violation of City Code and State Law, to refuse to inspect the apartments of Plaintiffs, because the Plaintiffs were tenants of the Housing Authority.

355. As a result of the conspiracy Plaintiffs have suffered monetary and non-monetary damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant them the following relief:

A.     The Court should issue an order granting Plaintiff's request for declaratory relief, finding that the Defendant's actions violate the FHA.

B.     The Court should enter a permanent injunction and all other affirmative relief necessary, enjoining Defendants and their affiliates, subsidiaries, agents, employees, and representatives from continuing the illegal conduct described above, and further directing Defendants to take all affirmative steps necessary to remedy the effects of its past illegal conduct.  Such affirmative relief should include, but not necessarily be limited to, the elimination of any and all policies which allow the Housing Authority of the City of Annapolis to be treated differently than any other landlord in the City of Annapolis, and to ensure that the displacement of African Americans from the City is stopped and policies are put in place to affirmatively further fair housing for this protected class within the City limits of the City of Annapolis.

C.     As a part of any permanent injunction or other affirmative relief, the Court should oversee the implementation of a plan by which the City of Annapolis and the Housing Authority of the City of Annapolis are required to enforce and comply with the City Code regardless of the race of the tenants.

D.      As a direct, legal, and proximate result of the defendants' acts and/or omissions, Plaintiffs have sustained, and will continue to sustain, economic damages to be proven at trial. As a further result of Defendants' acts and/or omissions, Plaintiffs have suffered physical harm and emotional distress, resulting in damages in an amount to be proven at trial.

E.      The Court should enter a judgment for punitive damages to the Plaintiffs, in an amount to be proved at trial before a jury.

F.      The Court should award Plaintiffs their reasonable attorneys' fees, costs, and expenses.

G.      The Court should grant such other relief as it deems just and equitable.

### DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues in this case.

**WISE & DONAHUE, PLC**

By:     /s/ *P. Joseph Donahue*
        P. Joseph Donahue, Esquire
        Bar Number: 06245
        18 West Street
        Annapolis, Maryland 21401
        Telephone: 410-280-2023
        Fax: 410-280-0905
        Email: pjd@wisedonahue.com

**Maryland Legal Aid – Anne Arundel County Office**

By:   /s/ *Kathleen M. Hughes*
      Kathleen M. Hughes
      Bar Number: 14892
      khughes@mdlab.org

      /s/ *Lisa M. Sarro*
      Lisa M. Sarro
      Bar Number: 14803
      lmsarro@mdlab.org
      P.O. Box 907
      Annapolis, Maryland 21404
      Telephone: 410-972-2700
      Fax: 410-269-8916

      *Attorneys for Plaintiffs*