## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

Heaven White, *et al.*                                          *

                                    *          Civil Action No. CCB-19-1442

            v.                                                    *

                                      *

The City of Annapolis by and through               *

the City Council, *et al.*                                     *

### MEMORANDUM

    The plaintiffs, almost all of whom identify as African American,[1] reside in public

housing owned and operated by the Housing Authority of the City of Annapolis ("HACA").

They have sued the City of Annapolis (the "City") and Gavin Buckley as Mayor of the City of

Annapolis (collectively, the "city defendants"), and HACA and Beverly Wilbourn as Executive

Director of HACA (collectively, the "HACA defendants"). The plaintiffs' claims concern the

City's decision not to enforce the inspection and licensing requirements in its residential property

code on HACA-owned and operated public housing,[2] and HACA's decision not to comply with

those requirements. The plaintiffs argue that the failure to enforce the inspection and licensing

requirements on HACA properties disparately impacts African Americans and is discriminatory.

    The plaintiffs filed their complaint on May 16, 2019, (ECF 1) and their amended

complaint on June 12, 2019, (ECF 8). The city defendants and HACA defendants both have

filed motions to dismiss[3] or, in the alternative, for summary judgment.[4] The motions have been

---

[1] It appears that plaintiff Jonathan Dixon does not identify as African American. (Am. Compl. ¶ 9). He lived with Breonna Dixon and her two minor children, who are African Americans. (*Id.*).

[2] There are some public housing units in Annapolis that are located outside of HACA-managed properties and are inspected by the City. (Am. Compl. ¶ 171 n.10). The relationship between these units and HACA is not clear. As used herein, "HACA properties" refers only to those properties that HACA owns and that are managed solely by HACA.

[3] The HACA defendants have filed a partial motion to dismiss. It appears they seek to dismiss all claims except for the negligence claim as to plaintiff Smith.

[4] At this stage, before the parties have had a chance to engage in discovery, the court declines to treat the motions as ones for summary judgment.

fully briefed and oral argument was held on December 19, 2019. For the reasons set forth below, the motions will be granted in part and denied in part.

## FACTS

The Annapolis City Code requires rental units to have operating licenses. (Annapolis City Code, Chapter 17.44.010). To obtain an operating license, the rental units must be inspected and in compliance with the City's Residential Property and Maintenance Code. (*Id.* 17.44.030 *et seq.*; Am. Compl. ¶¶ 33–35). Landlords must pay a fee to obtain a license or a license renewal. (Annapolis City Code, Chapter 17.44.040(A); *see* Am. Compl. ¶ 64). The City, however, does not require inspections and licensing of HACA properties; such properties are the only rental properties in Annapolis that are neither licensed nor inspected. (Am. Compl. ¶ 37). This apparently is a longstanding arrangement, as although rental licenses have been required of landlords since approximately 1985, HACA housing units "have never been fully, finally, or properly inspected and licensed in accordance with the City Code." (*Id.* ¶ 40).

The plaintiffs live in nine households in five HACA properties: Harbour House, Newtowne Twenty, Eastport Terrace, Morris H. Blum Senior Apartments, and Robinwood.[5] Although the timeline of events for each plaintiff is not entirely clear from the amended complaint, all of the plaintiffs allege defects in their housing units, generally toxic mold and/or water and sewage leaks, from around 2016 to the present. (*See e.g. id.* ¶¶ 186–188 (Smith family, toxic mold in apartment discovered in 2016); ¶ 214 (Holliday family, sewage pipe ruptured at unspecified time); ¶¶ 227–237 (Dixon family, HACA refused to properly treat mold in 2018); ¶ 249 (Glenn Rogers, odors out of ventilation caused intense burning in eyes starting in 2018)).

---

[5] HACA also owns and manages a sixth property, Bloomsbury Square, (Am. Compl. ¶ 29), but none of the plaintiffs reside there. In total, HACA manages approximately 790 apartments, home to 1,600 residents, throughout the six properties. (*Id.*).

In November 2015, then-Mayor Michael J. Pantelides announced that he would start inspecting HACA properties in accordance with the city code and, on May 1, 2016, inspections commenced. (Am. Compl. ¶¶ 52–57, 73). The inspections were completed around August 2016 and uncovered 2,498 city code violations. (*Id.* ¶ 73). For example, the inspections revealed violations relating to smoke detectors and mold (*id.* ¶ 275, Fuller household), and ungrounded electrical outlets (*id.* ¶ 199, Clark household). According to the plaintiffs, many of the violations remain unremedied (*e.g. id.* ¶ 219, White household), the City did not require HACA to relocate tenants "pending the correction of the dangerous conditions" as required by the code (*id.* ¶ 75), and the HACA properties were never fully and properly licensed (*Id.* ¶ 76).

On April 18, 2017, Beverly Wilbourn became the executive director of HACA. (*Id.* ¶ 79). On December 7, 2017, a new Mayor, Gavin Buckley, was sworn in (*id.* ¶ 81), and at some point thereafter, according to the plaintiffs, he and HACA agreed to no longer enforce the inspection and licensing requirements on HACA properties, and to suspend City inspections.[6] (*Id.* ¶¶ 101–105). According to the plaintiffs, HACA subsequently cut down on funding for residential services. (*Id.* ¶¶ 108–109). In the spring of 2018, HACA defunded or otherwise removed its full-time inspector on staff. (*Id.* ¶ 164).

The plaintiffs argue that the City's refusal to enforce the licensing and inspection requirements on HACA properties, and HACA's refusal to follow them, is discriminatory. While the racial composition of the HACA properties is not available from public sources, the racial composition of the census blocks where each property is located demonstrate that the "[r]esidents of the six Housing Authority properties are disproportionately Black" compared to the residents of the City of Annapolis as a whole. (*Id.* ¶ 169). According to the plaintiffs, five of

---

[6] At oral argument, HACA's counsel stated that the City is currently inspecting some HACA properties. The City's counsel also noted that the inspections are ongoing. Further, he argued that after 2016, the City did not intend to permanently stop the inspections but instead paused them so they could reevaluate some logistical issues.

the six HACA properties are located in majority Black census blocks, while three are located in blocks where more than 90% of residents are Black. (*Id.* ¶ 168). In contrast, in 2010, Annapolis residents were 53.5% White, 25.7% Black, and 16.8% Latino. (*Id.* ¶ 171). Further, Annapolis's "Five Year Consolidated Housing and Community Development Plan Federal Fiscal Year 2015–2019," stated that 91.3% of the City's public housing units were occupied by Black tenants and 7% were occupied by White tenants, although this figure also includes public housing units that are not managed by HACA and that are inspected by the City. (*Id.* ¶ 171 & n.10).

