## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**Baltimore Division**

| | |
|---|---|
| **Heaven White,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:19-cv-01442-CCB** |
| **The City of Annapolis by and through the City Council,** *et al.*, | |
| **Defendants.** | |

## CONSENT DECREE

## Table of Contents

I.  BACKGROUND.................................................................................1

II.  JURISDICTION, PURPOSE, AND SCOPE OF ORDER.................................2

III.  DEFINITIONS...........................................................................3

IV.  GENERAL NONDISCRIMINATION PROVISIONS.................................7

V.  SPECIFIC PROVISIONS.........................................................8

Fair Housing Education and Training ……….....................................8

Inspections of the HACA Properties…………..................................9

Repairs of HACA Properties and Relocation of HACA Tenants…………………..9

Modification of City Policies to Facilitate an Expedited Redevelopment of the HACA Properties…………………………………………………11

Creation of Hard Units ……...............................................13

Use of Voucher-Based Housing Opportunities…………………………16

Reasonable Accommodation Policy and Procedures……………………16

Future Redevelopment Requirements for HACA Properties……………..20

Record-Keeping and Reporting Requirements……………………………22

Remedies for Non-Compliance………………………...................24

Monetary Relief and Attorneys' Fees and Costs……………….................25

Mutual Release and Modification of Decree…………………...................25

Miscellaneous Terms………………………...................................26

Signature Pages

Attachment 1:  Reasonable Accommodation Policies and Procedures

Attachment 2:  LTA Criteria

Attachment 3:  Certification

# I.      BACKGROUND

The Plaintiffs, past and present tenants of public housing, initiated this action on May 16, 2019, to enforce the provisions of the Equal Protection Clause, Fair Housing Act as amended in 1988, 42 U.S.C. § 3601, *et seq.* (the "Act"); Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 1982, 1983, 1985, 1986 and 2000d; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504");  the Americans with Disabilities Act as applicable, 42 U.S.C. §§ 12101 *et seq.* ("ADA") as well as state law claims.  The Complaint as amended, alleges policies and practices by the City of Annapolis ("City") and the Housing Authority of the City of Annapolis ("HACA") relating to the licensing and inspection of rental properties including public housing, all of which is owned and operated by HACA, that had the effect of discriminating against the African American and disabled tenants of public housing.  As a result of these actions the Plaintiffs allege, they have suffered hardships and injury, and they and other tenants of HACA will in the future suffer injury without changes to the current practices.

Plaintiffs allege that HACA as it exists today has been severely hampered by prior management missteps and missed opportunities so that its properties are in dire need of renovation and maintenance to ensure the health and safety of its tenants going forward.   Plaintiffs further allege that HACA struggles to provide decent, safe and sanitary housing without the financial ability to adequately repair and maintain its properties, and as a result sought to exempt itself from the City's licensing and inspection regime.  The City complied with these efforts to the detriment of HACA's tenants.

A change in the City's landlord licensing and inspection policies and practices is warranted and the City has already enacted Resolution R-26-19 to eliminate the harm and inequities caused by the prior policy so that all tenants in the City will be treated equally and afforded the same protections.  City policy now calls for the inspection of all rental properties without exception. Similarly, newly enacted Maryland legislation, MD HOUS & CMTY DEV §  13-112, to become

effective October 1, 2020 also requires the inspection and licensing of HACA properties without exception, but with no defined or established enforcement procedures.  To avoid further delay or injury to Plaintiffs and other HACA tenants similarly impacted, the Plaintiffs and HACA seek to resolve these issues in a cooperative manner.

Plaintiffs and HACA acknowledge and agree that this Consent Decree, referred to herein as "Consent Decree" or "Agreement,"  is the compromise of disputed liability claims, and that the actions taken are not to be construed or used by any party or third party as an admission of liability on the part of HACA, who expressly denies any and all liability.   HACA intends merely to avoid further litigation by entering this Consent Decree.  In recognition of the mutual benefit to Plaintiffs and  HACA,  and  to  avoid  extensive  pre-trial  discovery,  and  costly  and  protracted  litigation, Plaintiffs and HACA agree as follows:

## II.    JURISDICTION, PURPOSE, AND SCOPE OF ORDER

1.    The purpose of this Consent Decree is to ensure compliance with and redress violations of Equal Protection Clause, Fair Housing Act as amended in 1988, 42 U.S.C. § 3601, *et seq*. (the "Act"); Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 1982, 1983, 1985, 1986 and 2000d; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); Americans with Disabilities Act as applicable, 42 U.S.C. §§ 12101 *et seq*. ("ADA") as well as state law claims.  All actions required to be taken herein are intended to be coextensive with the remedial reach of these statutes and regulations.

2.    Plaintiffs and HACA stipulate and the Court finds that the Court has personal jurisdiction over HACA for purposes of this Civil Action, and subject matter jurisdiction over the claims in this Civil Action pursuant to 28 U.S.C. §§ 1331; 42 U.S.C. § 12133; 28 U.S.C. §§ 2201 and 2202; 42 U.S.C. § 3613; and 28 U.S.C. § 1367.

3.     The provisions of this Consent Decree apply to the Housing Authority of the City of Annapolis.

4.     This Consent Decree shall govern the conduct of parties to it from the Effective Date of the Consent Decree until such time as the Closing occurs on the redevelopment of, or substantial renovation and/or rehabilitation of all of the HACA Properties as defined in paragraph III.5.d.

## III.   DEFINITIONS

5.     The following terms when used in this Consent Decree shall have the following meanings:

   a.   "City" refers to the City of Annapolis made up of the Mayor and the Alderpersons of the City of Annapolis which according to Article 1 of its Charter, constitutes a municipal body corporate and politic.

   b.   "HACA" or the "Housing Authority" refers to the Housing Authority of the City of Annapolis which is a public body corporate and politic. MD HOUS & CMTY DEV § 13-103.

   c.   "Defendants" refers to the City and HACA.

   d.   "HACA Properties" refers to the following six (6) existing HACA Properties:

      i.   Bloomsbury Square – Rebuilt in 2002, this is HACA's newest property, and is comprised of 51 units;

      ii.   Harbour House – Constructed in 1964, is comprised of 273 units;

      iii.   Eastport Terrace – Constructed in 1953, is HACA's oldest property and is comprised of 84 units;

iv. Morris H. Blum Senior Apartments – Constructed in 1976, are HACA's only dedicated units for the elderly and disabled, and requires heads or co-heads of household, spouse, or sole member to be elderly (62 years of age of older) or nearly-elderly (between 50-61 years of age) or a family to include a person with a disability to apply and is comprised of 154 units;

v. Robinwood – Constructed in 1970 is comprised of 150 units; and

vi. Newtowne Twenty (or "Newtowne 20") – Constructed in 1971 is comprised of 78 units.

e. "HACA Tenants" are tenants of any of the existing HACA Properties as defined herein.

f. "Effective Date of the Consent Decree" refers to the date the Court gives final approval to and enters this Consent Decree.

g. "Hard Unit" means an Affordable rental housing unit that results from new construction, substantial rehabilitation, acquisition, or existing housing stock, and may include redevelopment of one or more of the HACA Properties. "Hard Unit" may include Affordable rental housing units that result from HUD's Rental Assistance Demonstration ("RAD") or other HUD-based or mixed-finance or affordable housing program which includes restrictive covenants containing a minimum of a fifteen-year affordability term.

h. "Developer/Owner" refers to a developer or subsequent owner of one of the HACA Properties, whether that property is acquired through RAD,

or any other method, who is to be bound pursuant to the terms of this Decree.

i.   "Scattered site unit" refers to public housing units owned or managed by HACA, a Developer/Owner, or some other entity pursuant to an agreement with HACA that are generally fewer than fifteen (15) units per site.

j.   An "Accessible Unit" means:

    i.   For purposes of the accessibility requirements related to Hard Units herein, an "Accessible Unit" means a dwelling unit, including, but not limited to, mixed-finance developments that complies with the applicable requirements in the Uniform Federal Accessibility Standards or HUD's Alternative Accessibility Standard set forth in 24 CFR Part 8.

k.   "Affordable" means:

    i.   In reference to units for households with incomes at or below eighty (80) percent of Area Median Income ("AMI"), a unit that the household can obtain for thirty (30) percent or less of its income or a unit that is otherwise subject to rent restrictions based on the household's income.

    ii.   In reference to units for households with incomes at or below thirty (30) percent of AMI, the total tenant payment limitations for the Housing Choice Voucher Program as set forth in 24 CFR §§5.628, 982.4, and 983.3.

iii. In reference to units for household with incomes between eighty (80) to one hundred and fifty (150) percent of AMI, tenant maximum rents to be subject to fair market value rates.

l. "Project" means all units covered by a single contract or application for assistance or all units treated as a whole for processing purposes, whether or not located on a single site, and includes both multifamily and scattered site projects.

m. "Closing" means the date on which financing and other principal commitments regarding the redevelopment (including but not limited to financing, land conveyances, covenants, agreements and contracts) are performed or converted to binding obligations of performance.

n. "Plaintiffs" refers to Heaven White, individually and as Mother and Next Friend of D. C. minor plaintiff, H. C. minor plaintiff, K. C., minor plaintiff; D'Andre Covert; Tameka Wright individually and as Mother and Next Friend of D. W., minor plaintiff, D. W., minor plaintiff, D. W., minor plaintiff, D. W., minor plaintiff, D. W., minor plaintiff, D. W., minor plaintiff,  D. W., minor plaintiff, D. W., minor plaintiff; Janay Young, individually and as Mother and Next Friend of O. B., minor plaintiff, Z. B., minor plaintiff; Glenn Rogers; Lakeedrah Johnson, individually and as Mother and Next Friend of P. J., minor plaintiff; LaDawn Camp, individually and as Mother and Next Friend of A. L. R., minor plaintiff; Tiamoni Johns, individually and as Mother and Next Friend of N. J., minor plaintiff, Z. G., minor plaintiff;

Nashell Smith, individually and as Mother and Next Friend of D. P.,

minor plaintiff, D. P., minor plaintiff, M. P., minor plaintiff; Lakisha

McGowan, individually and as Mother and Next Friend of M. C.,

minor plaintiff, M. C., minor plaintiff, C. R., minor plaintiff, K.R.,

minor plaintiff, K. R., minor plaintiff; Nicole Clark, individually and

as Mother and Next Friend of T. L., minor plaintiff, N. Q. C., minor

plaintiff; Tyneice Holliday, individually and as Mother and Next

Friend of D. R., Jr., minor plaintiff, A. H., minor plaintiff, E. D., minor

plaintiff; Breonna Dixon; individually and as Parent and Next Friend,

Jonathan Dixon; individually and as Parent and Next Friend of  A. D.,

minor plaintiff, A. D., minor plaintiff; Lakisha Fuller, individually and

as Mother and Next Friend of M. D. , minor plaintiff, O. D., minor

plaintiff, A. N., minor plaintiff; Rynika Simms, individually and as

Mother and Next Friend of A. M. S., minor plaintiff.