The plaintiffs also argue that, in addition to the disparate impact, Annapolis's history supports an inference of intentional discrimination. The plaintiffs cite to Annapolis's history of segregation, and the 1960's urban renewal policies that pushed out African Americans from their communities, causing a housing crisis and forcing many African Americans into public housing. (*Id.* ¶ 25 (HACA segregated housing until the mid-1960's); ¶ 26 (urban renewal policies); ¶ 28 (African Americans moved to public housing units away from the city center)).

A brief explanation of the regulatory scheme for inspections of federally funded public housing, and HACA housing specifically, is helpful.[7] First, federal law requires that "[e]ach public housing agency that owns or operates public housing shall make an annual inspection of each public housing project" and make it available to the Department of Housing and Urban Development ("HUD") upon request. 42 U.S.C. § 1437d(f)(3). HUD also conducts inspections of public housing, although, according to the plaintiffs, HUD inspects fewer than 20% of the HACA apartments, and HACA has up to four months of advance notice to prepare the apartments for inspection. (*Id.* ¶ 165). A federal regulation makes clear that HUD physical inspections do not relieve the housing authority "of the responsibility to inspect public housing units" and the physical condition standards set forth in the regulation "do not supersede or

---

[7] HACA receives federal funding. (Am. Compl. ¶¶ 89, 141).

preempt state and local building and maintenance codes with which the PHA's public housing must comply." 24 C.F.R. § 902.20(d),(e).

Annapolis also receives federal funds, including the Community Development Block Grants ("CDBG") from HUD, which are used, in part, for low-income housing. (Am. Compl. ¶ 141). As a condition of receiving the grants, Annapolis consents annually to a mandatory duty to "affirmatively further fair housing," including by conducting "an analysis of impediments to fair housing choice" and taking "appropriate actions to overcome the effects of impediments identified through that analysis." (Id. ¶¶ 149–150).

Second, Maryland law provides that all housing projects "are subject to the planning, zoning, sanitary, health, fire, housing, subdivision, and building laws, ordinances, codes, rules, and regulations that apply where the housing project is located," Md. Code. Hous. Comm. Develop. ("HCD") § 12-403, except that "[t]o aid and cooperate in the planning, undertaking, construction, or operation of housing projects located wholly or partly in the area in which it may act, a State public body, with or without consideration and on terms that it determines, may . . . plan, replan, zone, or rezone any part of the State public body, make exceptions to its sanitary, building, housing, fire, health, subdivision, or other similar laws, rules, regulations, and ordinances or make any changes to its map or master plan[.]" Md. Code HCD § 12-506(b)(9).

Finally, the City of Annapolis and HACA have a "Cooperation Agreement" that governs their relationship. The City entered into a Cooperation Agreement with HACA on March 10, 1950, and the most recent amendment was approved on February 6, 2009. (Id. ¶ 92).[8] The agreement provides that the City should "[f]urnish or cause to be furnished to [HACA] and the

---

[8] The Cooperation Agreements and the amendments are attached as Exhibit 4 to the HACA defendants' partial motion to dismiss. (ECF 18-6). They may be considered at the motion to dismiss stage as they are integral to the complaint and their authenticity has not been challenged. See U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency, 745 F.3d 131, 136 (4th Cir. 2014).

tenants of such Project public services and facilities of the same character and to the same extent
as are furnished from time to time without cost or charge to other dwellings and inhabitants in
the Local Government." (*Id.* ¶ 94; ECF 18-6, Cooperation Agreement ¶ 5(a) (March 5, 1965)).[9]
The Cooperation Agreement also provides that "[i]nsofar as the Local Government may lawfully
do so" it may "grant such deviations from the building code of the Local Government as are
reasonable and necessary to promote economy and efficiency in the development and
administration of such Project, and at the same time safeguard health and safety." (Cooperation
Agreement, ¶ 5(c)).

The plaintiffs have filed a 17-count amended complaint. Counts 1 through 7 allege
various civil rights claims against all defendants. Counts 8 and 9 allege disability discrimination
against HACA and the City of Annapolis. Count 10 requests a writ of mandamus, under
Maryland law, against the City and Buckley. Counts 11 and 15 through 17 are state law claims
against all defendants. Counts 12 through 14 are breach of contract and breach of warranty
claims against Wilbourn and HACA.

## STANDARD OF REVIEW

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to
raise a right to relief above the speculative level on the assumption that all the allegations in the
complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555
(2007) (citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence
sufficient to prove the elements of the claim. However, the complaint must allege sufficient
facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012)
(citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the

---

[9] The HACA defendants have attached a 1950 Cooperation Agreement (ECF 18-6 at 13), a 1965 Cooperation
Agreement (ECF 18-6 at 1), and a 1976 Cooperation Agreement (ECF 18-6 at 10). The relevant provisions are
largely the same in all of the versions.

right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Additionally, although courts "must view the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments'" in deciding whether a case should survive a motion to dismiss. *U.S. ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

## ANALYSIS

### I.   Claims against Buckley and Wilbourn

Any claims against Buckley and Wilbourn in their individual or official capacities will be dismissed. First, the complaint does not appear to name Buckley and Wilbourn in their individual capacities, despite the plaintiffs' arguments to the contrary. Even if it did, Buckley and Wilbourn are entitled to qualified immunity for the federal claims and public official immunity for the state claims.[10] Finally, the official-capacity claims against them are duplicative of the claims against the City and HACA, respectively.

#### i.   Qualified Immunity

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The defendants bear the burden of proving their entitlement to qualified immunity. *Danser v. Stansberry*, 772 F.3d 340, 345 (4th

---

[10] The plaintiffs also requested leave to amend the complaint to clarify that it names Buckley and Wilbourn in their individual capacities. For the reasons set forth, the court will not grant leave to amend, because the amendment would be futile. *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009) (explaining that leave to amend "should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile.").

Cir. 2014). To prevail on a qualified immunity defense, a government official must demonstrate either (1) that the facts, construed in the plaintiff's favor, do not constitute a violation of the plaintiff's constitutional rights, or (2) that the right infringed upon was not clearly established at the time of the alleged violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan*, 555 U.S. 223, 231–33, 236 (2009).

"To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right," and "existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quotation marks and citations omitted). "At the time of the official's actions, the constitutional right allegedly violated must be clearly defined in a concrete factual situation such that its contours are clear, unmistakable, and applicable to the precise conduct at issue." *Altamira-Rojas v. City of Richmond*, 184 F. Supp. 3d 290, 294 (E.D. Va. 2016) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). "The Court should focus upon the right, not at an abstract level, but at the level of the specific conduct in question." *Id.* (citing *Simmons v. Poe*, 47 F.3d 1370, 1385 (4th Cir. 1995)).