## IV.    GENERAL NONDISCRIMINATION PROVISIONS

6. HACA shall comply with the Fair Housing Act, Section 504 of the Rehabilitation Act,

the ADA as applicable, their implementing regulations, and state and federal law

independent of this Agreement in their programs, activities, and services.  Specifically,

HACA, its officers, employees, agents, and successors shall not

   a. Discriminate in the sale or rental, or otherwise make unavailable or

   deny, a dwelling to any person because of race, color, or a disability;

   b. Discriminate in the terms, conditions, or privileges of sale or rental of a

   dwelling, or in the provision of services or facilities in connection

   therewith, on the basis of race, color, or disability;

    c.   Refuse to make reasonable accommodations in the application of rules, policies, practices or services when such accommodations may be necessary to afford a person or persons with disabilities an equal opportunity to use and enjoy a dwelling; and

    d.   Coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the FHA.

## V.    SPECIFIC PROVISIONS

### Fair Housing Education and Training

7.   Within ninety (90) days of the effective date of this Decree, HACA shall provide, through an independent contractor with subject matter knowledge acceptable to the Plaintiffs, an educational program for all of its employees on the ADA as applicable, FHA, Rehabilitation Act, and HACA's Reasonable Accommodation Policy. The proposal will be sent to Plaintiffs' counsel for approval in advance.

    a.   The purpose of the training is to ensure that all employees and agents of HACA are familiar with the Fair Housing Act, the Americans with Disabilities Act as applicable, and the Rehabilitation Act.  The training shall also familiarize all employees with HACA's Reasonable Accommodations Policy and Procedures in Public Housing referenced herein.

    b.   Within ninety (90) days after a new or current employee begins employment at HACA, that employee shall undergo training designed

to fulfill the objectives described herein.  This requirement may be satisfied by review of a video of the training received by HACA employees pursuant to the preceding paragraph, or by some other means that is deemed acceptable by Plaintiffs.  The employee shall sign a written statement indicating that he or she has been provided with a handout summarizing the Fair Housing Requirements stated in this Consent Decree, has read it, and will comply with the provisions set forth under this "Fair Housing Education and Training" section.

**Inspections of the HACA Properties**

8.   HACA acknowledges that inspections of the HACA Properties shall be of the same rigor and standards and be completed in the same manner as inspections conducted by the City of all other residential rental properties in the City.

9.   Inspections of the HACA Properties will be attended by a HACA designee and may at any time be attended by representatives of Plaintiffs with the HACA tenant's written consent that can be executed up to or at the time of inspection.

**Repairs of HACA Properties and Relocation of HACA Tenants**

10. To the extent the City discovers conditions that implicate life safety issues within a HACA unit and gives written notice to HACA, HACA will remediate that condition within 72 hours of discovery.  To the extent it is necessary to relocate the tenant(s) temporarily or if the City recommends relocation, HACA will relocate tenants to a hotel within six miles of their residence or if in excess of six miles until the City has verified that the life safety issue has been remediated.  To the extent remediation is not possible within 72 hours or determined impractical, HACA will provide temporary relocation as stated above and/or offer a transfer to a comparable alternative housing unit in

accordance with 24 C.F.R. §905.200(b)(10) and other applicable regulations. HACA will not allow temporary relocation at a hotel for more than seven (7) days unless HACA cannot provide a comparable alternative unit.  If provided temporary housing in a hotel, HACA will provide reimbursement for transportation costs outside of a tenant's normal expenses under the following limited circumstances:

    a. A maximum amount of $800/year will be set aside for a transportation fund for emergency transfers. The transportation fund will cover only extraordinary costs due to being located at a temporary shelter and not for routine costs or costs covered by any other entity. The fund will not exceed a maximum aggregate amount of $10,000 and will be terminated once the amount of $10,000 is reached regardless of whether the Consent Decree is still in effect, as effective date is defined in Paragraph II.4.  Upon the date set in Paragraph II.4, ending the effective date of the Consent Decree, any amount of the annual $800 or $10,000 aggregate remaining will revert to HACA for any purpose and any obligations to pay transportation hereunder shall cease except as required by HUD regulations.

    b. The funds will be expended on a reimbursement basis only. The resident will complete a form provided by management, certifying that the request for reimbursement for transportation is an extraordinary cost and these costs are not otherwise covered by any other entity. HACA will provide the form to the head of household within twenty-four to forty-eight hours of relocation.  The head of household must submit the form with all required documentation within 30 days of resident's return home or another unit provided by HACA.

    c. Receipts for transportation costs are required for reimbursement.

    d. Individual households are eligible for a maximum amount of $75/year for transportation reimbursement.

    e. Residents that are provided transportation directly from HACA, management entity, or any other entity without charge to Resident will not be eligible for reimbursement.

    f. Transportation reimbursement is only allowed for costs to and from school or work outside of a tenant's normal expenses.

    g. To the extent a Resident has his/her own vehicle, it is expected that vehicle will be used for transportation and no transportation costs will be reimbursed.

    h. HACA is not obligated to create a specific fund or account, but simply to keep an accurate record of the transportation funds used under this paragraph 10.

**Modification of City Policies to Facilitate an Expedited Redevelopment of the HACA Properties**

11. HACA agrees that one of the most significant hurdles to redevelopment of the HACA Properties is securing financing for the redevelopment. Whereas HUD's Rental Assistance Demonstration ("RAD") program, Section 18 disposition, and other preservation programs allow for redevelopment of the properties through leveraging debt and equity, the reality is that in order to attract developers, the density of such properties must allow for the expansion of the existing number of units and to include market rate and mixed use applications as necessary. To effectuate the legitimate ability of HACA to redevelop its properties in a timely manner through the HUD's preservation programs or other redevelopment programs that may become available, HACA commits to the following:

   a. HACA agrees to aggressively negotiate with the County and State Legislators for tax credits and grants to ensure the redevelopment of the HACA Properties as discussed *infra* is viable.

   b. The scale of redevelopment contemplated by this Consent Decree is significant for a City the size of Annapolis. The costs for full redevelopment and/or revitalization of all the HACA Properties is likely to rise into the hundreds of millions of dollars and is likely to attract developers, redevelopers, and speculators of varying size, with various levels of experience, capabilities, and limitations. HACA acknowledges such large-scale redevelopment in a small town has the potential to give rise to conflicts of interest, be they conflicts that are based on long-established relationships among elites in the community

or conflicts based on the opportunism of outsiders to the community. HACA acknowledges that the HACA community will benefit most from thoughtful and holistic developers who are interested in elevating the community which they have committed to redevelop through a spirit of co-ownership and pride. With this understanding, HACA agrees as follows:

    i. It will endeavor to identify and disclose to Plaintiffs' representative all known conflicts of interest between selected redevelopers and HACA that constitute, under applicable HUD requirements, actual conflicts of interest or the appearance of a conflict of interest. Such conflicts of interest that may reflect impropriety, or the appearance of impropriety, and which require disclosure, include, but are not limited to, contracting with redevelopers who have fiscal ties to prior HACA or City employment or prior HACA or City legal representation. For purposes of this paragraph 11, the test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that HACA's ability to carry out the responsibilities of providing safe, affordable, and habitable public housing with competence, impartiality, and integrity is impaired.

    ii. In its various solicitations related to redevelopment, HACA will include a preference for selected redevelopers who qualify as minority-owned small businesses or, alternatively, selected

redevelopers who are willing to commit to sub-contracting with minority-owned small businesses.

iii. It will conduct outreach for its solicitations for redevelopment to non-profit, community-oriented developers who have experience in large scale redevelopment of underprivileged and marginalized communities to respond.

c. Should there be a question or disagreement over whether or not such conflict exists, HACA will defer to the Court, and HACA hereby agrees that the Court will have the final say over whether a conflict of interest exists.

d. It is contemplated that the City will initiate quarterly meetings with HACA to discuss HACA's ongoing redevelopment efforts, and HACA agrees to participate fully and in good faith in such meetings.

**<u>Creation of Hard Units</u>**

12. HACA agrees it will take all necessary steps to cause the development by public or private developers, or a combination thereof, of 790 Hard Units, with at least 357 – the number of units currently located in Eastport – of those units located within one half mile of the existing developments of Harbour House and Eastport Terrace, over a period of approximately twelve (12) years.

13. The 790 Hard Units shall represent at a minimum 1-for-1 replacement of the current HACA Properties as defined herein and shall maintain the same eligibility requirements.  Current tenants of public housing units will have the first right to return to their HACA Property upon redevelopment of the properties (the "Right to Return") and receive the applicable HUD assistance

associated with these Hard Units in accordance with HUD approval and requirements. For current tenants with the Right to Return but whose income exceeds the permissible income limits of the HUD and/or tax credit program implemented at a redeveloped HACA Property, HACA will, to the extent permissible under then-current requirements, extend all rights in the attached LTA to such tenants and will work to establish commensurate, alternate requirements to the extent a LTA right is not permitted under then-current requirements including provisions that would grant a preference for re-entering a HUD subsidy program if their income decreases

14. Subject to paragraph 13, HACA agrees that the intent of this Consent Decree is to redevelop the HACA Properties in a way so that no current public housing tenant loses their eligibility for newly redeveloped units by HACA and that it is HACA's further desire to redevelop the existing HACA Properties as affordable and/or mixed-income housing for families up to 150% average median income range, if permitted by the applicable financing. The parties acknowledge that available financing may require this income range to be limited to 80% area median income in some redevelopments so as to comply with HUD and tax credit requirements.

15. HACA agrees that an additional and significant hurdle to redevelopment of the HACA Properties is the lack of available funding sources to support the HACA Properties as they currently exist. Specifically, given the general state of the properties, and without directing blame toward any of the parties for the current state of the properties, it is not disputed that the HACA Properties have a demonstrable lack of comparative capital improvements to other developments

built around the same time – indeed in some instances by the same developers
– and due to that lack of local funding, the properties are less attractive.

16. Hard Units will be controlled by deed restrictions or other legal instruments to
ensure that they remain Affordable to and occupied by eligible households for
a minimum of fifteen (15) years.  However, the affordability term will be longer
than fifteen (15) years if the owner of Hard Units, or the Project or development
wherein the Hard Units are located, has any financing, deed, or other restriction
that imposes an affordability requirement beyond fifteen years on the units or
the Project or development wherein the units are located, in which case the
longer affordability term shall apply to the Hard Units.

17. The parties understand that any development is contingent on funding, HUD
approval, land acquisition, and other factors outside of HACA's
control.  HACA will use its best efforts to meet the following interim goals:

| HACA Property | Anticipated HUD Approval Year | Anticipated Construction Completion |
|---|---|---|
| Newtowne 20 | 2020 | 2023 |
| Morris Blum | 2021 | 2024 |
| Eastport Terrace Harbour House | 2024 | 2027 |
| Robinwood | 2025 | 2029 |
| Bloomsbury Square | 2028 | 2030 |

18. Defendant HACA, shall provide housing opportunities to redress the previous
exclusion of Plaintiffs and those similarly situated from access to safe and

habitable housing.   It is the parties' intent that the housing opportunities discussed herein, as well as the Hard Units discussed *supra*, and provided by this Decree will result in the provision of housing that is supported by HUD-approved programs.