At issue here is the right, under the Fair Housing Act and civil rights statutes, to live in a rental unit subject to the same inspection and licensing requirements as private rental units. The plaintiffs have pointed to no case that clearly defines this right. Moreover, excepting HACA properties from the inspection and licensing requirements is a longstanding practice that, at the least, a reasonable person could believe was authorized by state law and contemplated under the federal scheme. Finally, while the plaintiffs may have sufficiently pled intentional discrimination as to the City and HACA, as discussed *infra,* they have not sufficiently pled that Buckley or Wilbourn were motivated by racial animus, as would be necessary to defeat their

8

qualified immunity. Many of the plaintiffs' allegations that support an inference of discrimination relate to the history of Annapolis generally, rather than to Buckley or Wilbourn specifically. *See Eberhart v. Gettys*, 215 F. Supp. 2d 666, 678–80 (M.D.N.C. 2002) (finding that although the plaintiffs survived summary judgment on their selective enforcement claim, two of the individual defendants were entitled to qualified immunity because the plaintiffs did not sufficiently demonstrate that these defendants had the requisite racial animus). Therefore, Buckley and Wilbourn are entitled to qualified immunity.

ii.   Public Official Immunity

As to the state law claims, Buckley and Wilbourn are immune under Md. Code Cts. & Jud. Proc. § 5-507(a), which provides that "[a]n official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action." Both Buckley and Wilbourn acted in a discretionary capacity and within the scope of their employment with respect to the licensing and inspection requirements.[11] Malice means "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will, or fraud," and a plaintiff asserting malice "must point to specific evidence that raises an inference that the defendant's actions were improperly motivated." *Koon as next friend of Gray v. Prince George's Cnty.*, No. DKC-17-2799, 2019 WL 1317401, at *7 (D. Md. March 22, 2019) (citations omitted).[12] Although the plaintiffs point to statistical disparity and Annapolis's history of racism, the plaintiffs have offered no specific evidence that Buckley

---

[11] The plaintiffs argue elsewhere that Buckley was required to enforce the inspection and licensing requirements on HACA properties. As discussed above, though, without deciding whether that is correct, state law at least contemplates exceptions to certain housing laws, so enforcement on HACA properties could reasonably be considered discretionary.

[12] Unreported cases are cited for the soundness of their reasoning, not for any precedential value.

or Wilbourn's actions were improperly motivated. Therefore, Buckley and Wilbourn are entitled to public official immunity.

   iii.   Official Capacity Claims

Finally, claims against Buckley and Wilbourn in their official capacities are duplicative of the claims against the government entities, City of Annapolis and HACA. *See Windsor v. Bd. of Educ. of Prince George's Cnty.*, TDC-14-2287, 2016 WL 4939294, at *7 (D. Md. Sept. 13, 2016) (collecting cases). Accordingly, the court will dismiss both the individual-capacity and official-capacity claims against Buckley and Wilbourn in this case.

**II.   Fair Housing Act**

The plaintiffs allege both disparate impact and disparate treatment theories under the Fair Housing Act ("FHA"). In the Fourth Circuit, an "FHA claim can proceed under either a disparate-treatment or a disparate-impact theory of liability, and a plaintiff is not required to elect which theory the claim relies upon at pre-trial, trial, or appellate stages." *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 421 (4th Cir. 2018). Because the plaintiffs have sufficiently pled disparate impact, there is no need to resolve the disparate treatment argument at this time.[13]

In order to survive a motion to dismiss on a disparate impact theory FHA claim, the plaintiffs "must demonstrate a robust causal connection between the defendants' challenged policy and the disparate impact on the protected class." *Reyes*, 903 F.3d at 424 (describing the "three-step, burden-shifting framework" for analyzing FHA disparate impact claims); *see also Texas Dep't of Hous. and Cmty. Affairs v. The Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507,

---

[13] To the extent the defendants argue that the FHA claims are time-barred, the court cannot make that determination based on the complaint. The Fair Housing Act has a two year statute of limitations. 42 U.S.C. § 3613. The inspections are alleged to have resumed in 2016, and then stopped sometime in 2018, which is within the statute of limitations.

2523 (2015); *Prince George's Cnty., Md. v. Wells Fargo & Co.*, 397 F. Supp. 3d 752, 766 (D. Md. 2019) (at motion to dismiss stage, only first step at issue).

Here, the plaintiffs identify a specific policy: the City's policy of not enforcing the city code requiring inspections and licensing on HACA properties, and HACA's policy of not following the City's inspection and licensing requirements. *See Inclusive Cmtys.*, 135 S. Ct. at 2523 (explaining that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity"). This policy disproportionately impacts African Americans, because HACA public housing has a significantly higher proportion of African American residents than the City of Annapolis as a whole. (Am. Compl. ¶ 169).

The defendants argue that there is no disparate impact because the policy of exempting HACA from the requirements applies equally to all HACA residents no matter their race – that is, all HACA residents live in apartments that are not inspected or licensed by the City. In support, they cite *Edwards v. Johnson Cnty. Health Dep't*, 885 F.2d 1215 (4th Cir. 1989). In *Edwards*, the plaintiffs alleged that the county's practice of permitting housing that failed to comply with migrant housing standards disproportionately impacted minorities, as more than 90% of the migrant workers were non-white. *Id.* at 1217. The court held that, as disproportionate adverse impact is measured by "whether the policy in question had a disproportionate impact on the minorities in the total group to which the policy was applied," *id.* at 1223 (quoting *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 987 (4th Cir. 1984)), the proper question was whether minority migrant farmworkers suffered more harm than white migrant farmworkers, and not whether the policy disproportionately impacted minorities in the context of the entire community. *Id.* at 1223–24.

11

As the plaintiffs argue, however, in *Edwards*, the permits required by state law were applicable specifically to migrant housing,[14] whereas here, the same city code applies to all rental units in the city, with the defendants making an exception for HACA properties. Therefore, *Edwards* is distinguishable, and it appears the proper group by which to measure disparate impact is the entire rental population in Annapolis.[15]

The plaintiffs also have sufficiently alleged a robust causal connection between the defendants' challenged policy and the disparate impact on the protected class. The plaintiff must "'demonstrate that the disparity they complain of is the result of one or more of the [ ] practices that they are attacking . . . , specifically showing that each challenged practice has a significantly disparate impact' on the protected class." *Reyes*, 903 F.3d at 425 (quoting *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 657 (1989)). Here, the plaintiffs have sufficiently alleged that the policy of exempting HACA properties from the licensing and inspection requirements of the code has a robust causal connection with the alleged disparate impact on African Americans.