**Use of Voucher-Based Housing Opportunities**

19. HACA agrees that it will pursue amending its Administrative Plan for The Housing Choice Voucher to allow for the affected tenant household to obtain a Tenant Based Voucher or other voucher, which may be available from HUD for those instances where necessary repairs to a HACA unit cannot be made within thirty (30) days.

**Reasonable Accommodation Policy and Procedures**

20. HACA shall adopt, fully implement, and adhere to a new Reasonable Accommodation Policy.  The parties recognize that the policy will be subject to public notice, comment, and board approval requirements. The Policy is attached hereto as Attachment 1, it has been posted for public comment by HACA and is awaiting comments and board approval.  To the extent changes to the Policy are necessary based on public comment or board recommendation, the parties agree to consider the suggestions of Plaintiffs' counsel and seek Plaintiffs' counsels' review and approval prior to finalizing the Policy, which then will be put forth for public notice, comment and board approval. Parties understand that if a request for a reasonable accommodation requires a waiver of a HUD regulation, HACA will consult with HUD before granting or denying such a request. Parties understand that only HUD can determine whether a request for a reasonable accommodation requires a waiver of a HUD program, and only HUD can grant or deny such a waiver.

21. HACA shall post signs in the common areas of all HACA offices and common facilities, which provide notice of its Reasonable Accommodations Policy and tenants' and applicants' right to request a reasonable accommodation. The signs shall be no smaller than 8.5" by 14".

22. To ensure confidentiality of information related to requests for reasonable accommodation, HACA currently has established procedures, which it shall continue to implement and enforce, that ensure that information supplied by public housing tenants, applicants for public housing, or others regarding a person's disability, medical status, and/or the reason why a person has requested a reasonable accommodation is kept confidential.  Such information shall be made available only to persons within HACA who are directly involved in decisions regarding the person's request for a reasonable accommodation, or as otherwise required by law or by this Decree.

23. HACA shall identify a Reasonable Accommodation Coordinator within HACA who will oversee HACA's implementation of and ongoing compliance with its Reasonable Accommodation Policy and Procedures. HACA shall enter all requests for reasonable accommodations it receives from any public housing tenant or applicant, and any response(s) it makes to such requests, into its reasonable accommodation database – which database may be either through use of spreadsheet or separate software – within five (5) business days of receipt of the request(s). The database shall be updated to reflect actions taken with respect to reasonable accommodation requests within five (5) business days of the action taken. The Reasonable Accommodation Coordinator shall regularly monitor the database for compliance with HACA's Reasonable Accommodation Policy.

24. For each request received, the database shall include the following information:

    a.  the name and address of the person making the request;

    b.  the nature of the request;

    c.  the date and time the request was made;

    d.  the HACA staff person to whom the request was initially directed;

    e.  the nature of any response(s) made by HACA staff to the request, including:

        i.  whether HACA staff made a request for information or verification;

        ii.  whether HACA staff requested a meeting with the person making the request;

        iii.  any other communications related to this request;

        iv.  the date(s) of any response(s) made by HACA staff;

        v.  the name of the HACA staff person who provided the response(s) to the request;

        vi.  whether HACA granted or denied the request, and the date on which such decision was communicated;

        vii.  if the request was granted, the date HACA began to implement the request and the date implementation of the request is completed;

        viii.  if the request was denied, the reason(s) therefore, the name of the HACA staff person who made the decision to deny the request, and the date thereof;

        ix.  if the request was denied, whether the person who made the request requested an informal review and/or contacted the Reasonable Accommodation Coordinator or their office."

25. HACA shall date-stamp all written requests for reasonable accommodation it receives. HACA shall maintain all written requests for reasonable accommodation and copies of written responses prepared by any employee or agent of HACA throughout the duration of this Decree.

26. HACA shall keep a copy of each date-stamped request for a reasonable accommodation and maintain those copies in accordance with HUD record-keeping requirements. HACA shall also provide a copy of the date stamped written request for a reasonable accommodation to the public housing tenant or applicant who made the written reasonable accommodation request.

27. HACA shall ensure that all housing management staff, maintenance staff, and any other staff or agents who have regular contact with applicants or public housing tenants have read and are familiar with the Reasonable Accommodation Policy. HACA shall ensure that all housing management staff are aware of:

    a.  procedures tenants may follow to request a reasonable accommodation, including the right to make the request verbally;

    b.  the requirement to enter the request into the reasonable accommodation database;

    c.  the obligation to respond to a request within twenty (20) business days; and

d.  the obligation to keep any information regarding the fact that a tenant has a disability, the nature of the disability, and/or the tenant's need or request for an accommodation confidential.

**Future Redevelopment Requirements for HACA Properties**

28. HACA agrees that it shall incorporate in any future redevelopment agreements, whether through RAD or other redevelopment agreements, at the time of Closing,[1] the following:

a.  As to Waiting Lists, the Developer/Owners will maintain waiting lists in accordance with federal, state and local fair housing requirements.

b.  As to Lease Renewals, the Developer/Owners are required to have leases with their tenants that automatically renew from year-to-year unless terminated for good cause or the tenant does not meet program qualification/eligibility requirements.

c.  As to the Grievance Process/Informal Hearing, the Developer/Owners are required to adopt and adhere to a grievance process as required pursuant to HUD requirements related to the specific redevelopment funding for the property to provide tenants a meaningful opportunity to contest adverse actions.

d.  As to the Determination of Eligibility, Tenant Selection and Occupancy Criteria, the Developer/Owners must apply criteria in substantially the same form as in the "Long Term Affordable Criteria" ("LTA Criteria"), attached as Attachment 2, as discussed herein.  The parties recognize

---

[1] The "redevelopment agreements" referenced herein are intended to consist of one or more of the following documents or their equivalents based on the type of funding for the property: "Control Agreement," "Ground Lease," and "Amended and Restated Operating Agreement."

that the LTA Criteria will be subject to public notice, comment and board approval requirements.  At a minimum, HACA agrees that the language for any proposed lease will comply with the lease requirements stated at paragraph 12 of Attachment 2.  HACA further agrees to consider the suggestions of Plaintiffs' counsel and seek Plaintiffs' counsels' review and approval prior to finalizing the remaining provisions of its LTA Criteria, which then will be put forth for public notice, comment and board approval.

e. As to <u>Security Deposits</u>, the Developer/Owners must set the security deposit at $50.00, or five (5) percent of one month's rent, whichever is lower.

f. As to training of Developer/Owners' Property Managers, the Developer/Owners shall require their managers and all other entities who manage the properties to participate in trainings regarding the Fair Housing Act, Section 504 of the Rehabilitation Act, Title II of the ADA, their implementing regulations, and other applicable HUD guidelines and state and federal law independent of this Agreement in their programs, activities, and services.  They shall provide to HACA at the time of Closing a copy of their planned training policy.

g. As to the verification of an individual HACA Tenant's need for a Reasonable Accommodation, as that HACA Tenant returns to a redeveloped HACA Property, HACA shall transfer documentation verifying that HACA Tenant's need for a Reasonable Accommodation, and the Developer/Owners shall accept such documentation of that

HACA Tenant's need for the Reasonable Accommodation previously extended by HACA.

29. At least thirty (30) days prior to Closing, HACA shall execute the certification attached hereto as Attachment 3 for each HACA Property being redeveloped, certifying that the requirements related to paragraph 28 contained in the Developer/Owners' Agreements shall be included the redevelopment agreements. No Closing shall take place in the absence of a certification by HACA to Plaintiffs that the Developer/Owners' Agreements represent the requirements contained in paragraph 28. HACA shall provide copies of the executed Developer/Owners' Agreements within thirty (30) days after Closing but may redact other confidential portions of the agreement consistent with this paragraph.

30. HACA agrees that it shall preserve and enforce the provisions in paragraph 28 for at least fifteen (15) years beginning from the Closing date that each HACA Property converts from public housing to any other redevelopment plan.

31. The parties agree that all phases of planning for redevelopment shall be made with maximum transparency and tenant participation and input through engagement with tenants in the affected communities, the tenant councils and the resident advisory board of HACA to ensure that all tenants' concerns regarding the conditions of their units are being addressed in the near term.

**Record-Keeping and Reporting Requirements**

32. HACA shall submit Consent Decree Compliance Reports in accordance with paragraph 34 no later than January 15th and July 15th, or the first business day thereafter, for the remainder of this Decree.

33. HACA Consent Decree Compliance Reports shall describe all specific actions it has taken to fulfill its obligations under this Decree. After the initial compliance report, all reports shall include information regarding activities that have occurred since the previous report was submitted.  HACA shall include in the reports the following information:

   a. Publicly available information on financing, development approval, construction, and anticipated location of Hard Units;

   b. The number of leased Hard Units by bedroom size and Project or development address, and, separately, the number of leased Accessible Units by bedroom size and Project or development address;

   c. Outreach and education with the development community regarding Hard Units;

   d. Outreach and education with the HACA tenants regarding the status of redevelopment required pursuant to this Decree;

   e. Evidence of training required pursuant to this Decree.

34. All required Consent Decree Compliance Reports, certifications and documentation of compliance submitted to Plaintiffs' representatives must be submitted to:

   P. Joseph Donahue
   18 West Street
   Annapolis, Maryland 21401
   pjd@thedonahuelawfirm.com

   The burden is on Plaintiffs' representative to give notice to HACA of any change in contact or contacts' address.  Reports may be submitted by email.

35. Throughout the term of this Decree, HACA shall retain all records relating to implementation of the provisions of this Agreement.

**Remedies for Non-Compliance**

36. Plaintiffs may file an enforcement action if they have first provided HACA with a notice of dispute, which shall trigger an obligation for good faith negotiations between HACA and Plaintiffs regarding the issue(s) in dispute. The period for informal negotiations shall not exceed thirty (30) days from the time the Plaintiffs send the notice of dispute, unless that period is modified by written agreement of the Defendant(s) and Plaintiffs.  Failure of HACA to respond to Plaintiffs' notice of dispute within thirty (30) days shall result in Plaintiffs' right to file an enforcement action related to that dispute.  Failure of Plaintiffs to file an enforcement action within ninety (90) days of the notice given to HACA of a dispute shall constitute as a waiver by Plaintiffs of that dispute, unless the parties mutually agree in writing to an extension.  Failure to raise a known dispute within one (1) year from Plaintiffs' discovery of the existence of the dispute shall also be considered a waiver of the right to dispute it.

37. In the event the representatives for Plaintiffs contend that there has been a failure by HACA whether willful or otherwise, to perform in a timely manner any act required by this Decree or otherwise to act in conformance with any provision thereof, the representatives for Plaintiffs may move this Court to impose any remedy authorized by law or equity, including, but not limited to, an order requiring performance of such act or deeming such act to have been performed, and an award of damages, costs, and reasonable attorneys' fees as approved by the Court which may have been occasioned by the violation or failure to perform.