Finally, as to the specific provisions of the FHA, the plaintiffs have sufficiently alleged a violation of 42 U.S.C. § 3604, but not 42 U.S.C. § 3608. Under Section 3604(b), it is unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. 3604(b). According to HUD regulations: "It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to impose different terms, conditions or privileges relating to the sale or rental

---

[14] *See Edwards*, 885 F.2d at 1217 ("Owners of the farms, as required by state law, had applied for and received state permits to operate migrant housing facilities . . . [health department officials] inspected the two facilities and verified that they complied with state health and safety standards for migrant farm housing.")

[15] HACA also argues that the court should measure disparate impact only as to HACA residents because "HACA has no ability to control licenses for non-public housing tenants." (ECF 25, HACA's Reply at 9). At this stage, however, the plaintiffs have sufficiently alleged HACA's involvement in the City's decision to stop inspecting and licensing HACA units.

12

of a dwelling or to deny or limit services or facilities in connection with the sale or rental of a dwelling. "Prohibited actions under this section include, but are not limited to . . . [f]ailing or delaying maintenance or repairs of sale or rental dwellings because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.65(a),(b)(2).  As the plaintiffs allege that the defendants denied or limited the services or facilities provided to them, including failing to properly maintain and inspect the units, the plaintiffs properly allege a violation of this section.

Section 3604(a) makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a).  While Section 3604(a) may not regulate the provision of substandard housing, *see Thompson v. U.S. Dep't of Hous. and Urban Develop.*, 348 F. Supp. 2d 398, 416 (D. Md. 2005), the amended complaint sufficiently alleges that at least some plaintiffs were forced to leave their apartments for periods of time due to the alleged defects.  Therefore, the plaintiffs have sufficiently pled, at this stage, their Section 3604(a) claim.

The § 3608 claim relates to the defendants' alleged improper use of the CDBG funds.[16]  Although the plaintiffs do not specify under what subsection of § 3608 they are bringing their claim, it appears it is (d), which states that "[a]ll executive departments and agencies shall administer their programs and activities relating to housing and urban development (including any Federal agency having regulatory or supervisory authority over financial institutions) in a manner affirmatively to further the purposes of this subchapter and shall cooperate with the Secretary to further such purposes."  First, it is not clear that § 3608 provides a cause of

---

[16] The plaintiffs also allege that the City falsely represented to HUD that they inspect all rental units in their 2018 application for the grants.  It seems the City had used language from a previous year's report, and did not update it to reflect the decision to stop inspecting properties. (*Id.* ¶ 164).

action against a local government defendant.[17]   Second, even if it does, the plaintiffs have not

sufficiently alleged that the defendants used federal funds, including CDBG funds, "in a

discriminatory manner which promotes segregation and otherwise failed to meet the

'Affirmatively Furthering Fair Housing' obligations of the Fair Housing Act," (Am. Compl. ¶

292), as the complaint provides no specific allegations to support this conclusion.

### III.     42 U.S.C. § 1983 & Equal Protection Clause

The plaintiffs bring a claim under Section 1983, alleging the defendants have violated

their constitutional rights under the Equal Protection Clause.   To show a violation of the Equal

Protection Clause, the plaintiffs must show that they (1) were treated differently from others with

whom they are similarly situated, and (2) the unequal treatment was the result of intentional or

purposeful discrimination.   *Martin v. Duffy*, 858 F.3d 239, 252 (4th Cir. 2017).

As to the first prong, and as described above, the plaintiffs have shown they were treated

differently from similarly situated persons (*i.e.* private renters).   As to the second prong, in

determining whether there was intentional or purposeful discrimination, a court should consider

factors such as: (1) whether the action bears more heavily on one race than another, (2) whether

there are clear patterns of action that are unexplainable on grounds other than race, (3) the

historical background of the action in question, (4) the sequence of events leading to the

defendant's actions, (5) departures from a defendant's regular course of action, and (6) the

legislative or administrative history.   *Vill. of Arlington Heights v. Metro. Hous. Develop. Corp.*,

---

[17] The plaintiffs cite to two cases in support.   The first, *Young v. Pierce*, 554 F. Supp. 1010, 1018–19 (1982), found a private cause of action under § 3608, but against HUD.   The second, *ACORN v. Cnty. of Nassau*, No. 05-CV-2301(JFB)WDW, 2006 WL 2053732, at *12 (E.D.N.Y. July 21, 2006), allowed a § 3608 claim against a local county defendant, but it appears the defendants in that case argued that the plaintiffs failed to state a claim, not that § 3608 did not provide a cause of action.   By its plain reading, § 3608 appears to apply only to federal departments and agencies.   *See also Thompson*, 348 F. Supp. 2d at 418 ("Section 3608 of Title VIII is enforceable through the Administrative Procedure Act . . ., which regulates the administration and operation of federal agencies, because the provision requires Federal Defendants to affirmatively administer the agency's programs so as to promote fair housing.").

429 U.S. 252, 266–67 (1977); *see N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220–21 (4th Cir. 2016).

Here, the policy of exempting HACA properties bears more heavily on African Americans. While "official action will not be held unconstitutional solely because it results in a racially disproportionate impact," such impact can provide "an important starting point." *Arlington Heights*, 429 U.S. at 264–66. Additionally, historical background may also point to discriminatory intent: according to the plaintiffs, HACA public housing properties were segregated until the mid-1960's (Am. Compl. ¶ 25); Annapolis's urban renewal policies, for example eminent domain, destroyed many homes in the almost entirely African American Old 4th Ward, displacing 237 families (*id.* ¶ 26); and African American residents were congregated into public housing units far from employment opportunities and without a viable public transportation system (*id.* ¶ 28). Further, Annapolis historically has placed great emphasis on inspections and licensing, even seeking emergency State legislative action when their previous inspection and licensing scheme was held unconstitutional, *Vytar Assocs. v. Mayor and Alderman of City of Annapolis*, 301 Md. 558, 568–69 (1984), which may make the decision to exempt HACA properties more suspect.

On the other hand, legislative discussion cited in the amended complaint indicates that the aldermen were concerned about the cost to HACA for licensing and inspection fees, indicating that the exemption may have been for financial, rather than racially discriminatory, reasons. (*See* Am. Compl. ¶ 69).[18] This view also is supported by the proposed legislation to alleviate HACA of its debt to the City. (*Id.* ¶¶ 95–96). The sequence of events leading to the defendants' actions show that Mayor Pantelides's decision to inspect public housing was met

---

[18] Additionally, it appears another reason for not putting money into improving the public housing units was because HACA and the City planned to demolish some of them soon and move residents into new developments. (Am. Compl. ¶¶ 116, 118)

with some concern. (*Id.* ¶ 67). Although the plaintiffs argue that the City had already found a way to conduct inspections in 2016, they also acknowledge that the 2016 inspections were never completed and the violations not completely fixed. (*Id.* ¶¶ 76–78). This could be evidence of discriminatory treatment, but it could also be further evidence of HACA's financial struggles. Finally, the decision to refrain from enforcing the city code on HACA was a departure from the immediate course of action, but a return to what the City had previously done.