**Monetary Relief and Attorneys' Fees and Costs**

38. The total sum of Nine Hundred Thousand DOLLARS ($900,000.00),
including attorneys' fees and costs, paid by or on behalf of HACA to or on
behalf of Plaintiffs, sufficiency of which is hereby acknowledged, the
Plaintiffs agree to this Consent Decree and the Full and Final Release of
Claims set forth herein. Payment shall be disbursed in accordance with
Counsel for Plaintiffs' instructions no later than forty-five days from Counsel
for Defendants' receipt of those instructions. Payment disbursements shall be
made in the following amounts and made payable to, or on behalf of, the
following payee designations:

    **Payee:      The Donahue Law Firm LLC Attorney Trust Account**

    **Amount:   $900,000.00**

39. Plaintiffs with an outstanding rent balance owed HACA at the time of the
Effective Date of this Consent Decree, who have not yet entered into a
repayment agreement with HACA, agree to pay the remaining amount in full
immediately, subject to a review of the total amount of debt alleged to be
owed by the tenant, and good faith negotiations between HACA and the
tenant to resolve any discrepancies related to the amount owed by the tenant.
Any payment made will be handled by Plaintiffs' counsel prior to
disbursement to the individual Plaintiff.

40. HACA shall be responsible for its attorneys' fees and costs.

**Mutual Release and Modification of Decree**

41. In consideration of the terms and commitments of this Consent Decree,
Plaintiffs hereby forever waive, release, and covenant not to sue HACA, its
successors, assigns, agents, employees, insurers and attorneys with regard to

any and all claims, damages, and injuries of whatever nature, whether presently known or unknown, arising out of the subject matter of the above-captioned case.

42. HACA hereby forever waives, releases, and covenants not to sue Plaintiffs their successors, assigns, agents and attorneys with regard to any and all claims, damages, and injuries of whatever nature, whether presently known or unknown, arising out of the subject matter of the above-captioned case.

43. The terms and provisions of this Decree may not be modified except upon written agreement of both parties.

44. The persons whose signatures appear below are authorized to bind the parties to this Decree.

**Miscellaneous Terms**

45. The Parties agree to work in good faith to achieve the success of this Consent Decree and to resolve informally any differences regarding interpretation of and/or compliance with the terms of this Consent Decree.

46. This Consent Decree represents the product of negotiations and shall not be deemed to have been drafted exclusively by any one party.  This Consent Decree shall be reasonably construed. In the event of a dispute regarding the meaning of any language contained in this Agreement, this Agreement shall not be construed against either party as drafter.

47. If any provision of this Consent Decree is found to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this Decree will not be affected or impaired and shall continue in full force and effect to all extent possible.

48. If the terms of this Consent Decree or the attached Long Term Affordable Criteria ("LTA") conflict with current or future federal law or with specific requirements of the U.S. Department of Housing and Urban Development or the U.S. Department of Treasury, the Parties shall confer and, if necessary, may modify this Agreement by doing so in writing and as authorized by the legal representatives of the Parties.

49. This Consent Decree, including all exhibits attached hereto, constitutes the entire agreement between the parties and supersedes all prior agreements, promises and understandings, whether oral or written. This Consent Decree shall not be modified, amended, supplemented or revised, except by a written document signed by all Parties or counsel for the Parties.

50. Wherever appropriate herein, words used in the singular shall be considered to include the plural and words used in the plural shall be considered to include the singular.

51. This Consent Decree may by executed in counterparts. If executed in counterparts, each shall be deemed an original and all, taken together, shall constitute one and the same instrument.

52. Headings and captions contained in this Consent Decree are for the purposes of reference and context and do not create or establish obligations.

53. In consideration of the actions set forth in this Consent Decree, Plaintiffs hereby, release, acquit, and forever discharge Defendant, which includes HACA and its affiliates, parent or subsidiary agencies, assigns, agents, servants, employees, officers, successors, insurers, Housing Authority Risk Retention Group, RSUI, administrators, attorneys, Beverly Wilbourn, individually and as HACA's former Executive Director, and all other persons, firms, corporations,

associations, or partnerships (collectively referred to herein as "Released Parties") of and from any suits, claims, actions, causes of action, demands, and/or rights that Plaintiffs ever had, now have whether known or unknown, against Defendant also known as the Releasees and/or Released Parties for any and all claims generally arising out of, as a consequence of, resulting from, for, upon or by reason of, or relating in any way to each Plaintiffs' tenancy or participation in any program operated by HACA from the beginning of each Plaintiffs' tenancy or participation in any program operated by HACA to the Effective Date of this Consent Decree.

54. The Parties acknowledge and agree that this Consent Decree is entered into in order to compromise disputed claims and that nothing contained herein or the promises contained herein shall be construed or used to establish admission of liability or improper conduct on the part of the any Released Parties.

55. Each of the undersigned hereby individually warrants that s/he is entitled to enforce and settle the aforesaid claim and to give a full and complete release therefrom on behalf of herself and all interested parties.

56. Each Plaintiff agrees to hold harmless and indemnify the Released Parties for any sums, which they may be required to expend or pay as a result of any subsequent claims or litigation brought by that specific Plaintiff or their agent related to any claims released by paragraph 53 or any liens arising out of any claims released by paragraph 53, except that this paragraph does not operate to make the other Plaintiffs responsible for the acts or any liens of any other specific Plaintiff.

57. The undersigned further declares and represents that no promise, inducement, or agreement not herein expressed has been made to the undersigned, that this

Consent Decree contains the entire agreement between the Parties hereto, and that the terms of this Consent Decree and the release terms herein are contractual and not a mere recital.

58. The undersigned agrees to execute any supplementary documents and to take all supplementary steps that may be necessary to give full force and effect to the terms of this Consent Decree and the release terms herein.

59. The undersigned hereby states that s/he has carefully read the foregoing Consent Decree and the Release contained herein and/or that someone has carefully read the foregoing Consent Decree and Release to her/him.  S/he further states that s/he knows the contents thereof, has had the advice of counsel regarding this Settlement and release, and that s/he signed the same of her/his own free act.

THE PARTIES CONSENT TO THE ENTRY OF THIS CONSENT DECREE AS INDICATED BY THE SIGNATURES OF INDIVIDUAL PLAINTIFFS OR THEIR REPRESENTATIVES AND DEFENDANTS BELOW:

[space intentionally left blank]

**CAUTION:**

**READ THE FOREGOING CONSENT DECREE INCLUDING BUT NOT LIMITED TO RELEASE
LANGUAGE BEFORE SIGNING**

Plaintiff **Heaven White**:

_____          5-06-21
Heaven White                                                          Date

**D'Andre Covert**,  by:

_____          5 - 6 - 21
Heaven White, Power of Attorney and Agent              Date

█████████████

████████████

██████████ , minors, by:

_____          5 - 6 - 21
Heaven White, Parent and Next Friend                     Date

Witness:

Jennifer Broman          JB          5. 6. 21
(printed name)          (signature)          Date

CAUTION:

READ THE FOREGOING CONSENT DECREE INCLUDING BUT NOT LIMITED TO RELEASE
LANGUAGE BEFORE SIGNING

Plaintiff, **Tameka Wright**:

_____        Wednesday May 5, 2021
Tameka Wright                                                      Date

████████████████

████████████████

████████████████

████████████████

████████████████

████████████████

██████████████, and

██████████████, minors, by:

_____        Wednesday May 5, 2021
Tameka Wright, Parent and Next Friend              Date

Witness:

_____        5.5.21
Jennifer Braman            (signature)                    Date
(printed name)

**CAUTION:**

**READ THE FOREGOING CONSENT DECREE INCLUDING BUT NOT LIMITED TO RELEASE LANGUAGE BEFORE SIGNING**

Plaintiff, **Janay Young**:

Janay Young _____   5/11/2021
                                                 Date

█████████

███, minors, by:

Janay Young, Parent and Next Friend _____   5/11/2021
                                                    Date

Witness:

Janay Young _____   5/11/2021
(printed name)        (signature)              Date

**CAUTION:**

READ THE FOREGOING CONSENT DECREE INCLUDING BUT NOT LIMITED TO RELEASE
LANGUAGE BEFORE SIGNING

Plaintiff, **Glenn Rogers**:

Glenn Rogers _____   5/5/2021
                                           Date

Witness:

Jennifer Braman _____   /s B _____   5.5.21
(printed name)        (signature)         Date

**CAUTION:**

READ THE FOREGOING CONSENT DECREE INCLUDING BUT NOT LIMITED TO RELEASE
LANGUAGE BEFORE SIGNING

Plaintiff, **Lakeedrah Johnson**:

_____   05/05/21
Lakeedrah Johnson                                          Date

_____, minor, by:

_____   05/05/21
Lakeedrah Johnson, Parent and Next Friend                 Date

Witness:

_Jennifer Braman_____   _JrB_____   5.5.21
(printed name)         (signature)          Date

**CAUTION:**

READ THE FOREGOING CONSENT DECREE INCLUDING BUT NOT LIMITED TO RELEASE
LANGUAGE BEFORE SIGNING

Plaintiff, **LaDawn Camp**:

_____     5·18·21
LaDawn Camp                                   Date

███████████, minor, by:

_____     5·18·21
LaDawn Camp, Parent and Next Friend           Date

Witness:

_____     5.18.21
(printed name)        (signature)             Date

**CAUTION:**

READ THE FOREGOING CONSENT DECREE INCLUDING BUT NOT LIMITED TO RELEASE
LANGUAGE BEFORE SIGNING

Plaintiff, **Tiamoni Johns**:

_____   $5/5/21$
Tiamoni Johns                                              Date

████████ , and

████████████ , minors, by:

_____   $5/5/21$
Tiamoni Johns, Parent and Next Friend                     Date

Witness:

Jennifer Broman _____   $5.5.21$
(printed name)          (signature)         Date

**CAUTION:**

**READ THE FOREGOING CONSENT DECREE INCLUDING BUT NOT LIMITED TO RELEASE
LANGUAGE BEFORE SIGNING**

Plaintiff, **Nashell Smith**:

_____     5/5/2021
Nashell Smith                                                    Date

██████████████

████████████████

████████████████, minors, by:

_____     5/5/2021
Nashell Smith, Parent and Next Friend                Date

Witness:

Jennifer Broman _____ /L B _____     5.5.21
(printed name)          (signature)               Date

**CAUTION:**

**READ THE FOREGOING CONSENT DECREE INCLUDING BUT NOT LIMITED TO RELEASE
LANGUAGE BEFORE SIGNING**

Plaintiff, **Lakisha McGowan**:

_____     5.5.21
Lakisha McGowan                                                Date

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED], minors, by:

_____     5.5.21
Lakisha McGowan, Parent and Next Friend              Date

Witness:

Jennifer Broman          Jd. B          5.5.21
(printed name)          (signature)          Date

CAUTION:

READ THE FOREGOING CONSENT DECREE INCLUDING BUT NOT LIMITED TO RELEASE
LANGUAGE BEFORE SIGNING

Plaintiff, **Nicole Clark**:

_____     5/11/21
Nicole Clark                                         Date

**Teray Lemon**,  by:

_____     5/11/21
Nicole Clark, Power of Attorney and Agent            Date

███████████ , minor, by:

_____     5/11/21
Nicole Clark, Parent and Next Friend                 Date

Witness:

_Jennifer Broman_ / _JB_                             5.11.21
(printed name)         (signature)                   Date

**CAUTION:**

**READ THE FOREGOING CONSENT DECREE INCLUDING BUT NOT LIMITED TO RELEASE LANGUAGE BEFORE SIGNING**

Plaintiff, **Tyneice Holliday**:

_____   5/12/2021
Tyneice Holliday                                  Date

███████████████
███████████████
████████, minors, by:

_____   5/12/2021
Tyneice Holliday, Parent and Next Friend          Date

Witness:

Jennifer Broman _____   MB _____   5.12.21
(printed name)        (signature)         Date

**CAUTION:**

READ THE FOREGOING CONSENT DECREE INCLUDING BUT NOT LIMITED TO RELEASE
LANGUAGE BEFORE SIGNING

Plaintiff, **Breonna Dixon**:

_____     5/10/21
Breonna Dixon                                          Date

Plaintiff, **Jonathan Dixon**:

_____     5/10/21
Jonathan Dixon                                         Date

██████████████
████████, minors, by:

_____     5/10/21
Breonna and Jonathan Dixon, Parents and Next Friends   Date

Witness:

_____     5.10.21
(printed name)        (signature)                      Date

**CAUTION:**

READ THE FOREGOING CONSENT DECREE INCLUDING BUT NOT LIMITED TO RELEASE
LANGUAGE BEFORE SIGNING

Plaintiff, **Lakisha Fuller**:

_Lakisha Fuller_                                    5-17-21
Lakisha Fuller                                      Date

███████████

███████████

███████████ , minors, by:

_Lakisha Fuller, Parent and Next Friend_            5-17-21
Lakisha Fuller, Parent and Next Friend              Date

Witness:

_Patrick Donahue_        _signature_        5-17-2021
(printed name)           (signature)        Date

**CAUTION:**

**READ THE FOREGOING CONSENT DECREE INCLUDING BUT NOT LIMITED TO RELEASE
LANGUAGE BEFORE SIGNING**

Plaintiff, **Rynika Simms**:

_____    5-11-2021

Rynika Simms                                                                                   Date

████████████████, minor, by:

_____    5-11-2021

Rynika Simms, Parent and Next Friend                                           Date

Witness:

_____    5.11.21

(printed name)                    (signature)                                     Date

**CAUTION:**

**READ THE FOREGOING CONSENT DECREE INCLUDING BUT NOT LIMITED TO RELEASE
LANGUAGE BEFORE SIGNING**

Defendant, Housing Authority of the City of Annapolis

_Melissa Maddox Evans_                    4/29/2021

By:  Melissa Maddox-Evans, Executive Director          Date

Witness:

_Lisa Meagher_        _Lisa Meagher_        11/29/2021

(printed name)        (signature)        Date

```
LISA ANN MEAGHER
NOTARY PUBLIC
QUEEN ANNE'S COUNTY
MARYLAND
My Comm. Expires Nov. 30, 2022
```

44

**Attachment 1:**
**Reasonable Accommodation Policies and Procedures**

# Table of Contents

**INTRODUCTION** .......................................................................................................................... **2**

**PART A.  POLICY.** .......................................................................................................................... **2**

SECTION 1.     DEFINITIONS. ........................................................................................................ 2

SECTION 2.  POLICY STATEMENT. .............................................................................................. 3

SECTION  3.  PURPOSE. .................................................................................................................. 3

SECTION 4.  AUTHORITY. .............................................................................................................. 3

SECTION 5.  MONITORING AND ENFORCEMENT. .................................................................... 4

SECTION 6.  GENERAL PRINCIPLES FOR PROVIDING REASONABLE ACCOMMODATIONS. ...... 4

SECTION  7.  AMENDMENT. ........................................................................................................... 5

SECTION 8.  STAFF TRAINING ..................................................................................................... 5

**PART B.  PROCEDURES.** ............................................................................................................... **5**

PROCEDURE #1 - COMMUNICATION WITH APPLICANTS AND RESIDENTS .................................. 5

PROCEDURE #2 - SEQUENCE FOR MAKING DECISIONS ........................................................... 6

PROCEDURE #3 - GUIDELINES FOR DETERMINING REASONABLENESS ...................................... 7

**ATTACHMENTS TO PROCEDURES** ............................................................................................. **9**

ATTACHMENT 1 - REQUEST FOR A REASONABLE ACCOMMODATION ................................... 10

ATTACHMENT 2 - REQUEST FOR INFORMATION OR VERIFICATION ...................................... 12

ATTACHMENT 3 - LETTER DENYING REQUEST FOR REASONABLE ACCOMMODATIONS ...... 13

ATTACHMENT 4 - LETTER APPROVING REQUEST FOR REASONABLE ACCOMMODATIONS .. 15

ATTACHMENT 5 - REQUEST FOR MEETING ............................................................................. 16

# INTRODUCTION

This Reasonable Accommodation Policy and Procedures, comprised of **Part A and Part B,** sets forth the policy and procedures of the Housing Authority of the City of Annapolis ("**HACA**") in connection with making reasonable accommodations for qualified applicants or residents with disabilities for participation in HACA's public housing programs and activities. A copy of this Reasonable Accommodation Policy and Procedures is posted in HACA's Main Office located at 1217 Madison Street, Annapolis, Maryland, 21403, and the property management office at each public housing development. Additionally, a copy of this Reasonable Accommodation Policy and Implementation Procedures may be obtained upon request from HACA at their Main Office, 410-267-8000.

# PART A. POLICY.
## SECTION 1.    DEFINITIONS.

1.1.    The term "**ADA**" shall mean the Americans with Disabilities Act.

1.2.    The term "**FHA**" shall mean the Fair Housing Act of 1968.

1.3.    The term "**HACA**" shall mean the Housing Authority of the City of Annapolis.

1.4.    The phrase "**individual with disabilities**" shall have the same meaning as the term "individual with handicaps" under 24 C.F.R. §8.3, as follows:

> **24 C.F.R. § 8.3. Definitions.**
> ……………………………
> "Individual with handicaps" means any person who has a physical or mental impairment that substantially limits one or more major life activities; has a record of such an impairment; or is regarded as having such an impairment.

1.5.    The term "**Policy**" shall mean Part A of this Reasonable Accommodation Policy and Procedure, as adopted by the HACA Board of Commissioners, and as may be amended.

1.6.    The term "**Procedures**" shall mean Part B of this Reasonable Accommodation Policy and Procedure, as may be revised from time to time.

1.7.    The term "**reasonable accommodation**" means a modification or change in HACA's rules, policies, practices, or services, that will provide the opportunity to participate in HACA's programs and services and to meet HACA's essential requirements of tenancy to an otherwise eligible individual with a disability.

**SECTION 2.  POLICY STATEMENT.**

HACA is committed to ensuring that its policies and practices do not deny individuals with disabilities the opportunity to participate in, or benefit from, nor otherwise discriminate against individuals with disabilities in connection with, the operation of HACA's housing services or programs, solely on the basis of such disabilities. Therefore, if an individual with a disability requires an accommodation, such as an accessible feature or modification to HACA policy, HACA will provide such accommodation, unless doing so would result in a fundamental alteration in the nature of the program or an undue financial or administrative burden. In such a case, HACA will make another accommodation that would not result in a financial or administrative burden.

**SECTION 3.  PURPOSE.**

This Policy is intended to:

- communicate HACA's position regarding reasonable accommodations for persons with disabilities in connection with the agency's housing programs services, and policies;

- establish a procedural guide for implementing such Policy; and

- comply with applicable federal, state and local laws to ensure accessibility for persons with disabilities to housing programs, benefits and services administered by HACA.

**SECTION 4.  AUTHORITY.**

The requirements of this Policy are based upon the following statutes or regulations:

- Section 504 of the Rehabilitation Act of 1973, as amended ("Section 504") prohibits discrimination on the basis of disability status and states that:

  "No qualified individual with handicaps shall, solely on the basis of handicap be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity that receives Federal financial assistance from the Department";

- The Fair Housing Act ("FHA") prohibits discrimination in the sale, rental and financing of dwellings. The FHA requires reasonable accommodations in rules, policies, practices, services and reasonable modifications to dwelling units and public common areas;

- Title II of the Americans With Disabilities Act ("**ADA**"), prohibits discrimination on the basis of disability status by public entities. Except as provided in §35.102 (b), of 28 CFR Part 35, the ADA applies to all services, programs and activities provided or made available by public entities (State and local governments); and

- Part 8, of Code of Federal Regulations, Title 24, Housing and Urban Development, entitled Non-Discrimination Based On Handicap In Federally Assisted Programs and Activities of the Department of Housing and Urban Development applies to recipients of federal funds and implements the requirements of the Rehabilitation Act.

## SECTION 5.  MONITORING AND ENFORCEMENT.

The HACA Fair Housing and Equal Opportunity Office ("**FH&EO Office**") is responsible for monitoring HACA's compliance with and enforcing the requirements under this Policy. Questions regarding this Policy, its interpretation or implementation should be made by contacting the HACA FH&EO Office in writing, or in person by appointment, at 1217 Madison Street, Annapolis, Maryland, 21403, 410-267-8000. The FH&EO Office may require the submission of data from HACA public housing developments and field offices in order to evaluate and document HACA's compliance with this Policy.

## SECTION 6.     GENERAL PRINCIPLES FOR PROVIDING REASONABLE ACCOMMODATIONS.

Listed below are the general principles which provide a foundation for the Policy and which HACA staff should apply when responding to requests for reasonable accommodations within all HACA housing programs:

6.1     It is presumed that the individual with a disability is usually knowledgeable of the appropriate types of, and methods for providing, reasonable accommodations needed when making a request. However, HACA reserves the right to investigate and offer equally effective alternatives to the requested accommodation, and/or alternative methods for providing the requested accommodation.

6.2.     The procedure for evaluation and responding to requests for a reasonable accommodation relies on a cooperative relationship between HACA and the applicant/resident. The process is **NOT** adversarial.

HACA shall inform all applicants and residents of alternative forms of communication. The Request Form is designed to assist HACA and our applicants/residents. If an applicant/resident does not, or cannot use the Request Form, HACA will still respond to the request for an accommodation. The applicant/resident may also request assistance with the Request Form, or such applicant/resident may request that the Request Form be provided in an equally effective format or means of communication.

**Example(s):** Some examples of alternative equally effective forms of communication include the following: Qualified interpreters, printed material, telecommunications devices for deaf persons (TDD's), Maryland Relay System, or other aurally delivered materials available to persons with hearing impairments. Qualified readers, taped texts audio recordings, Brailed materials, large print materials, or other effective methods of making visually delivered materials available to individuals with visual impairments.

6.3.     If the accommodation is reasonable (see Procedure 3 below), HACA will grant it.

6.4.     In accordance with Procedure 3 (below), HACA will grant the request for a reasonable accommodation only to the extent that an undue financial and administrative burden is not created thereby.

6.5.     All written documents required by or as a result of this Policy must contain plain language and be in appropriate alternative formats in order to communicate information and decisions to the person requesting the accommodation.