The court should not consider "each piece of evidence in a vacuum" but instead engage in a "totality of the circumstances analysis." *McCrory*, 831 F.3d at 233. While the historical background and disparate impact weigh in favor of a discriminatory motive, other considerations are consistent with the City's explanation that this decision was made for financial or other logistical reasons. Because the question is close, and because the case will go forward and must proceed to discovery in any event, the court will deny the motion to dismiss without prejudice and will not dismiss the § 1983 claim at this time.[19]

## IV.    42 U.S.C. § 1985[20] and § 1986

Title 42 of the U.S. Code, § 1985, prohibits a conspiracy to deprive persons of their rights or privileges. To state a claim under § 1985(3), the elements are: "(1) A conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy." *Facey v. Dae Sung Corp.*, 992 F. Supp. 2d 536,

---

[19] According to the city defendants, "[b]ecause the § 1983 claim fails for the reason set forth, the City Defendants are not presently asserting the defense that the Complaint fails to state a claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978)." (ECF 17-1, City Defendants' Mot. to Dismiss at 20 n.19).
[20] While it is not clear from the amended complaint, the plaintiff's opposition clarifies that they assert a claim under subsection 3 of § 1985. (ECF 23, Pls.' Opp'n at 33).

540 (D. Md. 2014) (citation omitted).[21] Under 42 U.S.C. § 1986, a person may be liable if he or she has the power to prevent an act prohibited by § 1985 and neglects or refuses to do so.

The plaintiffs allege that Wilbourn and HACA conspired with Buckley and the City to stop inspections and prevent city inspectors from responding to complaints at HACA properties.[22] (Am. Compl. ¶¶ 101–104). While the court notes that "threadbare recitals" of a conspiracy do not state a claim, *Society Without a Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011), discovery must proceed on the alleged discriminatory actions by the City and HACA in any event. Therefore, the court will allow the § 1985 and § 1986 claims to go forward at this time.

## V.    42 U.S.C. § 1982

Under 42 U.S.C. § 1982, "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." An Eighth Circuit case has stated the elements are: "(1) membership in a protected class; (2) discriminatory intent on the part of the defendant and (3) interference with the rights or benefits connected with the ownership of property." *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004). Section 1982 may be violated in the case of a "municipal action benefiting white property owners that would be refused to similarly situated black property owners," "official action that depreciated the value of property owned by black citizens," or action that would hamper black residents "in the use of their property," such as a street closing that "severely restricted access to black homes." *City of*

---

[21] The defendants raise the intracorporate conspiracy doctrine, under which corporate employees generally cannot conspire with each other or with the corporation, unless they possess a personal stake independent of their relationship to the corporation, or where their acts are not authorized by the corporation. *Facey*, 992 F. Supp. 2d at 542. Because the alleged conspiracies here involve two separate government entities, HACA and the City, the intracorporate conspiracy doctrine is not applicable. *See Thomas v. Northern Telecom, Inc.*, 157 F. Supp. 2d 627, 634 (M.D.N.C. 2000).

[22] As noted, all claims will be dismissed against Buckley and Wilbourn.

*Memphis v. Greene*, 451 U.S. 100, 123 (1981). The statute, however, "does not deal specifically with discrimination in the provision of services or facilities in connection with the sale or rental of a dwelling." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413 (1968). Some courts have found that the failure to maintain a safe and sanitary dwelling because of the tenant's race violates Section 1982, *Ross v. Midland Mgmt. Co.*, No. 02-C-8190, 2003 WL 21801023, at *2 (N.D. Ill. Aug. 1, 2003), while others have found it does not, *Rhodes v. Adv. Prop. Mgmt. Inc.*, No. 3:10-cv-826 (JCH), 2011 WL 2076497, at *7 (D. Conn. May 26, 2011).

Here, the plaintiffs have sufficiently alleged that they are part of a protected class and the defendants acted with discriminatory intent. Further, at this stage, the plaintiffs have alleged defects in the housing units sufficient to deprive them of their rights to the property. (*See e.g.* Am. Compl. ¶ 256, stating that Glenn Rogers was advised by his doctor to move out of the building because of his reactions to a toxin or irritant in his apartment). Finally, without deciding whether § 1982 covers claims of racial discrimination in the maintenance of housing, the court notes that as similar claims are going forward, there will likely be no additional discovery needed specifically for the § 1982 claim. Therefore, the court will not dismiss the § 1982 claim at this time.

## VI.    42 U.S.C. 2000d

Section 2000d, which is § 601 of Title VI of the Civil Rights Act of 1964, states that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." A plaintiff must show intentional discrimination, not just disparate impact. *Thompson*, 348 F. Supp. 2d at 418.

As stated above, the plaintiffs have made a sufficient showing at the motion to dismiss

stage of discriminatory intent.  They also have sufficiently alleged that they were denied benefits

of the public housing program, which receives federal financial assistance.[23]  Therefore, the §

2000d claim may proceed.

## VII.   Americans with Disabilities Act and Rehabilitation Act

Under Title II of the Americans with Disabilities Act of 1990 ("ADA"), "no qualified

individual with a disability shall, by reason of such disability, be excluded from participation in

or be denied the benefits of the services, programs, or activities of a public entity, or be subjected

to discrimination by any such entity."  42 U.S.C. § 12132.  Under Section 504 of the

Rehabilitation Act, as amended, "[n]o otherwise qualified individual with a disability in the

United States, as defined in section 705(20) of this title, shall, solely by reason of her or his

disability, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance[.]"  29 U.S.C.

§ 794(a).

The analysis for each claim is substantially the same.  Under either statute, a plaintiff

must allege that "(1) she has a disability, (2) she is otherwise qualified to receive the benefits of a

public service, program, or activity, and (3) she was excluded from participation in or denied the

benefits of such service, program, or activity, or otherwise discriminated against, on the basis of

her disability."  *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498

(4th Cir. 2005).  Claims under Title II and Section 504 "may be pursued under three distinct

grounds: '(1) intentional discrimination or disparate treatment; (2) disparate impact; and (3)

---

[23] Even if Buckley and Wilbourn were not entitled to qualified immunity, they could not be subject to suit under Title VI because they "are not programs or activities that have received any federal funds within the meaning of Title VI." *Windsor v. Bd. of Educ. of Prince George's Cnty.*, No. TDC-14-2287, 2016 WL 4939294, at *9 (D. Md. Sept. 13, 2016) (collecting cases).

failure to make reasonable accommodations.'" *Brown v. Dep't of Pub. Safety & Corr. Servs.*, 383 F. Supp. 3d 519, 552 (D. Md. 2019) (quoting *A Helping Hand, LLC v. Balt. City*, 515 F.3d 356, 362 (4th Cir. 2008)).