6.6.     Any required meetings with a person with a disability will be held in an accessible location.

## SECTION 7.  AMENDMENT.

7.1.     Policy. The Policy may be amended only by resolution of the Board of Commissioners.

7.2.     Procedures. The Procedures may be amended within the scope of the Policy by the Executive Director of HACA.

7.3.     Legal Compliance. Any amendment to the Policy or Procedures shall be consistent with all applicable laws and regulations.

## SECTION 8.  STAFF TRAINING

The Reasonable Accommodations Coordinator for the FH&EO Office will ensure that training sessions are held at least annually concerning the Policy and the Procedures and all applicable federal, state and local requirements regarding reasonable accommodations.

# PART B.  PROCEDURES.

## PROCEDURE #1 - COMMUNICATION WITH APPLICANTS AND RESIDENTS

1.  At the time of application, all applicants must be provided with the Request for Reasonable Accommodation Form (the "**Request Form**") (copy of which is affixed hereto as **Attachment 1**), or, upon the applicant's request, the Request Form must be provided in an equally effective format.

2.  HACA Residents seeking accommodations may contact the property management office located within their housing development or the HACA FH&EO Office directly to request the accommodation.

3. HACA is responsible for informing all residents that a request may be submitted for reasonable accommodations for an individual with a disability. All residents will be provided the Request Form when requesting a reasonable accommodation. However, a resident may submit the request in writing, orally, or use another equally effective means of communication to request the accommodation. Upon receiving the request, housing management and/or the FH&EO office will respond to the request within twenty (20) business days[1]. If additional information or documentation is required, a written request should be issued to the resident by using the Request For Information or Verification Form ("**Request for Information**"), a copy of which is affixed hereto as **Attachment 2.** A submission date should be specified in the Request for Information so as not to delay HACA's review of the request.

4. HACA will consent to or deny the request within thirty (30) business days after receiving all needed information and documentation from the resident. All decisions to grant or deny reasonable accommodations will be communicated in writing or if required, in an alternative format in order to communicate the decision to the applicant/resident. Exceptions to the 30 business day period for notification of HACA's decision on the request should be provided to the resident in writing setting forth the reasons for the delay. A copy each of the **Letter Denying Request for Reasonable Accommodations** and the **Letter Approving Request for Reasonable Accommodations** are affixed hereto as **Attachment 3** and **Attachment 4**, respectively.

5. HACA will maintain at its property management offices; and Main Office written materials which summarizes this Policy and highlights the procedures for making a request for reasonable accommodations.

**PROCEDURE #2 - SEQUENCE FOR MAKING DECISIONS**

1. Is the applicant/resident a qualified "individual with a disability"?

    (a) If **NO**, we are not obligated to make a reasonable accommodation; therefore, we may deny the request.
    (b) If **YES,** go to Step 2.
    (c) If more information is needed, either write for more information using the standard *Request for Information* letter, or request a meeting using the standard *Request for Meeting* letter. (A copy of the Request for Meeting letter is affixed hereto as **Attachment 5**).

---

[1] The term "**business days**" shall mean those days of the week, excluding Saturdays, Sundays and holidays observed by HACA

2. Is the requested accommodation related to the disability?

   (a) If **NO**, we are not obligated to make the accommodation; therefore, we may deny the request.
   (b) If **YES**, go to step 3.
   (c) If more information is needed, either write for more information using the *Request for Information* Letter, or request a meeting using the *Request for Meeting* Letter.

3. Is the requested accommodation reasonable? This determination will be made by following Procedure #3 - Guidelines for Determining Reasonableness.

   (a) If **YES**, we will approve the request for reasonable accommodation. A written description of the accommodation will be prepared and included in the Letter Approving *Request for Reasonable Accommodations*.
   (b) If **NO**, we may deny the request. Submit the denial using the Letter Denying *Request for Reasonable Accommodations*.
   (c) If more information is needed, either write for more information using the Letter Approving *Request for Reasonable Accommodations*, or request a meeting using the *Request for Meeting* Letter.

## PROCEDURE #3 - GUIDELINES FOR DETERMINING REASONABLENESS

1. In accordance with Policy Principle 6.1, HACA will consider the requested method for providing reasonable accommodations for an individual with a disability. However, HACA is required to evaluate the requested method and may require the individual with a disability to provide further information to demonstrate the need for the requested accommodation to enable access to and use of the housing program. Additionally, HACA may offer equally effective alternatives to the requested accommodation, and/or alternative methods for providing the requested accommodation.

2. Requests for reasonable accommodations will be considered on a case-by-case basis. Decisions regarding reasonable accommodations will be made in compliance with all applicable accessibility laws and requirements. Additionally, in those circumstances where HACA deems that a proposed reasonable accommodation would fundamentally alter the service, program, or activity, or would result in undue financial and administrative burdens, HACA has the burden of proving such result(s).

3. The responsibility for the decision that a proposed reasonable accommodation would result in such alteration or burdens shall rests with the Executive Director or his/her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by written statement of the reasons for reaching that conclusion. If an action would result in such an alteration or such burdens, HACA shall propose any other action that will not result in or require an alteration or burden.

4.   <u>Live-in-Aides.</u>      In some cases, an individual with a disability may require a live-in-aide. In accordance with the provisions of the HACA dwelling lease, HACA may permit a live-in to reside in the dwelling unit to assist an individual with a disability. A live-in-aide means a person (a) determined by HACA to be essential to the care and wellbeing of a family member with a disability; (b) is not obligated to support the family member; and (c) would not be living in the unit except to provide the supportive services. A live-in-aide would not be required to share a bedroom with another member of the household [see 24 CFR 966.4(d)(3)]. Prior to granting permission, the live-in aide must submit to a criminal background check in accordance with HACA's policies and procedures. Additionally, medical verification of the need for a live-in aide is required., and the following factors will be considered by HACA in determining whether to approve a live-in aide:

   (1)      whether the addition of a new occupant would create a situation of overcrowding in the dwelling unit, thereby requiring a transfer to another dwelling unit;

   (2)      the availability of an appropriate dwelling unit; and/or

   (3)      HACA's obligation to make reasonable accommodation for persons with disabilities.

5.   <u>Verification</u>. The PHA may verify a person's disability only to the extent necessary to ensure that applicants are qualified for the housing for which they are applying; that applicants are qualified for deductions used in determining adjusted income; that applicants are entitled to any preference they may claim; and that applicants who have requested a reasonable accommodation have a need for the requested accommodation. A PHA may not require applicants to provide access to confidential medical records in order to verify a disability nor may a PHA require specific details as to the disability. A PHA may require documentation of the manifestation of the disability that causes a need for a specific accommodation or accessible unit. A PHA may not ask what the specific disability is.

# **ATTACHMENTS TO PROCEDURES**

## ATTACHMENT 1 - REQUEST FOR A REASONABLE ACCOMMODATION

**[HACA return address]**

If you need:

- a change in our policies or procedures
- a repair or change in your apartment
- a repair or change to some other part of the property
- a change in the way we communicate with you

because of a disability, you may ask for this change, which is called a "reasonable accommodation."

If your request is reasonable, if it is not too expensive, and if it is not too difficult to arrange, we will try to make the changes you need.

We will make every effort to render a decision within thirty (30) business days.

We will let you know if we need more information or verification from you or if we would like to discuss other ways of meeting your needs.

If we turn down your request, we will explain our decision, and you may give us additional information.

Please advise us if you need help in using the form, or if you wish to receive this Request Form in an alternative format to meet your communication needs.

The following member of my household has a disability:

Please provide this reasonable accommodation (specify accommodation(s)):

I need this reasonable accommodation because:

Date: _____

Name: _____

Address: _____

Telephone: _____

**ATTACHMENT 2 - REQUEST FOR INFORMATION OR VERIFICATION**

**[HACA return address]**


Date: _____

To: _____
    _____
    _____


Dear Applicant or Resident:

We have received your Request for a Reasonable Accommodation. We need to know more about [issue, simply and clearly stated] before we can decide.

We need to know more because [reason, simple and clearly stated].

You can give us more information by [acceptable methods of verification]. If this is a problem for you, other ways of providing the information may also be acceptable.

We will not make a decision until we have this new information.

If you think that you have given us this information, or if you think that we should not ask for this information, please call us at [our telephone number]. Please call if you have any other questions.

[signature and closing]

### ATTACHMENT 3 - LETTER DENYING REQUEST FOR REASONABLE ACCOMMODATIONS

**[HACA return address]**

Date: _____

To: _____
_____
_____

Dear Applicant or Resident:

You requested the following change or accommodation [describe request]. We have attached a copy of your request form. We have **denied** your request because:

–   You do not meet the definition of an individual with handicaps and we are not required to provide a reasonable accommodation.

–   We think the accommodation you requested is not reasonable because we have decided:

    You do not need this accommodation in order to enjoy or participate equally in our housing.

    It will create undue financial and administrative burdens for us.

    It will change the fundamental nature of our program.

We have decided this because [give reasons, in clear and simple language].

We relied on these facts to deny your request [give facts, in clear and simple language].

To make this decision we [tell what documents or records we reviewed, tell which people we spoke with, describe other aspects of our investigation process].

If you disagree with our decision, you may contact the HACA Fair Housing and Equal Opportunity (FH&EO) Office at 410-267-8000. The FH&EO Office is located at 1217 Madison Street, Annapolis, Maryland 21403. You may also contact the following agencies:

**U.S. Department of Housing and Urban Development**
**Baltimore Field Office**
Bank of America Building, Tower II
100 South Charles Street, 5th Floor
Baltimore, MD 21201
Phone: (410) 209-6640

Fax: (410) 209-6673
TTY: (800) 877-8339

**Maryland Commission on Civil Rights**
6 St. Paul Street
9th Floor
Baltimore, MD 21202
Telephone: 410-767-8600

**Annapolis Human Relations Commission**
City of Annapolis
Office of Human Resources
145 Gorman Street, 2nd Fl
HumanRes@annapolis.gov
410-263-7998
Fax 410-295-7999
TDD use MD Relay or 711


[signature and closing]

## ATTACHMENT 4 - LETTER APPROVING REQUEST FOR REASONABLE ACCOMMODATIONS

**[HACA return address]**

Date: _____

To: _____
    _____
    _____

Dear Applicant or Resident:

We have approved your request for the following change or reasonable accommodation [description]:

– We can provide you with this accommodation by [date].

– To make the change you requested, we must have three bids and then arrange installation. This is why we are not able to provide you with the accommodation immediately.

– [other reason for delay].

Please call us at [our telephone number] if you have any questions.