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1).[24] "In considering whether an impairment substantially limits an individual in a major life activity, [courts should] construe the statutory text 'broadly in favor of expansive coverage,' keeping in mind that the language 'is not meant to be a demanding standard.'" *J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 670 (4th Cir. 2019) (quoting 28 C.F.R. § 36.105(d)(1)(i)). "A plaintiff is 'qualified' if she is 'an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.'" *Constantine*, 411 F.3d at 498 (quoting 42 U.S.C. § 12131(2)). "[T]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015) (quoting 29 C.F.R. § 1630.1(c)(4)).

The following individuals allege disabilities: D'Andre Covert (asthma, Am. Compl. ¶ 221); LaDawn Camp ("chronic illness which affects her immune system and makes her particularly sensitive to poor environmental conditions," *id.* ¶ 260); Nashell Smith ("breathing

---

[24] The Rehabilitation Act and the ADA "share the same definitions of disability." *Brown*, 383 F. Supp. 3d at 551 (quoting *Rogers v. Dep't of Health & Envtl. Control*, 174 F.3d 431, 433 (4th Cir. 1999)).

difficulties related to her asthma" *id.* ¶ 188),[25] John Dixon (multiple sclerosis, *id.* ¶ 227); Nicole

Clark's son (suffered an accident in 2017 which required significant recovery time, *id.* ¶ 196),

Tyneice Holliday's children (asthma, *id.* ¶ 213); Lakisha Fuller's son (asthma, *id.* ¶ 273); and

Glenn Rogers ("reaction to some toxin or irritant (in his apartment) to which he is sensitive," *id.*

¶ 256).[26]

The HACA defendants argue that "asthma" does not meet the standard for a "disability"

under the ADA or the Rehabilitation Act. Whether a disability meets the statutory definitions,

however, is fact-specific. For example, asthma could substantially limit the major life activity of

breathing. *See Godbolt v. Trinity Protection Servs. Inc.*, No. GJH-14-3546, 2017 WL 2579020,

at *10 (D. Md. June 12, 2017) (finding, on a motion for summary judgment, that an individual

who had a one-time asthma attack did not demonstrate a disability under the ADA, but that

"asthma" "present[s] in varying levels of severity" and could meet the standard for disability).

At this stage, it is reasonable to infer that the medical conditions alleged could substantially limit

one or more major life activities, such as breathing or sleeping, or the operation of a major bodily

function, such as immune system or respiratory functions. *See* 42 U.S.C. § 12102(2). Given the

direction to interpret "disability" broadly, *id.* § 12102(4)(A), the court finds that the above-

named plaintiffs have sufficiently alleged a disability to survive a motion to dismiss.

Although not entirely clear in the complaint, at oral argument the plaintiffs clarified they

intended to bring disparate impact ADA and Rehabilitation Act claims against the defendants. In

the employment context, the Supreme Court has held that under a disparate impact theory of

discrimination, a facially neutral practice may be discriminatory if it "fall[s] more harshly on one

---

[25] The plaintiffs also allege that Ms. Smith's children have "suffered nose bleeds and headaches as a result of exposure to the conditions of the apartment." (Am. Compl. ¶ 188). It is not clear if this is meant to allege that Ms. Smith's children have disabilities.
[26] The Johns family did not allege that anyone in their household has a disability.

group than another and cannot be justified by business necessity." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003). Here, the plaintiffs have sufficiently alleged, at this stage, that the policy of not inspecting and licensing HACA apartments falls more heavily on those plaintiffs with disabilities, such as asthma. Further, the defendants' arguments in their briefs do not appear to address the disparate impact claim, instead focusing on the other grounds of relief under the ADA and Rehabilitation Act, disparate treatment and failure to accommodate. Accordingly, the court will deny the motion to dismiss as to the ADA and Rehabilitation Act claims. Because it does so on disparate impact grounds, the court will not discuss the plaintiffs' other theory of failure to accommodate.

## VIII.   Writ of Mandamus

The plaintiffs ask the court to issue a writ of mandamus against the City and Buckley pursuant to Md. Rule 15-701 as part of the court's supplemental jurisdiction. The court "does not have jurisdiction to issue a writ of mandamus requiring state employees to act." *Cooke v. Dep't of Corr. of Md.*, No. ELH-16-3552, 2017 WL 896863, at *6 (D. Md. March 6, 2017) (citing *Gurley v. Superior Court of Mecklenburg Cty.*, 411 F.2d 586, 587 (4th Cir. 1969)). The plaintiffs have provided no case to the contrary. Therefore, the court will dismiss this request.

## IX.   Tort Claims

i.   <u>Required Notice</u>

The Local Government Tort Claims Act ("LGTCA") provides that:

(1) Except as provided in subsections (a) and (d)[27] of this section, an action for unliquidated damages may not be brought against a local government or its employees

---

[27] Subsection (a) relates to actions against nonprofit corporations or actions arising out of alleged incidents of sexual abuse. Subsection (d) provides for a waiver of the notice requirement upon motion and good cause. The plaintiffs have not filed such a motion. "Local government" is defined as including "[h]ousing authorities created under Division II of the Housing and Community Development Article." Md. Code Cts. & Jud. Proc. § 5-301(15). The plaintiffs do not dispute that HACA is covered by § 5-304(b) of the LGTCA.

unless the notice of the claim required by this section is given within 1 year after the injury.

(2) The notice shall be in writing and shall state the time, place, and cause of the injury.

Md. Code Cts. & Jud. Proc. § 5-304(b).

The notice requirement is a condition precedent for a tort claim against a local government, and must be affirmatively pled. *Hansen v. City of Laurel*, 420 Md. 670, 684 (2011). It may be satisfied, though, with substantial compliance, which "requires some effort to provide the requisite notice and, in fact, it must be provided, albeit not in strict compliance with the statutory provision." *Faulk v. Ewing*, 371 Md. 284, 299 (2002) (citation omitted); *see Edwards v. Montgomery College*, No. TDC-17-3802, 2018 WL 4899311, at *8 (D. Md. Oct. 9, 2018) (suggesting § 5-304(e) to be a codification of the doctrine of substantial compliance).

HACA concedes that plaintiffs Smith and Clark gave notice on February 18, 2019, and March 1, 2019, respectively, regarding injuries suffered by Smith and by Clark's son related to the mold conditions.[28] The other plaintiffs have not pled, and do not appear to have sent, such notices.[29] As the notice is a prerequisite for bringing a claim, the court will dismiss the tort claims (negligence, gross negligence, and tort civil conspiracy) as to all plaintiffs except for Smith and Clark.[30]

---

[28] The HACA defendants argue that Smith and Clark's claims should be limited to the claims for which they gave notice and to damages dating back one year prior to their notices. (ECF 18, HACA Defendants' Partial Mot. to Dismiss at 40–41). At this stage, it is not clear how the LGTCA notices given by Smith and Clark relate to their claims, and the court will not decide this at this time.