If you think this change or reasonable accommodation is not what you requested, if it is not acceptable, or if you object to the amount of time it will take to provide it, you may contact the HACA Fair Housing and Equal Opportunity (FH&EO) Office at 410-267-8000. The FH&EO Office is located at 1217 Madison Street, Annapolis, Maryland 21403. You may also contact the following agencies:

**U.S. Department of Housing and Urban Development**
Baltimore Field Office
Bank of America Building, Tower II
100 South Charles Street, 5th Floor
Baltimore, MD 21201
Phone: (410) 209-6640
Fax: (410) 209-6673
TTY: (800) 877-8339

**Maryland Commission on Civil Rights**
6 St. Paul Street
9th Floor
Baltimore, MD 21202
Telephone: 410-767-8600

**Annapolis Human  Relations Commission**
City of Annapolis
Office of Human Resources
145 Gorman Street, 2nd Fl
HumanRes@annapolis.gov
410-263-7998
Fax 410-295-7999
TDD use MD Relay or 711

[signature and closing]

**ATTACHMENT 5 - REQUEST FOR MEETING**

**[HACA return address]**

Date: _____

To: _____

_____

_____

Dear Applicant or Resident:

We have received your request for a reasonable accommodation. It would help us make our decision if we could meet with you. You may bring someone to assist you with the meeting.

We would like to meet on [date, time, place]. If you cannot come at that time, please call us at [our telephone number].

We will talk about [describe issue, simply and clearly] at this meeting.

Please come ready to talk to us about the changes you want. Please bring copies of any information that you would like to give us.

We look forward to meeting with you.

[signature and closing]

**Attachment 2:  LTA Criteria**

<u>**HOUSING AUTHORITY OF THE CITY OF ANNAPOLIS**</u>

**LONG TERM AFFORDABLE CRITERIA**
**APPLICABLE TO HACA PROPERTIES**

This document known as the "**Long Term Affordable Criteria Applicable to HACA Properties**" or "**LTA Criteria**" sets forth the requirements for applicants for, and residents of, the HACA Properties as such term is defined in the Consent Decree (each one of which is a "**HACA Property**") after HACA redevelops each HACA Property, directly or in partnership with subsidiaries of HACA and/or third party developers, which redevelopment is anticipated to include the conversion of HACA subsidy from public housing to another rental subsidy program. The Housing Authority of the City of Annapolis ("**HACA**") shall require the Owner and Management Agent of the HACA Properties to seek the prior written approval of HACA prior to changing any of the requirements set forth in this document. Any such change to the requirements contained in this document shall be subject to the notice and comment requirements of the ACOP or Administrative Plan, as applicable.

1.    **DEFINITIONS**

   (a)    "**ACOP**" means HACA's Admissions and Occupancy Policy, as may be amended from time to time, pertaining to its public housing program, subject to HUD notice and comment requirements.

   (b)    "**Administrative Plan**" means HACA's Housing Choice Voucher Program Administrative Plan, as may be amended from time to time, pertaining to its voucher program, subject to HUD notice and comment requirements.

   (c)    "**Applicable HUD Program Requirements**" means requirements imposed by the U.S. Department of Housing and Urban Development ("**HUD**") or the U.S. Department of Treasury in connection with the federal subsidy program or federal tax credits used at the HACA Property.

   (d)    "**Applicant**" shall mean a household (including the head of household and all other family members) on a Waiting List for admission to a HACA Property. Applicant does not include a current resident of a HACA property or someone who has been temporarily displaced due to unit repairs or redevelopment.

   (e)    "**Assisted Unit**" shall mean a unit at the HACA Property that receives federal rental subsidy in accordance with the Applicable HUD Program Requirements.

   (f)    "**Consent Decree**" means that certain consent decree dated _____, 2020, by and between HACA and Plaintiffs, Heaven White, *et al.*

   (g)    "**Family**" is defined as including, but is not limited to, the following, regardless of actual or perceived sexual orientation, gender identity, or marital status:

      (1)    A single person, who may be an elderly person, displaced person, disabled person, near-elderly person, or any other single person; or

(2)    A group of persons residing together, and such group includes, but is not limited to:

    (A)    A family with or without children (a child who is temporarily away from the home because of placement in foster care is considered a member of the family);

    (B)    An elderly family;

    (C)    A near-elderly family;

    (D)    A disabled family;

    (E)    A displaced family; and

    (F)    The remaining member of a tenant family.

(h)    "**Management Agent**" means the company engaged to manage and operate the development on behalf of the Owner.

(i)    "**Owner**" refers to the entity which owns the HACA Property and which is responsible for ensuring the Management Agent complies with the admissions and leasing requirements for the Assisted Units.

(j)    "**Public Housing Requirements**" means the Housing Act of 1937, as amended; regulations and notices issued by HUD thereunder pertaining to public housing; any other federal laws, regulations, notices and Executive Orders pertaining to public housing; and any written policies and procedures adopted by HACA, including but not limited to the ACOP, as those requirements may be waived or amended from time to time.

(k)    "**Resident**" shall mean a household who leases an Assisted Unit under these criteria.

(l)    "**Tenant Rent**" means the portion of the Total Tenant Payment the Resident pays each month to the Owner for rent.

(m)    "**Total Tenant Payment**" means the minimum amount a Resident must contribute toward rent and utilities regardless of the unit selected.

(n)    "**Waiting List**" means a waiting list for one or more HACA Properties established in accordance with Applicable HUD Program Requirements.

## 2.    SECURITY DEPOSIT; APPLICATION OR OTHER FEES

The amount of the security deposit for each Assisted Unit in a HACA Property will be equal to one month's rent, or Fifty Dollars ($50.00), whichever is lower. The Management Agent will establish a payment plan for payment of the security deposit in the event of a documented hardship situation.

Applicants will not be charged an application fee. Additionally, Applicants will not be charged any fee for credit or criminal background checks.

3. **SCREENING CRITERIA**

As part of the screening process required by the Applicable HUD Program Requirements, the following criteria will apply:

(a)     An Applicant may be screened for credit and criminal background according to the detailed screening process set forth in Section 3.1 below. Lack of credit history, on its own, will not be sufficient justification for rejection of an Applicant.

(b)     To the extent permitted by the Applicable HUD Program Requirements, the Owner and Management Agent shall not re-screen (i) Applicants who are current HACA public housing tenants and seek to move to a HACA Property at initial lease up or (ii) Residents who seek an immediate needs transfer within the HACA Property in which they reside provided that such households described in (i) or (ii) meet the following criteria: (x) are in good standing, (y) meet the income-eligibility requirements for the Assisted Unit, and/or (z) are approved for a reasonable accommodation, if applicable.

**3.1     DETAILED SCREENING PROCESS**

(a)     Credit and criminal background reports may be evaluated through a third-party screening company using the criteria set forth in Sections 3.1.1 and 3.1.2 below.

(b)     Rental history may be verified up to the past three years.

(c)     Applicants may be rejected for any of the following reasons: Agent **or** other acceptable references indicates a history of lease violations, including but not limited to repeated judgments for failure to pay rent, chronic late rental payments (more than four (4) late rental payments within a twelve (12) month period), prior eviction(s), history of public disturbances, damage to living unit or property of others, physical and/or verbal attacks on others, history of poor or unsatisfactory housekeeping or any other behavior that would have a substantial adverse impact upon the health, safety or peaceful enjoyment of other Residents, members of the community or Management Agent personnel at the HACA Property.

**3.1.1  Credit Screening Criteria**

(a)     **Credit Information**.

The criteria for determining an Applicant's eligibility based on credit screening are set forth hereunder. Applicants may be denied eligibility if they have a history of not meeting past financial obligations as demonstrated by the following:

- More than four (4) late rental payments within a twelve (12) month period only if the Applicant leased a dwelling unit that received continuous direct rental assistance subsidy that provided for the Applicant to pay no more than thirty percent (30%) of his or her income during the Applicant's tenancy.

- Unsatisfied collections, charge-offs, or judgments in the past 24 months totaling more than $3,000 in the aggregate.

Notwithstanding evidence of difficulty meeting past financial obligations, Applicants will be favorably considered if their poor payment history relates to:

- Medical debts
- Student loans

Applicants will not be denied eligibility solely on the basis of bankruptcy.

Other credit issues such as unsatisfied collections, charge-offs, judgments or liens will be reviewed in light of all the circumstances including evidence of the Applicant's limited disability benefits, prior lack of subsidized housing, illness or loss of Spouse, loss of primary support, etc. Such review may result in a favorable consideration for Applicant despite such credit issues. The housing application shall inform applicants that they have the opportunity to provide information about or to explain the circumstances for their poor credit history.

(b)   **Pre-Denial Review**

The Owner shall provide Applicants the opportunity to discuss reasons for a poor credit history, mitigating circumstances or requests for reasonable accommodations prior to the Owner making a determination to deny the Applicant on the basis of credit. Said pre-denial review will not replace or eliminate the informal hearing process set forth in 10.1 below. Examples of extenuating circumstances that should result in a favorable review by the Owner/Agent include (but are not limited to):

- Applicants whose form of income is from Supplemental Security Income (SSI) or similar form of disability payment.
- Applicants whose previous housing payment was substantially disproportionate to the tenant portion of rent for which he or she will be responsible in the Assisted Unit.
- Applicants with a documented/disclosed hardship that is not likely to repeat.

### 3.1.2   Criminal Screening

(a)   **General**.

1.   Denial of Eligibility.  An Applicant will be denied eligibility for admission for any of the following reasons:

- Any household member who has been convicted of drug-related criminal activity in connection with the manufacture or production of methamphetamine. This results in a lifetime ban from assisted housing.

- Any household member who is subject to a lifetime registration requirement under a State sex offender registration program.
- Any household member who has been evicted for drug-related criminal activity within the prior three (3) years.

2.   An Applicant may be denied eligibility for admission based upon the following:

- Public records, landlord references or criminal background checks indicate there is reasonable cause to believe that the Applicant and/or other household members have a history of violent criminal activity, violent behavior or alcohol or drug abuse that would threaten the health, safety, or right to peaceful enjoyment of the premises by other tenants.
- Public records or criminal background checks indicate Applicant/or household member has been convicted of a drug-related offense, Violent Criminal Activity, or felony offense.

"Alcohol or drug abuse" means, including but not limited to:

- Evidence of a history or pattern of illegal substance abuse that the individual has, within the past three years, engaged in to justify a reasonable belief that the individual's behavior is current.

"Violent criminal activity" means, including but not limited to:

- Evidence that the individual has, within the past three years, engaged in the behavior recently enough to justify a reasonable belief that the individual's behavior is current.
- Any history or evidence of repeated acts of violence on the part of an individual, or a pattern of conduct constituting a danger to peaceful occupancy by neighbors;
- Any history of initiating threats or behaving in a manner indicating an intent to assault employees or other tenants.

3.   Pending charges for any crime (not just those listed below) may be considered a cause for temporary denial of eligibility for admission. If the Applicant is temporarily denied admission because of the existence of a pending charge, the Applicant will maintain a priority order for occupancy of an Assisted Unit until disposition of the pending charge either (i) favorably, in which case the application process can continue, or (ii) unfavorably in which case the Applicant will be denied based on the criminal background screening criteria set forth herein.

(b)     **Specific Felony Crimes**

The following felonies may subject new Applicants to a maximum seven (7) year exclusion period. The exclusion period is calculated from the date of conviction or release from incarceration, whichever is later. If Management Agent chooses to utilize the maximum seven (7) year exclusion period to deny a new Applicant, the Applicant shall be notified that he or she may contact the tenant council at the HACA Property for assistance with appealing the Owner's decision in applying the seven (7) year exclusion period.