[29] Several of the plaintiffs allege that they contacted the City and/or complained to HACA, but this does not constitute appropriate notice under the LGTCA. First, it is not clear whom in the City they contacted, and notice should be given "to the corporate authorities of the defendant local government." Md. Code Cts. & Jud. Proc. § 5-304(c)(4). Further, there is no indication that any of the plaintiffs other than Smith and Clark communicated notice of the claim, rather than problems with the apartment. *See Ellis v. Hous. Auth. of Balt. City*, 436 Md. 331, 345 (2013) ("A plaintiff does not substantially comply with the LGTCA notice requirement where the plaintiff demands that a local government fix a defect, but neither explicitly nor implicitly indicates that the plaintiff intends to sue the local government regarding an injury resulting from the defect.").

[30] It is not clear whether Smith and Clark also provided their notices to the City. Regardless, for the reasons explained below, any tort claims against the city defendants would fail.

ii.   Negligence and Gross Negligence

As to Smith and Clark's negligence claim against HACA, the defendants argue that Clark has not sufficiently alleged proximate causation or injury.[31]  Clark, however, has sufficiently alleged that the defects in the apartment, such as mold, proximately caused injuries, such as her family having to move out of the apartment while her son recovered from an injury, because he could not spend so much time in the apartment. (Am. Compl. ¶ 196).  Therefore, Clark has sufficiently pled negligence as to HACA.

As to HACA, Smith and Clark have also stated a claim for gross negligence.  Although "[g]ross negligence must be plead with specificity," *Khawaja v. Mayor and City Council*, 89 Md. App. 314, 318 (1991), a "legally sufficient case of ordinary negligence will frequently be enough to create a jury question of whether such negligence was or was not gross." *Beall v. Holloway-Johnson*, 446 Md. 48, 64 (2016) (citing the lower court opinion in the case).  At this stage, before further factual development, the court will deny the motion to dismiss as to Smith and Clark's negligence and gross negligence claim against HACA.

As to the City, neither Smith nor Clark (nor the other plaintiffs) allege what duty the City owed them.  In order to be liable for negligence, the City must have "a legally recognized duty owed" to the plaintiffs. *Valentine v. On Target, Inc.*, 353 Md. 544, 549 (1999).  Gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them," *Beall*, 446 Md. at 64 (citation omitted), and therefore also requires the City to have a duty to the plaintiffs.  As the plaintiffs fail to allege any duty, the court will dismiss Smith and Clark's negligence and gross negligence claims against the City.

---

[31] It does not appear that HACA seeks to dismiss Smith's negligence claim.

Further, any amendment would be futile. Even if the plaintiffs did allege a duty, the City is immune from liability for "tortious conduct which occurred in the exercise of a 'governmental' rather than a 'proprietary' function." *Mayor and City Council of Balt. v. Whalen*, 395 Md. 154, 163 (2006) (citation omitted). A government function is "a purely governmental duty which had been imposed upon the municipality as a governmental or public agency by legislative enactment," while a proprietary function relates "to the local or special interests of the municipality" and is "imperative" rather than "discretionary." *Id.* at 163 (citations omitted). The Maryland Supreme Court has previously held that issuing building permits is a governmental function, even if the city collected fees, as long as they were not making a profit. *E. Eyring & Sons Co. v. City of Balt.*, 253 Md. 380, 383–84 (1969); *cf. Golt v. Phillips*, 308 Md. 1, 13 (1986). The plaintiffs do not allege that the licensing and inspection services are profit-making. Therefore, the government is entitled to immunity for the tort claims arising from that function.[32]

iii.   Tort Civil Conspiracy

A claim for civil conspiracy requires proof of: "1) [a] confederation of two or more persons by agreement or understanding; 2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and 3) [a]ctual legal damage resulting to the plaintiff." *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 154 (2007) (citation omitted). "'[C]onspiracy' is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Id.*

As discussed above, the City is immune from liability for alleged tortious conduct in the exercise of government functions, such as enforcing licensing and inspection requirements.

---

[32] The plaintiffs also argue that the City should not be afforded immunity because its code enforcement does not "promote the welfare of the whole public," *Eyring*, 253 Md. at 383, since it excludes HACA properties. Promoting the welfare, though, seems to refer to the nature of the act, and not necessarily whether it is applied equally to all individuals, and the plaintiffs provide no case to the contrary.

Because the negligence and gross negligence claims against HACA are going forward and there is not likely to be additional discovery required for the tort civil conspiracy claim, the court will deny the motion to dismiss the tort civil conspiracy claim against HACA as to Smith and Clark.

## X.   Consumer Protection Act

First, the failure to plead and provide notice under the LGTCA also bars the plaintiffs' claim under the Maryland Consumer Protection Act ("CPA"). The defendants argue that the CPA claim "sounds in tort" and is subject to the LGTCA notice requirement. (City Defendants' Mot. to Dismiss at 35 n.33). They point to *Green v. N.B.S., Inc.*, 180 Md. App. 639 (2008), *aff'd*, 409 Md. 528 (2009), which held that a Maryland statute that capped damages in personal injury actions brought by victims of tortious conduct applied to the plaintiff's CPA claim, even though the CPA claim was statutory and not a common law tort. *Id.* at 645–46, 660. The *Green* court cited to many cases in which courts held that "the fact that a cause of action arises out of a statute does not mean that a tort has not been committed." *Id.* at 651–52; *see also Harris v. Hous. Auth. of Balt. City*, 227 Md. App. 617, 623–24 (2016) (affirming dismissal of a CPA claim for failure to comply with the LGTCA).[33] The plaintiffs do not address this argument in their brief. As it appears that the LGTCA notice requirement also applies to the CPA claim, the court will dismiss the CPA claim, except as to Smith and Clark, for failure to plead and provide notice.

Further, even as to Smith and Clark, any claim against the City would fail because the CPA does not apply to it. In *Benson v. State*, the Court of Appeals of Maryland held that the CPA does not cover conduct by the state. 389 Md. 615, 651 (2005). Although *Benson* involved the state as a defendant, the court explained that "the rule of construction to be applied is to exclude the government from the statute's operation unless the Legislature provides particular

---

[33] Additionally, the LGTCA's notice requirement seems to be applicable to any "action for unliquidated damages" against the local government or its employees. Md. Code Cts. & Jud. Proc. § 5-304(b).

indication in the language that it intended to include the State in its sweep." *Id.* at 648.

Therefore, it appears that the reasoning of *Benson* would also apply to a local government as a

defendant.