1.      Felony Child Abuse
2.      Sexual Abuse of a Minor except when crime results in conviction as a sex offender subject to a lifetime registration requirement, who, in such case, is prohibited from federally assisted housing.
3.      Felony Arson
4.      Malicious Burning of Personal Property (First degree)
5.      Burning with Intent to Defraud
6.      Felony Assault Attempted Poisoning
7.      Manufacture, Distribution or Possession with the Intent to Distribute of CDS (Controlled Dangerous Substances)
8.      Damage to Associated Building when Charged as a Felony
9.      Murder (all forms)
10.     Attempted Murder (all forms)
11.     Voluntary Manslaughter (all forms)
12.     Homicide (all forms)
13.     Kidnapping
14.     Child Kidnapping
15.     Abduction of Child Under 16
16.     Robbery
17.     Robbery with a Dangerous Weapon
18.     Carjacking
19.     Felony Sexual Crimes, except when crime results in conviction as a sex offender subject to a lifetime registration requirement, who, in such case, is prohibited from federally assisted housing.
20.     Weapons Crimes - Felonies
21.     Use of a Machine Gun in a Crime of Violence
22.     Use of a Machine Gun for Aggressive Purposes
23.     Manufacture or Possession of a Destructive Device

(c)     **Other Felony Crimes**

An Applicant may be denied eligibility for admission due to convictions for other types of felony crimes for a maximum of three (3) years beginning on the date of conviction or the release from incarceration, whichever date is later.

(d) **Misdemeanor Crimes**

An Applicant may be denied eligibility for admission due to convictions for misdemeanor crimes for a maximum of eighteen (18) months beginning on the date of conviction or the release from incarceration, whichever date is later.

(e) **Confidentiality of Criminal Records**

Any criminal record received must be maintained confidentially, not misused or improperly disseminated.

(f) **Disclosure of Criminal Records to Family**

Before taking any adverse action based on a criminal conviction record, the Applicant and the subject of the record will be provided with a copy of the criminal record and an opportunity to dispute the record at an informal hearing.

### 3.1.3 Other Reasons to Deny Eligibility

Apart from the credit and criminal background screening criteria above, Applicants may be denied eligibility for the other following reasons:

- Applicant's household income must meet the Applicable HUD Program Requirements and the Low-Income Housing Tax Credit requirements, if applicable, for eligibility.
- Applicant fails to respond to a request for verification of information or for additional information within ten (10) working days of the written request from the Owner.
- Applicant makes any material false statement or omission on the application and/or during an application interview with the intention of misleading the Owner.
- Applicant's household size is incompatible with the Owner's occupancy standards and/or unit availability. Provided, however, that an Applicant who has a verifiable need for a live-in aide may not be denied admission on the grounds that the addition of a live-in aide violates the Owner's occupancy standards. A live-in aide is defined in the Applicable HUD Program Requirements.

The live-in-aide is subject to the same screening criteria as an Applicant.

### 3.1.4 Prohibited Criteria for Denial of Eligibility

An Applicant cannot be rejected because he or she:

- Has no income;
- Is not employed;
- Does not participate in a job-training program;
- Will not apply for various welfare or benefit programs;

- Has children;
- Is receiving welfare benefits;
- Has children born out of wedlock;
- Is a student, unless otherwise prohibited by the Applicable HUD Program Requirements or financing for the HACA Property.

**3.2    Mitigating Circumstances-Generally**

Mitigating circumstances are facts relating to the applicant's record of unsuitable rental history or behavior, which, when verified would indicate both: (1) the reason for the unsuitable rental history and/or behavior; and (2) that the reason for the unsuitable rental history and behavior is no longer in effect or is under control, and the applicant's prospect for lease compliance is an acceptable one, justifying admission.

If unfavorable information is received about an applicant, consideration shall be given to the time, nature, and extent of the applicant's conduct and to factors that might indicate a reasonable probability of favorable future conduct. In order to be factored into the screening assessment of the applicant, mitigating circumstances must be verifiable.

If the mitigating circumstances claimed by the Applicant relate to a disability, medical condition or course of treatment, the Owner may require documentation of the manifestation of a disability only to evaluate the mitigating circumstances that pertain to the request for a specific accommodation. The Owner may not require Applicants or Residents to provide access to confidential medical records in order to verify a disability or to disclose the identity of the disability or specific details about the disability.

**3.2.1  Mitigating Circumstances**

Examples of mitigating circumstances include:

- Evidence of successful rehabilitation;
- Evidence of the Applicant family's participation in and completion of social service or other appropriate counseling service;
- Evidence of successful and sustained modification of previous disqualifying behavior.
- Consideration of mitigating circumstances does not guarantee that the Applicant will qualify for admission. Such circumstances will be considered in light of:
- The applicant's ability to substantiate through verification the claim of mitigating circumstances and his/her prospects for improved future behavior; and
- The applicant's overall performance with respect to all the screening requirements.
- However if mitigating circumstances are found the applicant will keep his place on the Waiting List and will be housed in the unit which was offered if that unit is still available and if it is not will be housed when the next appropriately sized unit becomes available.

4.      **OCCUPANCY GUIDELINES**

The Owner and the Management Agent will implement the occupancy guidelines set forth in the Public Housing Requirements unless superseded by the Applicable HUD Program Requirements.

In accordance with the foregoing and in connection with admission to a redeveloped HACA Property, Applicants who are current HACA public housing tenants may be required to move to a larger or smaller sized unit than the one in which they currently reside if the occupancy of the current public housing unit is not in compliance with Applicable HUD Program Requirements for the HACA Property.

5.      **CALCULATION OF TOTAL TENANT PAYMENT AND TENANT RENT**

The Total Tenant Payment and Tenant Rent will be calculated in accordance with the Public Housing Requirements unless superseded by the Applicable HUD Program Requirements.

6.      **GUESTS**

Resident is permitted to have a guest in the unit for no more than fourteen calendar days during a twelve month period. The term "guest" means a person temporarily staying in the Assisted Unit with the consent of Resident or other member of the household who has express or implied authority to so consent on behalf of the Resident. A household member who is absent from the unit because he or she (a) is attending college, (b) is on military duty, or (c) is under a joint custody arrangement will not considered a guest when he or she stays in the unit. Management may waive/extend the two week period of time solely at its own discretion, as circumstances warrant.

7.      **TRANSFERS**

Resident transfers will be conducted in accordance with the Public Housing Requirements unless superseded by the Applicable HUD Program Requirements.

8.      **GRIEVANCE POLICY AND PROCEDURE**

The Owner and the Management Agent will comply with HACA's Grievance Policy and Procedure, as set forth in the ACOP, with respect to the Assisted Units.

9.      **TERMINATION POLICY AND PROCEDURE**

The Owner and the Management Agent will comply with the requirements for a Termination by the Housing Authority, as set forth in the ACOP, with respect to the Assisted Units.

10.    **TENANT LEASE REQUIREMENTS**

The leasing requirements and lease terms must comply with the provisions set forth in 24 CFR 966, subpart A.  The tenant lease must also incorporate the requirements related to terminations and grievances set forth in Sections 8 and 9 above.

**10.1   Lease Termination**

(a)    By Owner: The lease is automatically renewable for a 12-month period. Leases can only be terminated for serious or repeated violation of material terms of the lease or other good cause consistent with the requirements of 24 CFR 966.

(b)    By Resident: The Resident may terminate the lease by providing the Agent 30-days written notice.

**10.2   Notice of Lease Termination**

The notice of lease termination to the Resident shall state specific grounds for termination, and shall inform the Resident of the Resident's right to make such reply as the Resident may wish.

(a)    When the Owner is required to· afford the Resident the opportunity for a grievance hearing, the notice shall also:

   1.    Inform the Resident of the Resident's right to request a hearing in accordance with the Grievance Procedure;

   2.    Specify the judicial eviction procedure to be used by the Owner for eviction of the Resident, and state that HUD has determined that this eviction procedure provides the opportunity for a court hearing that contains the basic elements of due process as defined in HUD regulations; and

   3.    State whether the eviction is for criminal activity or for drug related criminal activity.

(b)    When the Owner is not required to afford the Resident the opportunity for hearing under the Grievance Procedure, the notice of lease termination shall:

   1.    State that the Resident is not entitled to a grievance hearing on the termination;

   2.    Specify the judicial eviction procedure to be used by the Management Agent for eviction of the Resident, and state that HUD has determined that this eviction procedure provides the opportunity for a court hearing that contains the basic elements of due process as defined in HUD regulations; and

   3.    State whether the eviction is for criminal activity or for drug-related criminal activity.

Notwithstanding this provision, the requirements for security deposits shall comply with Section 2 above, and calculation of the Total Tenant Payment shall comply with Section 5 above.

## 11.    REASONABLE ACCOMMODATION POLICY

The Owner and the Management Agent will comply with the Reasonable Accommodation Policy set forth in the ACOP, as may be modified by the Consent Decree, with respect to the Assisted Units.

## 12.    PET POLICY

The Owner and the Management Agent will apply HACA's Pet Policy, as set forth in the ACOP, to the Assisted Units.

## 13.    AVAILABILITY OF DOCUMENTS

A copy of each of the following documents will either be posted in a conspicuous location at the management office for the site or will be provided to the Resident:

- The LTA Criteria;
- Schedule of maintenance charges;
- Dwelling Lease;
- Grievance Policy and Procedure;
- Fair Housing poster;
- Equal Opportunity in Employment poster;
- Required public notices;
- Schedule of Utility Allowance, as applicable;

Information on eviction for drug-related and other criminal activity

## 14.    RESIDENT PARTICIPATION

The Owner and the Management Agent will comply with the resident participation requirements set forth in the Applicable HUD Program Requirements.

In the event that the Applicable HUD Program Requirements do not set forth resident participation requirements, the Owner and the Management Agent will provide residents with those resident participation rights set forth in 24 CFR Part 245.

All residents in Assisted Units are eligible to participate in tenant council activities and also eligible to serve on the Resident Advisory Board and serve as commissioners at HACA.

## 15.    COMPLIANCE WITH APPLICABLE LAWS

This LTA Criteria shall not violate State or Federal law. In the event the admissions and leasing criteria are deemed to be in violation of either State or Federal law, or both, and in

the event that a waiver of any such law cannot be obtained, they shall be amended to ensure that said violations are cured and that they remain in compliance with applicable law.

**Attachment 3:  Certification**

## CERTIFICATION REGARDING TERMS IN THE REDEVELOPMENT AGREEMENTS

**Housing Authority of the City of Annapolis**

***White v. City of Annapolis*
Consent Decree**

**<u>Certification</u>**

Pursuant to paragraph 28 of the Consent Decree ("the Decree") in the above-captioned case**,** I certify that the terms in the Redevelopment Agreements (as defined therein), as set forth in paragraphs 28-31 of the Decree, have not been modified.

I attest that I am authorized to make this certification on behalf of the Housing Authority of the City of Annapolis.

_____          _____

(Print Name)                                                                    (Title)

_____

(Signature)

_____

(Date Signed)