Finally, as to HACA, Smith and Clark's CPA claim may proceed.[34]  The CPA prohibits

any "false, falsely disparaging, or misleading oral or written statement, visual description, or

other representation of any kind which has the capacity, tendency, or effect of deceiving or

misleading consumers" or representation that "consumer realty . . . [is] of a particular standard,

quality, grade, style, or model which they are not."  Md. Code Com. Law § 13-301.  The Court

of Appeals of Maryland has previously held that the failure to "disclose the material fact that [the

defendant] did not hold a license to rent the premises as a multi-family unit amounted to a

violation of the Consumer Protection Act." *Lloyd*, 397 Md. at 144 (2007) (citing *Golt*, 308 Md.

1).

Here, the plaintiffs allege that HACA made misrepresentations in connection with the

rentals by stating that their units complied with the city code.  The complaint alleges that HACA

represented the units to be free of material defects (Am. Compl. ¶ 325), and falsely represented

that "HACA is obligated to . . . comply with the requirements of all applicable building and

housing codes materially affecting health and safety . . ." (*id.* ¶ 327).  Accepting these allegations

as true, Smith and Clark have plausibly alleged a claim against HACA under the CPA.

## XI.    Breach of Contract and Breach of Warranty of Habitability

The plaintiffs have sufficiently alleged a breach of contract claim against HACA.[35]  First,

the court cannot find the claims time-barred at this stage. The statute of limitations for breach of

contract actions in Maryland is generally three years. *Millstone v. St. Paul Travelers*, 183 Md.

---

[34] HACA does not argue that the CPA does not apply to it, and the parties have not briefed the issue.

[35] The plaintiffs brought their breach of contract and breach of warranty of habitability claims against HACA and Wilbourn only.  For the reasons stated above, Wilbourn is entitled to public official immunity.

App. 505, 511 (2008).  The HACA defendants argue that the plaintiffs' claims relating to "licenses, inspections or fire code" violations are time-barred because they were known prior to May 2016.  (HACA Reply at 18).  As to the housing violations discovered during the 2016 inspections, it is not clear when the plaintiffs knew that their apartments failed the inspection and when they knew that HACA would not be fixing the violations.  Additionally, it appears that the plaintiffs have plausibly alleged continuing violations, as they argue that HACA has continually refused to comply with the city code.  Finally, as for the licenses and inspections, according to the plaintiffs, HACA decided to stop conducting inspections sometime around 2018, after Mayor Buckley was sworn into office, which is within the statute of limitations period.

Although the plaintiffs did not attach any of their leases to the complaint, they restated some of the lease provisions in their amended complaint.  (Am. Compl. ¶ 333).  According to the plaintiffs, HACA obligated itself in the leases to "[m]aintain the unit and the development in decent, safe, and sanitary condition," "[c]omply with the requirements of all applicable building and housing codes materially affecting health and safety," and "[m]ake necessary repairs to the units within a reasonable time."  (*Id.*).[36]  At this stage, the plaintiffs have plausibly alleged that HACA breached their lease obligations by failing to maintain the apartments and remediate defects, and failing to comply with the inspection and licensing requirements of the code.  (*Id.* ¶ 334).[37]

The plaintiffs also bring a claim for breach of warranty of habitability.  At oral argument, counsel for the plaintiffs stated this claim was brought under either contract or common law.  To the extent the warranty is contractual it would appear to be duplicative of the contract claim; to

---

[36] According to the plaintiffs' counsel, public housing leases must include certain provisions set forth in 24 C.F.R. 966.4.

[37] The plaintiffs allege two counts of breach of contract – one count requests damages, and the other requests specific performance.  The court declines to decide what relief is available at this time, and both counts may proceed.

the extent it is common law, the plaintiffs have provided no case showing such a common law warranty in Maryland nor explaining its scope. As the breach of contract claim is going forward, though, and it appears no additional discovery will be needed for the warranty of habitability claim, the court will not dismiss it at this time.

## XII.   Punitive Damages

Finally, the HACA defendants argue that the request for punitive damages should be dismissed because none of the plaintiffs' claims allow for punitive damages.[38] The plaintiffs do not respond to this. The court will dismiss the plaintiffs' request for punitive damages.

Punitive damages are not available in private suits under Title VI, the Americans with Disabilities Act, and the Rehabilitation Act. *Barnes v. Gorman*, 536 U.S. 181, 189–90 (2002). Punitive damages are also not available against local governments under the Fair Housing Act, *Jennings v. Hous. Auth. of Balt. City*, No. WDQ-13-2164, 2014 WL 346641, at *9 (D. Md. Jan. 29, 2014), nor are they available against municipalities under § 1983. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 237, 271 (1981).[39] This rule also applies to the plaintiffs' § 1982, § 1985, and § 1986 claims. *See Bell v. City of Milwaukee*, 746 F.2d 1205, 1270 (7th Cir. 1984), *overruled on other grounds, Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005), ("The punitive damages rule of *City of Newport* is not confined to Section 1983 and applies to Section 1985 as well as to Section 1981."). Punitive damages are also not allowed against the local government under Maryland law. Md. Code Cts. & Jud. Proc. § 5-303(c) ("A local government may not be liable for punitive damages"); *id.* § 5-301 (local government includes housing authorities); *see*

---

[38] The city defendants have "adopted and incorporated" the HACA defendants' arguments to the extent they are consistent with the city defendants' arguments. (City Defendants' Mot. to Dismiss at 11). As the argument for dismissing the request for punitive damages is consistent, the court understands that it has been adopted by the city defendants also.

[39] Although *City of Newport* speaks of "municipalities," other cases have applied its reasoning to dismiss punitive damages claims against housing authorities. *See Farmer v. Wilson Hous. Auth.*, 393 F. Supp. 2d 384, 387 (E.D.N.C. 2004); *Jennings*, 2014 WL 346641, at *9.

*also Jennings*, 2014 WL 346641, at \*9 (finding a housing authority not liable for punitive damages under Maryland law). Therefore, the court will dismiss the plaintiffs' request for punitive damages.

## CONCLUSION

Accordingly, the court will grant in part and deny in part the motions to dismiss. Specifically, the court will dismiss the following: 1) all claims against Buckley and Wilbourn in both their individual and official capacities; 2) the 42 U.S.C. § 3608 claim; 3) the ADA and Rehabilitation Act claims as to Tiamani Johns, individually and on behalf of her one minor child; 4) the request for writ of mandamus; 5) the CPA, negligence, gross negligence, and tort civil conspiracy claims against the City, and, except as to Smith and Clark, against HACA; and 6) the request for punitive damages. Further, to the extent the plaintiffs requested leave to file an amended complaint in their opposition and at oral argument, the request is denied. A separate order follows.

2/3/20
Date

CCB

Catherine C. Blake
United States District Judge